**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

(Filed Electronically May 17, 2007)

| | | |
|---|---|---|
| RICHARD AND SUSAN CARY, et. al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 06-707 L |
| THE UNITED STATES, | ) | Senior Judge Wiese |
| Defendant. | ) | |

**PLAINTIFFS' SUPPLEMENT TO REQUEST TO CONDUCT DISCOVERY**

Plaintiffs, Richard and Susan Cary, et al., ("Plaintiffs") by and through their respective counsel, respectfully submit this Supplement to Plaintiffs' Request to Conduct Discovery dated May 7, 2007.

## I. FACTUAL BACKGROUND

This case is about Forest Service utilitarian policies and practices which have resulted in the preservation and conservation of natural resources and wildland recreational opportunities for the public at the expense of the destruction of private property adjacent to the Cleveland National Forest ("CNF"). Plaintiffs have not and do not argue before this Court the propriety or usefulness of either these policies or the Forest Service's actions, but instead have pled that the Government's practices, and the benefits derived therefrom, came with a foreseen price tag attached: alteration of the fire ecology in and around the CNF. In other words, the crux of Plaintiffs' Complaint is not that Defendant failed to take the appropriate care in crafting or implementing its management policies in and around the CNF, but instead that Plaintiffs, as adjacent landowners, should not be required to shoulder the costs associated with the

Government's deliberate policies. This burden is properly allocated to the public for whose benefit these practices have been followed for the past century.

The Government was fully aware of the cost outcome associated with its practices and policies in the CNF. For example, on December 4, 2003 (approximately one month after the Cedar Fire), Ray Quintanar, Director of Fire and Aviation Management for the USDA Forest Service, testified on the Forest Service's behalf before the Governor's Blue Ribbon Fire Commission in San Bernardino, California. With respect to the Cedar Fire, Mr. Quintanar expressed the Forest Service's knowledge as to the "incident of potential"[1], stating:

> ***I want you to realize that this was no surprise, what was happening here, what was about to happen***. If I look at the February seasonal fire outlook, the most critical areas that we identified in California were the southern forests, the four southern forests, where we have a significant population and limited means of egress into that area. The February seasonal fire outlook also, as we are looking again on those forests, the concentrations of standing and dead trees, as well as brush died back. The evacuation and firefighting efforts in these communities was in itself difficult and most dangerous, if it was to happen at all. ***The incident potential for this fire, as we look at that, existed for a long time***. ***This is nothing new that was happening***. It was well recognized early on that something needed to be done.[2]

Similarly, in its May 2004, Draft Land Management Plan for the Southern California National Forests, the Forest Service admits:

> Fire is a fact of life in southern California. Fire is not a question of if, rather, it is a question of ***when and how much***. . . . ***The situation is compounded by decades of fire suppression practices that have resulted in the development of unnaturally dense stands of trees and the accumulation of brush and other flammable fuels in many areas***.[3]

---

[1] State of California Governor's Blue Ribbon Fire Commission, Transcript of Proceedings, 12/04/03, San Bernardino, California, at 75.
[2] *Id.* at 75-76 (emphasis added).
[3] USDA, Forest Service, Pacific Southwest Region, Draft Land Management Plan Part 1: Southern California National Forest Vision, May 2004, atVision-6 (emphasis added).

The U.S. Forest Service's famous mission statement, "the greatest good for the greatest number in the long run"[4], as applied to the CNF, has provided San Diego County with potable water, preserved wildlife and archeological sites, and allowed the public access to the wildlands of Southern California, to name a few public benefits. The pursuit of these goals however, required the Forest Service to severely alter the natural fire regime in the CNF, with the specific knowledge that the resulting increased fuel loads would inevitably threaten adjacent private properties with fire spreading from the CNF to these properties.

## II. LEGAL ANALYSIS

### A. THE JURISDICTIONAL REQUIREMENTS APPLICABLE TO TAKINGS CLAIMS ARE UNIQUE

Generally, in order to establish the jurisdiction of the United States Court of Federal Claims over a dispute, a complaint must allege a non-frivolous claim based on a "Constitutional provision, statute or regulation . . . that is money-mandating." *Fisher v. United States,* 402 F.3d 1167, 1172-73 (Fed.Cir.2005). There is no dispute either that Plaintiffs' Complaint alleges a non-frivolous claim based on the Fifth Amendment of the United States Constitution or that the Takings Clause is a money-mandating provision. *See*, *Moden v. United States*, 404 F.3d 1335, 1341 (Fed.Cir.2005) ("Thus, to the extent [plaintiffs] have a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper.").

The unique development of inverse condemnation jurisprudence dictates a further examination by trial courts into the facts of the dispute, known as the "*Ridge Line* inquiry", in order to determine that treatment under the Takings Clause is appropriate. *See, Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed.Cir.2003). Recognizing that "[i]nverse condemnation law is tied to, and parallels, tort law", the *Ridge Line* Court clarified that "[t]he

[4] 1905 "Use Book", U.S. Department of Agriculture, Forest Service at 12.

line distinguishing potential physical takings from possible torts is drawn by a two-part inquiry." *Id.*

> First, a property loss compensable as a taking only results when the government intends to invade a protected property interest *or the asserted invasion is the direct, natural, or probable result of an authorized activity* and not the incidental or consequential injury inflicted by the action . . . . Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.

*Id.* at 1355-56 (internal quotation marks and citations omitted; emphasis added).

Accordingly, Plaintiffs have alleged in their Complaint a deliberate land management program conceived and executed by the Forest Service for the benefit of the general public, involving, *inter alia*, the suppression of all fires for the otherwise laudable purposes of protecting important natural resources and promoting relatively unfettered public access. Again, *the allegations of the Complaint* ***do not*** *concern themselves with the propriety of these policies or the competence of their execution, but rather with the foreseen, direct, natural, and probable consequences thereof: the alteration of the ecosystem of the CNF from a landscape of smaller seasonal wildfires into one of significantly less frequent, but proportionately larger mega-fires.*

### B. THERE IS A RECOGNIZED NEED FOR DISCOVERY BEFORE MAKING A FACT-BASED DETERMINATION AS TO WHETHER A CLAIM IS A TAKING OR A TORT

Defendant has moved this Court for judgment on the pleadings and dismissal for failure to state a claim upon which relief can be granted, or in the alternative, for lack of jurisdiction pursuant to RCFC 12(b)(1). Defendant claims that "for purposes of its motion for judgment on

the pleadings, Defendant assumed the truth of Plaintiffs' factual allegations"[5], however, the Federal Circuit requires a trial court to apply the two-part *Ridge Line* inquiry when the Government challenges jurisdiction on the basis that a claim sounds in tort. *See*, *Ridge Line*, 346 F.3d at 1355-56. As such, Defendant's claim that it assumed the truth of Plaintiffs' factual allegations for purposes of its motion is both erroneous in that its motion denies allegations in the Complaint and misleading in that Defendant's assumption of the truth of facts in the Complaint simply does not exhaust the *Ridge Line* inquiry nor does it relieve the Court of its duty to decide jurisdictional matters.

For example, Plaintiffs allege in the Complaint that "DEFENDANT was or should have been aware that its land management polices… created a significant risk that a wildfire originating in the CNF… would spread to adjacent landowners' properties…"[6], and that "one of the DEFENDANT'S land management policies was to permit public recreational access to and use of the CNF for hunting purposes during heightened fire hazard conditions, ***despite the known risk of a fire being started by a hunter***… and despite the known risk that any such fire caused by a hunter… would likely lead to a wildfire spreading to neighboring privately owned properties."[7] However, Defendant specifically denies these allegations in its motion where it argues that it:

> could not have foreseen, as a direct, natural, and probable consequence [sic] of its decisions to suppress forest fires and permit public use of public lands, that… a lost hunter would take the inadvisable, and illegal, step of setting a signal fire.[8] [And a]ny damage caused by the Cedar Fire… could not have been seen as a natural consequence of the Forest Service's policy...[9]

---

[5] Defendant's Opposition to Plaintiffs' Request for Discovery, dated May 2, 2007 at p. 2.
[6] Complaint at ¶ 42.
[7] Complaint at ¶ 45 (emphasis added).
[8] Defendant's Motion for Judgment on the Pleadings at 9.
[9] Id. at 7.

Because of the tension between the federal requirement of notice pleading and the uniquely substantive, fact-intensive nature of the *Ridge Line* inquiry as a jurisdictional requirement,[10] reversible error could occur if Plaintiffs are required to prove that a taking occurred without the opportunity to conduct discovery. A recent decision, citing the application of *Ridge Line* in both the Court of Federal Claims and the Federal Circuit, held that "[b]ecause this inquiry is fact based… it is conducted after discovery, either on a motion for summary judgment or following trial." *Tommaseo v. United States*, 75 Fed.Cl. 799 (2007) (publication page references not yet available).

### C. FORESEEABILITY IS AN INDISPENSABLE ELEMENT OF TAKINGS CLAIMS FOUNDED ON AN IMPLIED INTENT

The first prong of the *Ridge Line* test requires a deliberate action on the part of the Government in order to prove a taking. This may be found either by an express intent to take the property at issue, or by an implied intent, due to the fact that the "authorized activity" carries with it a "direct, natural, or probable result" such that the Government may be charged with contemplating same when implementing its program.[11] Courts impose this requirement because "the Government must be held responsible for the foreseeable consequences [of its actions] to the [plaintiff's property]." *Eyherabide v. United States*, 345 F.2d 565, 570 (Ct.Cl. 1965). In fact, "an inverse condemnation plaintiff must prove that the government should have predicted or foreseen the resulting injury." *Moden*, 404 F.3d at 1343. This is an objective standard, and may be proven by showing that the asserted taking was "the direct or necessary result of the

[10] Although a jurisdictional question, "the government's challenge is based on one of the substantive issues of the takings analysis (*i.e.*, whether the action resulted in a taking)". *Hansen v. United States*, 65 Fed.Cl. 76, 95 (2005) (citing *Lockheed Martin Corp. v. United States, 50 Fed.Cl. 550, 553* (2001), *aff'd*, 48 Fed.Appx. 752 (Fed.Cir.2002)).

[11] "[I]t [is] clear that destruction and invasion of private property that is even the collateral result of government action can result in a compensable taking." *Hansen*, 65 Fed.Cl. at 103 (citing *Pumpelly v. Green Bay Co.*, 80 U.S. 166 (1871)).

[Government's] act or because it was within the contemplation of or reasonably to be anticipated by the government." *Id*. at 1344, fn. 3 and 1343, fn. 2 (internal quotation marks omitted).

Therefore, the need for inquiry into the likelihood of the outcome of the Government's actions, *i.e.* the foreseeability of the damage to Plaintiffs' properties, does not convert Plaintiffs' takings claim into one sounding in tort, but rather is a proper application of the *Ridge Line* test. The Cedar Fire may have been the largest fire in California's history, despite the vast amount of technology and resources invested in fire protection in California. Fire protection however, is not the issue in this case. Plaintiffs have alleged and believe through investigation already conducted that through discovery will be able to prove that the spread of the Cedar Fire was not only the "direct, natural, [and] probable" result of Defendant's authorized land management and fire prevention policies but *was actually foreseen by the Government decades ago*.

Because fire is a natural, seasonal element in the CNF, the alteration of the forest's fire regime is analogous to the damming of a river in seasonal flood ecologies. Even though dams are generally seen as promoting "the greatest good for the greatest number in the long run" by providing, *e.g.*, recreational areas, clean electricity, and municipal water reserves, it is well settled that the cost of damming a river – altering the local flood cycle – may result in a taking of adjacent private property. Courts have long held that recurring flooding of private property (above the ordinary high-water mark) which results from an authorized government action such as the construction of a dam constitutes a Fifth Amendment taking. *See, United States v. Twin City Power Co.*, 350 U.S. 222 (1956); *United States v. Willow River Power Co.,* 324 U.S. 499, 509 (1945). Just as a disturbance to a waterway can lead to predictable, substantial flooding on adjacent properties, disturbance to the fire regime in the CNF directly, naturally, and probably led to the magnitude and spread of the Cedar Fire and the resulting damage to Plaintiffs' properties, as predicted by Defendant. Again, Plaintiffs assert that the Constitution requires the

public, not adjacent landowners, to bear the cost of years of protecting water and other natural resources for public use.

### D. DEFENDANT PREDICTED AND FORESAW THE RESULTING INJURY TO PLAINTIFFS' PROPERTY

In *Ridge Line*, the Federal Circuit recognized that "inverse condemnation law is tied to, and parallels tort law." 346 F.3d at 1355. That is, the *Ridge Line* "tort-taking inquiry in turn requires consideration of whether the effects… experienced were the predictable result of the government's action, and whether the government's actions were sufficiently substantial to justify a takings remedy." However, Defendant confuses the foreseeability of ***Plaintiffs' injuries*** with the foreseeability of a "lost hunter… setting a signal fire."[12] The standard set out by the Federal Circuit requires that plaintiff prove that the government should have predicted or foreseen ***the resulting injury***." *Moden* 404 F.3d at 1343 (emphasis added). As previously indicated, Defendant has not only admitted that it should have, but also that it in fact did predict and foresee Plaintiffs' injuries.

In 1974, the USDA Forest Service specifically acknowledged that the natural and seasonal fire ecology in the Southern California Forests had been disturbed by Defendant's management practices and that "fuel modification is required to prevent California conflagration fires".[13] As noted below, however, such fuel modification has been severely limited (for the same reasons the natural fire regime was interrupted) by other natural resource objectives, such as protecting San Diego's watershed, preserving endangered species, and granting public access

---

[12] Defendant's Motion for Judgment on the Pleadings at 9.
[13] USDA FS General Technical Report PSW-7 / 1974 at 6.

to California wildlands to name a few. As such, Defendant not only should have foreseen, but in fact, knew that its policies would result in Plaintiffs' injuries.

That the Cedar Fire was ignited by a lost hunter is not an intervening cause that makes Plaintiffs' injuries unforeseeable. In fact the ignition itself was a foreseeable event. The Forest Service's own research regarding fire ignitions in the CNF informed Defendant that human ignitions were the source of 921 fires in the CNF in the 1990s, as opposed to 75 lightning ignitions.[14] Notwithstanding, Plaintiffs' injuries were the result of Defendant's authorized activities which caused a typical seasonal fire to become a conflagration, not unlike a typical snow melt becoming a flash flood. Even if the ignition by a lost hunter were an intervening cause with respect to the time of the ignition, just because "injury *may* not be foreseeable if an intervening cause breaks the chain of causation" it does not follow that the injury *was not* or *should not have been* foreseen. *Moden* 404 F.3d at 1344. The Federal Circuit has explicitly rejected the "remoteness of cause defense" with respect to inverse condemnation. *Id.* Even where the authorized activity is remote, such as erecting a dam (or accumulating unnatural fuel loads in a Southern California forest), where the flooding of land (or the spread of a conflagration fire) is foreseeable there is no intervening cause breaking the chain of causation. *Id.* at 1343-44.

Again, the Forest Service has admitted that "Long-standing fire suppression practices have resulted in dense undergrowth buildup in some forests, depleting health and resiliency of forests and grasslands to fire and pests. This buildup of fuels can become a tinder box even under

[14] Draft Environmental Impact Statement for Revised Land Management Plans, Pacific Southwest Region, R5-MB-045, May 2004, at Table 110.

such natural conditions as drought or extreme fire seasons."[15] As such, Defendant cannot claim that the natural ecology of the Southern California forests caused Plaintiffs' injuries. Because Defendant not only "should have predicted or foreseen the resulting injury" but has admitted on numerous occasions that it in fact did predict and foresee the resulting injury from the management practices alleged by Plaintiffs, Plaintiffs have properly plead an inverse condemnation claim. And because Plaintiffs have not alleged any wrongdoing or even questioned Defendant's rationale for its management policies, it cannot even be inferred that Plaintiffs have alleged a tort.

### E. THE UNITED STATES RECEIVED A BENEFIT AT THE EXPENSE OF THE OWNERS OF PROPERTY ADJACENT TO THE CNF.

Plaintiffs have alleged in the Complaint and can prove the second prong of the *Ridge Line* inquiry, that the predicted spread of fire such as the Cedar Fire from the CNF to Plaintiffs' properties appropriated a "benefit to the government at the expense of the property owner[s], or at least preempt[ed] the owner's right to enjoy his property for an extended period of time." *Ridge Line, Inc.*, 346 F.3d at 1356.

Notwithstanding that Plaintiffs are claiming a right to "just compensation" for property *destroyed* by the Cedar Fire (thus meeting the requirement that the right to enjoy the property alleged taken must be preempted "for an extended period of time"), Plaintiffs have pled and with discovery expect to be able to prove, that multiple benefits accrued to the Government as a result of the taking in this case. For example, Defendant is in possession of documents showing that a

[15] USDA, Forest Service Performance and Accountability Report – Fiscal Year 2003.

primary use of the CNF is its watershed, which supplies water to San Diego County.[16] In 1912, District Forester, L.A. Barrett wrote, "The Cleveland Forest is, and always will be, chiefly valuable for watershed protection purposes only."[17] However, protecting the CNF's watershed necessarily entails a cost: suppression of fires in order to minimize particulate contamination and pollution as a result of subsequent erosion. One of the earliest Technical Reports issued by the Forest Service's Pacific Southwest Forest and Range Management Station stated, "For the country as a whole, the current level of fire protection has greatly reduced the hydrologic importance of fire from what it was several decades ago. Where severe, widespread wildfire still occurs, as in some areas of the West, fire is still a serious threat to watersheds."[18]

While prescribed fire has been a known solution to the unnatural fuel load build-up in the CNF, competing public interests severely limit this as a viable alternative. For example, a 1998 study by the USDA Forest Service asked Forest Service "Fuels Management Officers" to rate fourteen factors on a five-point "scale of importance" representing "the degree to which each factor imposed a barrier to expanding the use of prescribed fire."[19] The highest mean rating was "the environmental factor" which included "laws to protect water quality, endangered species, archeological sites, and other resource values."[20] In a Forest Service document titled "Southern California Fuels Treatment Effectiveness Review", Mike Benefield, discussing the effect of

---

[16] See Michael Sakarias, *The Journal of San Diego History*, Fall 1975, Volume 21, Number 4 (citing multiple Forest Service documents pertaining to the CNF which are believed to be in Defendant's exclusive custody or control).

[17] Michael Sakarias, supra (citing the Barrett Report, March 30, 1912, believed to be in Defendant's exclusive custody or control).

[18] USDA Forest Service, General Technical Report PSW- 18/1976.

[19] Influences on Prescribed Burning Activity in the United States National Forest System, IFFN No. 19 – September 1998, at 43-46

[20] Id.

prescribed burns in the CNF and the Cedar Fire, wrote, "the three prescribed fires… had served to deflect the spread, while taking the flaming front out of the Cedar Fire."[21] However, Mr. Benefield added:

> Due to resource constraints, fuels treatments including prescribed burning are often restricted from riparian areas. During the Cedar Fire, in one such area where fuels treatment was omitted because of concern for the critical habitat of the Arroyo Toad, the fire spotted into the untreated riparian vegetation and moved up Indian Creek towards the top of Laguna Mountain.[22]

Such admissions that the spread of the Cedar Fire from the CNF to Plaintiff's properties was the direct, natural, and probable result of authorized government activities which appropriated many specific benefits to the public at the expense of Plaintiffs property interests are only the tip of the iceberg. Plaintiffs are informed and believe that Defendant possesses reports and other documents memorializing not only Defendant's knowledge that its land and resource management policies created over the last century an unnaturally dense fuel load in the CNF, but also the multitude of public benefits conferred by these utilitarian policy decisions. Provided the opportunity to conduct discovery, Plaintiffs will be able to prove that this Court has jurisdiction over this matter.

## III. <u>LIMITED DISCOVERY</u>

Plaintiffs are aware of specific documents and narrow categories of discovery that will support Plaintiffs' allegations of inverse condemnation and will prove by a preponderance of evidence that this Court has jurisdiction over this matter. Specifically, Plaintiffs are informed and believe that Defendant possesses documents including but not limited to:

---

[21] Southern California Fuels Treatment Effectiveness Review, Mike Benefield, Assistant Fire Staff, Central Oregon Fire Management Service.
[22] Id.

1. Land Management Plans for the CNF for the years 1983-2003 (documenting Defendant's knowledge, policy goals, and calculated risks taken with respect to fires spreading from the CNF to adjacent properties)
2. Forest Service document titled "Changing Social and Legal Forces Affecting The management of National Forests", 1997, by Diana Dravenieks Apple, a Strategic Planner with the Forest Service (describing the competing interests and forest uses that resulted in the accumulation of unnatural fuel loads in the CNF alleged by Plaintiffs)
3. Forest Service document titled "Fire and Fuels Buildup", 2003 (acknowledging the effectiveness of fuel reduction in reducing catastrophic fire)
4. Barrett report, March 30, 1912 (District Forester, L.A. Barrett stating "The Cleveland Forest is, and always will be, chiefly valuable for watershed protection purposes only.")
5. Cleveland National Forest, Land Classification Order - Recreational Plan, 1920 (indicating that recreational had become a second priority to watershed protection in the CNF.)
6. Cleveland National Forest, Grazing Report, 1926, 1927 (stating that sheep were experimented with (but discontinued) for fuel reduction on Laguna Mountain, indicating Defendant's knowledge of the need for fuel reduction)
7. Cleveland National Forest, Recreational Plan, 1937 (describing CNF usage priority as: (1) watershed; (2) recreation; (3) grazing; and (4) timber)
8. The Leopold Report, 1963 (advising Defendant that "biotic management" is necessary and that total fire suppression is adverse to ecosystem)
9. USDA FS General Technical Report PSW-7 / 1974 (USDA FS, Clive Countryman, recognizes fuel modification as only solution to So Cal conflagration problem)
10. USDA, Influences on Prescribed Burning Activity in the United States National Forest System, IFFN No. 19 – September 1998, p. 43-46 (USDA FS survey reporting that USDA FS "Fuel Management Officers" find environmental laws protecting water, endangered species, archaeological sites, and other natural resources to be greatest barrier to use of prescribed fire)
11. Southern California Fuels Treatment Effectiveness Review (2003) (explaining that the 2001 and 2002, prescribed burns in the CNF allowed Fire Fighters to protect Pine Creek, while excluded riparian vegetation (to protect endangered Arroyo Frog) allowed Cedar Fire to spread up Laguna Mountain)
12. Federal Wildland Fire Management Policy Report (2001) (explaining evolution of wildland fire policy)

While the above are specific documents known to Plaintiffs, there are also limited categories of discovery that Plaintiffs reasonably believe will support Plaintiffs' "takings" allegations. For example, Plaintiffs seek Technical Reports that examine the issues of fire and fuels management in the CNF, Technical Reports that examine watershed protection in the CNF, and "Schedules of Proposed Actions" ("SOPA") in the CNF that relate to prescribed burns prior to October 25, 2003.

Even if traditional discovery is not permitted prior to responding to Defendant's allegation that Plaintiffs' claims do not comport with the *Ridge Line* inquiry, limited discovery consisting of these few narrow categories of documents – the specific documents identified above and corresponding interrogatories – will confirm Plaintiffs' allegations that the spread of the Cedar Fire from the CNF to Plaintiffs' property was the "direct, natural, or probable result of an authorized activity" and that the invasion "appropriate[d] a benefit to the government at the expense of the property owner." *Ridge Line*, 346 F.3d at 1355-56. Additionally, discovery will support and frame Plaintiffs' allegations of inverse condemnation so that Defendant can directly respond to the claims against it.

## IV. CONCLUSION

For the reasons explained above, this Court should find that it has jurisdiction to hear Plaintiffs' Fifth Amendment Takings claim, or at a minimum permit Plaintiffs to conduct discovery in order to meet the required burden of proof.

Dated this 17th day of May, 2007

Respectfully submitted,

/s/ Mark S. Grotefeld

Mark S. Grotefeld
GROTEFELD & DENENBERG, L.L.C.
105 West Adams Street, Suite 2300
Chicago, Illinois 60603
Telephone: (312) 601-2398
Facsimile: (312) 601-2402

Counsel for Plaintiffs.

SF# 14074