**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

(Filed Electronically July 20, 2007)

| | | |
|---|---|---|
| RICHARD AND SUSAN CARY, et al., on behalf of themselves and all others similarly situated, who sustained damage to a property interest as a result of the Cedar Fire | ) | No. 06-707 L |
| Plaintiffs, | ) | Senior Judge Wiese |
| vs. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiffs, RICHARD AND SUSAN CARY, et al., by and through their counsel, GROTEFELD & HOFFMANN, LLP, and pursuant to this Court's Order dated March 27, 2007, respectfully submit this Opposition to Defendant's Motion for Judgment on the Pleadings.

This Opposition is based upon Rules 12(c), 12(b)(6), and 12(b)(1) of the Rules of the Unites States Court of Federal Claims, the United States Constitution, relevant case law, and the attached Memorandum of Points and Authorities. Plaintiffs' Complaint properly asserts a non-trivial Fifth Amendment Takings Claim against the United States, and Plaintiffs should be allowed to proceed to trial on this matter.

Dated: July 20, 2007

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

I. QUESTION PRESENTED ..... 1

II. STATEMENT OF THE CASE ..... 1

III. ARGUMENT ..... 2

A. STANDARD OF REVIEW ..... 2

B. BECAUSE THE JURISDICTIONAL ISSUES RAISED BY DEFENDANT NECESSARILY INVOLVE A DETERMINATION OF THE MERITS OF THE CASE, PLAINTIFFS SHOULD BE ALLOWED TO CONDUCT DISCOVERY BEFORE THE COURT RULES ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS. ..... 3

C. DEFENDANT'S CHARACTERIZATION OF PLAINTIFFS' COMPLAINT AS A "TORT CLAIM" IS ERRONEOUS. ..... 4

1. The Negligent Firefighting Cases Relied Upon by Defendant Do Not Apply to This Dispute. ..... 6

a. Thune v. United States ..... 7

b. Teegarden v. United States ..... 7

2. Arguments in Some of the Flood Cases Are Applicable by Analogy to the Current Dispute. ..... 8

D. PLAINTIFFS' COMPLAINT PROPERLY ALLEGES A FIFTH AMENDMENT TAKINGS CLAIM. ..... 9

1. Defendant is Appropriately Charged with the (Implied) Intent to Take Plaintiffs' Property as the Natural Result of Its Authorized Land Management Policies Functioning as Designed. ..... 10

a. Defendant Not Only Should Have But in Fact Did Foresee Plaintiffs' Injuries. ..... 15

b. The Ignition of the Cedar Fire Was Not an Intervening Cause. ..... 17

2. Defendant's Land Management Policies Appropriated a Benefit to the Government at Plaintiffs' Expense. ..... 19

TABLE OF CONTENTS (CON'T)

E. DEFENDANT'S FORESEEABILITY AND CAUSATION ARGUMENTS DO NOT RELIEVE THE GOVERNMENT OF THE CONSTITUTIONAL OBLIGATION TO PAY "JUST COMPENSATION". ....21

1. A Claim for Inverse Condemnation Is Not Defeated by the Presence of Other "Contributing Factors". ....21

2. An Intent to Avoid Property Damage by Fire Does Not Defeat Plaintiffs' Taking Claim. ....23

IV. CONCLUSION ....24

## TABLE OF AUTHORITIES

### CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ........................................ 3

### STATUTES

5 U.S.C. Appendix 2 ("Federal Advisory Committee Act") ........................................ 10

16 U.S.C. §475 et seq. ("Organic Administration Act") ........................................ 10. 11, 20

16 U.S.C. §1531 et seq. ("Endangered Species Act") ........................................ 10

16 U.S.C. §1600 et seq. ("National Forest Management Act") ........................................ 10

28 U.S.C. §1346(b)(1) ("Federal Tort Claims Act") ........................................ 5

28 U.S.C. §1491 ("Tucker Act") ........................................ 3, 4

33 U.S.C. §1251 et seq. ("Clean Water Act") ........................................ 10

42 U.S.C. §4321 et seq. ("National Environmental Policy Act") ........................................ 10

42 U.S.C. §7401 et seq. ("Clean Air Act") ........................................ 10

### CASES

*Avery v. United States*, 165 Ct.Cl. 357, 330 F.2d 640 (1964) ........................................ 4-5

*Berenholz v. United States*, 1 Cl.Ct. 620 (1982) ........................................ 5, 6

*Catellus Devel. Corp. v. United States*, 26 Cl.Ct. 210 (1992) ........................................ 4

*Cotton Land Co. v. United States*. 109 Ct.Cl. 816, 75 F.Supp. 232 (1948) ........................................ 12-14, 17-18

*Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998) ........................................ 6

*El-Shifa Pharm. Indus. v. United States*, 378 F.3d 1346 (Fed. Cir. 2004) ........................................ 5-6

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005) ........................................ 3, 9

*Gould Inc. v. United States*, 935 F.2d 1271 (Fed. Cir. 1991) ........................................ 2

## TABLE OF AUTHORITIES (CON'T)


*Hansen v. United States,* 65 Fed. Cl. 76 (2005)....4

*J.M. Huber Corp. v. United States*, 27 Fed.Cl. 659 (1993)....2

*Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368 (Fed. Cir. 1994)....2

*Moden v. United States*, 404 F.3d 1335 (Fed. Cir. 2005)....4-5, 9, 17

*Napier v. F/V DEESIE, Inc.*, 454 F.3d 61 (1st Cir. 2006)....22

*Pashley v. United States*, 140 Ct.Cl. 535, 156 F.Supp. 737 (1957)....23

*Pixton v. B & B Plastics, Inc.*, 291 F.3d 1324 (Fed. Cir. 1998)....2

*Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746 (Fed. Cir. 1988)....2

*Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed. Cir. 2003)....3, 10, 12, 19

*Rith Energy, Inc. v. United States*, 247 F.3d 1355 (Fed. Cir. 2001)....6

*Sanguinetti v. United States,* 264 U.S. 146 (1924)....12

*Teegarden v. United States*, 42 Fed. Cl. 252 (1998)....6, 7-8

*Thune v. United States*, 41 Fed. Cl. 49 (1998)....6-7, 22

*Tommaseo v. United States*, 75 Fed .Cl. 799 (2007)....3-4

*United States v. Twin City Power Co.,* 350 U.S. 222 (1956)....9

*United States v. Willow River Power Co.,* 324 U.S. 499 (1945)....9

*Vaizburd v. United States,* 384 F.3d 1278 (Fed. Cir. 2004)....12, 19


## RULES OF THE COURT OF FEDERAL CLAIMS


RCFC 12(b)(6)....2

RCFC 12(c)....2

RCFC 26(c)....4

## TABLE OF AUTHORITIES (CON'T)

### SECONDARY AUTHORITIES

Benefield, Mike, *Southern California Fuels Treatment Effectiveness Review*........................ 20-21

*Fire Restriction and Closure Plan for Cleveland National Forest*.........................................11, 23

Haines, Terry, et al., USDA Forest Service, *Influences on Prescribed Burning Activity in the United States National Forest System*, International Forest Fire News, September, 1998 ...........16

*Review and Update of the 1995 Federal Wildland Fire Management Policy*........................11, 20

State of California Governor's Blue Ribbon Fire Commission, Transcript of Proceedings, 12/04/03, San Bernardino, California ....................................................................................15

U.S. General Accounting Office, GAO/T-RECED-98-273, *Western National Forests: Catastrophic Wildfires Threaten Resources and Communities* 1 (1998).......................................14

*Urban Wildland Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire*, 66 Fed. Reg. 43,384 (August 17, 2001)..................................................15

USDA Forest Service, *California Fire Siege 2003: The Story*...................................................11

USDA Forest Service, *Draft Environmental Impact Statement for Revised Land Management Plans, Pacific Southwest Region* ("2004 EIS"), R5-MB-045, May 2004 ..............................18, 20

USDA Forest Service, *Draft Land Management Plan Part 1: Southern California National Forest Vision*, May 2004............................................................................................ 15-16

USDA Forest Service, Gen. Tech. Rep. PSW-7, *Can Southern California Wildland Conflagrations be Stopped?* (1974)........................................................................16, 23

USDA Forest Service, *The Use of the National Forest Reserves: Regulations and Instructions* (1905)..........................................................................................................17

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. QUESTION PRESENTED

Whether Plaintiffs' Complaint asserts a proper "takings" claim based upon the Fifth Amendment of the United States Constitution.

## II. STATEMENT OF THE CASE

This action arises out of the destruction of Plaintiffs' real and personal property in the Cedar Fire, which originated in the Cleveland National Forest ("CNF") on or about October 25, 2003. Plaintiffs have alleged, and Defendant agrees, that the Cedar Fire began as a small signal fire started by a lost hunter in the CNF. (Complaint, ¶20; Defendant's Motion for Judgment on the Pleadings ("Motion"), p. 2.)

The crux of this dispute is not what caused the Cedar Fire, but instead what caused Plaintiffs' injuries. Due to weather, topography, and vegetation, wildfire is an unavoidable and undisputed fact of life in Southern California generally. Plaintiffs' Complaint asserts that nearly a century of prioritizing the natural resources (such as endangered species, timber, watersheds, and vistas) and the recreational use of its national forests, including the CNF, came with a *known* price tag attached: the creation of wildlands prone to large, uncontrollable conflagrations.

Plaintiffs' Complaint disputes neither the propriety of these practices nor the proficiency with which Defendant carried out its land management policies. Plaintiffs assert that because the public has reaped the benefits of these policies through, *inter alia*, the sale of timber, the protection of ecological diversity and clean water and air, and the use of forest lands for recreation, the Plaintiffs should not be required to shoulder the associated costs. The Constitution requires that this burden be borne by the public.

On April 20, 2007, Defendant filed its Motion for Judgment on the Pleadings. Pursuant to this Court's Order of March 27, 2007, Plaintiffs filed a Status Report requesting limited discovery for the purpose of responding to Defendant's jurisdictional allegations. Defendant's Opposition to the request and Plaintiffs' Reply thereto were filed on May 2, 2007 and May 7, 2007, respectively. Plaintiffs also filed a Supplement to Request to Conduct Discovery on May 17, 2007. Plaintiffs' request for discovery was denied, and an Order Establishing Briefing Schedule was filed on May 22, 2007.

## III. ARGUMENT

### A. STANDARD OF REVIEW

The Court of Federal Claims has adopted a "strict standard" in ruling on Motions for Judgment on the Pleadings pursuant to Rules of the Court of Federal Claims ("RCFC") 12(c) and 12(b)(6). *J.M. Huber Corp. v. United States*, 27 Fed. Cl. 659, 662 (1993). In order to meet this burden, Defendant must prove "to a certainty that [Plaintiffs are] entitled to no relief under any state of facts which could be proved in support of [their] claim." *Id.* Moreover, a court must "assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the non-movant". *Gould Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

Because Defendant's Motion also challenges subject matter jurisdiction, Plaintiffs bear "the burden of establishing that such jurisdiction exists." *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1372 (Fed. Cir. 1994). "When a party has moved to dismiss for lack of subject matter jurisdiction, we view the alleged facts in the complaint as true, and if the facts reveal any reasonable basis upon which the non-movant may prevail, dismissal is inappropriate." *Pixton v. B & B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 1998). In making this determination, the "court may consider relevant evidence in order to resolve [a] factual dispute." *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988).

**B. BECAUSE THE JURISDICTIONAL ISSUES RAISED BY DEFENDANT NECESSARILY INVOLVE A DETERMINATION OF THE MERITS OF THE CASE, PLAINTIFFS SHOULD BE ALLOWED TO CONDUCT DISCOVERY BEFORE THE COURT RULES ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS.**

The Fifth Amendment to the Constitution provides, in pertinent part, "nor shall private property be taken for public use, without just compensation." The unique development of inverse condemnation jurisprudence dictates an examination into the facts of the dispute to determine that treatment under the Takings Clause is appropriate. *See, Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003). Recognizing that "[i]nverse condemnation law is tied to, and parallels, tort law", the *Ridge Line* Court clarified that "[t]he line distinguishing potential physical takings from possible torts is drawn by a two-part inquiry." *Id.*

> First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action . . . . Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.

*Id.* at 1355-56 (internal quotation marks and citations omitted). Much like in other actions brought under the Tucker Act (28 U.S.C. §1491), the "neat division between jurisdiction and merits has not proved to be so neat. In these cases, involving suits against the United States for money damages, the question of the court's jurisdictional grant blends with the merits of the claim." *Fisher v. United States*, 402 F.3d 1167, 1171-72 (Fed. Cir. 2005) (en banc).

Because of the tension between the federal requirement of notice pleading and the uniquely substantive, fact-intensive nature of the *Ridge Line* inquiry as a jurisdictional requirement, Plaintiffs should not effectively be required to prove that a taking occurred without the opportunity to conduct discovery. *Tommaseo v. United States*, 75 Fed. Cl. 799, 804 (2007)

("Because [the *Ridge Line*] inquiry is fact based... it is conducted after discovery, either on a motion for summary judgment or following trial."); *Catellus Devel. Corp. v. United States*, 26 Cl.Ct. 210, 215 (1992) ("plaintiff must be permitted to continue its discovery if it has the proclivity of unearthing operative facts critical to the dispositive motion.").

Without an opportunity for discovery, Plaintiffs are held to the burden of proving the requisite probability and foreseeability that Defendant's policies resulted in a Fifth Amendment taking, without disclosure of the very Government correspondence, technical reports, and other documents known to exist that evince the deliberate and informed decisions distinguishing Plaintiffs' claims from those sounding in tort. Mindful of the need to protect parties from "annoyance, embarrassment, oppression, or undue burden or expense", Plaintiffs renew their request that they be allowed limited discovery in order to properly respond to the jurisdictional questions raised by Defendant. *See* RCFC 26(c).

**C. DEFENDANT'S CHARACTERIZATION OF PLAINTIFFS' COMPLAINT AS A "TORT CLAIM" IS ERRONEOUS.**

The distinction between takings and torts has been approached in various and inconsistent ways over the years. In a recent opinion, Judge Block acknowledged:

> Despite the Serbonian Bog into which the takings jurisprudence of this court has fallen, the historical origin and application of the basic principles of takings jurisprudence reveal that there is no clear cut distinction between torts and takings. The best that can be said is that not all torts are takings, but that all takings by physical invasion have their origins in tort law and are types of governmental nuisances or, at times, trespasses.

*Hansen v. United States,* 65 Fed. Cl. 76, 80 (2005). The interconnectedness between these two bodies of law is further illustrated by the direct application of tort law to takings cases. *See, e.g.*, *Moden v. United States*, 404 F.3d 1335, 1343-44 (Fed. Cir. 2005) (citing its predecessor's application of "the law of torts" to a takings claim to determine if an "intervening cause [broke]

the chain of causation" as set forth in *Avery v. United States*, 165 Ct.Cl. 357, 330 F.2d 640, 644-45 (1964)).

Drawing a distinction between a taking claim and a claim for damages that sounds in tort – however approached in the past – remains critical to determining whether this Court may adjudicate a case. *See* 28 U.S.C. §1491; *see also*, *Berenholz v. United States*, 1 Cl.Ct. 620, 626-27 (1982). Frankly, there are aspects to the events of the Cedar Fire that Plaintiffs believe amount to actionable negligence on the part of the Government. Accordingly, Plaintiffs filed a separate lawsuit pursuant to the Federal Tort Claims Act ("FTCA"). *See*, 28 U.S.C. §1346(b)(1). Defendant is aware of this lawsuit and seems to imply that the claim before this Court is little more than a "semantic ploy[]", asserting that "a plaintiff may not simply recast [a tort] claim as a taking."[1] (Motion, p. 10.)

By further claiming that the tort-based complaint filed in district court "alleg[es] the same operative facts" as the Complaint before this Court (Motion, p. 3), Defendant seems to imply that the same operative facts may not give rise to both a taking and a tort, which was the stance taken by the *Moden* trial court. *See*, 60 Fed. Cl. at 288. Even if this statement were true[2], it is not a permissible basis on which to deny jurisdiction over a takings claim. In *El-Shifa Pharm. Indus. v. United States*, the Court of Appeals for the Federal Circuit affirmed:

---

[1] Defendant also asserts that the Complaint states a tort claim because Plaintiffs cannot show that the damage they suffered was a direct, natural, and probable consequence of authorized governmental projects. (S*ee*, Motion, pp. 9-12). This argument concerns the causation requirement of the *Ridge Line* inquiry and is addressed fully in section III.D.1., *infra*.

[2] Plaintiffs seriously dispute this conclusion. The complaint filed in the United States District Court for the Southern District of California is based upon the actions (or failures to act) of the United States Forest Service employees on or about October 25, 2003, the day the Cedar Fire began. Claims are made for negligent fire suppression, *per se* negligent fire suppression, premises liability, and trespass. The Complaint before this Court, on the other hand, asserts that the damage to Plaintiffs' properties was the direct and foreseeable (and *foreseen*) result of the land management practices and policies implemented over the last century in the CNF.

> That the complaint suggests the United States may have acted tortiously towards the appellants does not remove it from the jurisdiction of the Court of Federal Claims. To the contrary:
>
> > If the government appropriates property without paying just compensation, a plaintiff may sue in the Court of Federal Claims on a takings claim regardless of whether the government's conduct leading to the taking was wrongful, and regardless of whether the plaintiff could have challenged the government's conduct as wrongful in another forum.
>
> *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1353 (Fed. Cir. 1998); *see also Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1365 (Fed. Cir. 2001) ("[A] takings claim lies, as long as the government's action was authorized, even if the government's action was subject to legal challenge on some other ground.").

378 F.3d 1346, 1353 (Fed. Cir. 2004). The fact Plaintiffs have made claims of negligence in another court is simply not relevant to the determination of whether the Complaint before this Court states a proper cause of action under the Fifth Amendment.

Unlike the Plaintiffs' tort claims, including allegations that the Government *acted* negligently in response to the Cedar Fire, this Complaint contemplates the Government's land use *policies* and the natural, foreseeable, and foreseen results of those policies. Because the Complaint addresses the foreseeable consequences of a deliberately conceived governmental program, Defendant's motion should be denied. *See*, *Berenholz*, 1 Cl.Ct. at 628. The only wrongdoing alleged in the Complaint is Defendant's failure to compensate Plaintiffs for the property interests taken by the United States for the benefit of the public.

**1. The Negligent Firefighting Cases Relied Upon by Defendant Do Not Apply to This Dispute.**

Similarly, the negligent firefighting cases relied upon by Defendant, namely *Thune v. United States*, 41 Fed. Cl. 49 (1998) and *Teegarden v. United States*, 42 Fed. Cl. 252 (1998), do not apply to the facts of this dispute. Although at first glance cases may seem to apply – both addressing purported takings claims resulting from the destruction of private property by wildfire – both are distinguishable on their facts.

a. ***Thune v. United States***

*Thune* was based upon damage suffered when a controlled burn in Wyoming ultimately spread beyond the planned area due to unforeseen wind conditions. 41 Fed. Cl. at 50. Mr. Thune's claim failed, however, because he could not allege that the destruction of his property was "a natural consequence of the [controlled burn] as designed." *Id.* at 52. As authorized and designed, the burn was to be confined to a specific area and would not have harmed Mr. Thune's property. *Id.* at 50. The Court found that his claim sounded in tort because asserting that Government "failed to maintain and control" the burn was tantamount to alleging "the government's faulty, negligent, or improper implementation of an authorized project". *Id.* at 51-52. The Court also found that the damage to Mr. Thune's property was not foreseeable, because

> the USFS conducted daily on-site measurements of temperature and wind speed and requested spot forecasts from the National Weather Service in preparation for the controlled burn. [Citation] On Octover 14, 1991, the day the fire was ignited, the USFS received a weather forecast for the area showing favorable wind conditions.

*Id.* at 53. In contrast, Plaintiffs' Complaint **does not allege** that Defendant failed to implement properly its land management policies in the CNF or that it failed to control the fire and **does allege** that the weather conditions were foreseen. (*See* section III.E.1., *infra.*) Plaintiffs also allege that Defendant's land management policies, as designed, carried with them the direct, natural, probable, and foreseen result of damage by fire to lands adjacent to the CNF. (*See*, section III.D.1, *infra.*)

b. ***Teegarden v. United States***

In *Teegarden*, the plaintiffs asserted that the Government's decision regarding how to attack a wildfire in Utah resulted in a taking of their properties. 42 Fed. Cl. at 253-54. "The lynchpin of plaintiffs' claim rests on their allegations that the Forest Service 'deliberately and intentionally concentrated fire suppression manpower and equipment on [one part] of the fire

line, to the detriment and loss of the fire control in the vicinity of [plaintiffs' properties]'". 42 Fed. Cl. at 256. Although it was undisputed that the actions of the Forest Service were authorized, the problem with this purported takings claim, reasoned the trial court, was that the immediacy of the threat required prioritization of resources, and thus there was neither explicit nor implied governmental intent to take the plaintiffs' properties.[3] *Id.* at 256-57.

This dispute, on the other hand, does not involve the issues present in *Teegarden*. Plaintiffs' taking claim is not based, nor is it dependent, upon the actions (or the failures to act) of the Forest Service taken in response to a fire. Defendant's "duly authorized" actions were not defined or influenced by an immediate threat, but took place over nearly a century. Whether on the day of the fire Defendant did all it could to protect Plaintiffs' homes or simply abandoned firefighting altogether simply has no bearing on whether the *land management policies* duly authorized and implemented by Defendant over the last century led to a taking. Therefore outside of the general principles cited, this case, like *Thune*, should not inform this Court's determination of whether Plaintiffs' claim properly asserts a taking.

**2. <u>Arguments in Some of the Flood Cases Are Applicable by Analogy to the Current Dispute.</u>**

Arguing that the "wildfire cases" cited by Defendant are distinguishable from the instant action begs the question of which cases, if any, are on point. Plaintiffs assert that arguments articulated in the inverse condemnation "flood cases" apply by analogy. Abandoning for a moment the iconic, representational aspects of these elements as polar opposites, it is possible to draw striking comparisons between Plaintiffs' claim and those arising from flood damage.

Because fire is a natural, seasonal element in the CNF, the alteration of the forest's fire regime is analogous to the damming of a river in seasonal flood ecologies. Even though dams

---

[3] The trial court also noted that liability pursuant to the Fifth Amendment has never been imposed due to a failure to act. *Teegarden*, 42 Fed. Cl. at 257, fn. 4.

are generally seen as promoting "the greatest good for the greatest number in the long run" by providing, *e.g.*, recreational areas, clean electricity, and municipal water reserves, it is well settled that the cost of damming a river – altering the local flood cycle – may result in a taking of adjacent private property. Courts have long held that recurring flooding of private property which results from an authorized government action can constitute a Fifth Amendment taking. *See, e.g.*, *United States v. Twin City Power Co.,* 350 U.S. 222 (1956); *and United States v. Willow River Power Co.,* 324 U.S. 499, 509 (1945).

Just as a disturbance to a waterway can lead to predictable, increased, and substantial flooding on adjacent properties, Plaintiffs have alleged and will show below that as foreseen by Defendant, disturbance to the fire regime in the CNF directly, naturally, and foreseeably led to the increased magnitude and spread of the Cedar Fire and the resulting damage to Plaintiffs' properties. Plaintiffs assert that the Constitution requires the public, not adjacent landowners, to bear the cost of years of preserving water and other natural resources for public use.

Even if the Court does not agree with Plaintiffs' analogy to flooding, Plaintiffs believe that the general principles of takings jurisprudence, articulated as the *Ridge Line* inquiry, support a finding that the Court of Federal Claims has jurisdiction over Plaintiffs' takings claim.

### D. PLAINTIFFS' COMPLAINT PROPERLY ALLEGES A FIFTH AMENDMENT TAKINGS CLAIM.

In order to establish the jurisdiction of the United States Court of Federal Claims over a dispute, a complaint must allege a non-frivolous claim based on a "Constitutional provision, statute or regulation . . . that is money-mandating." *Fisher*, 402 F.3d at 1172-73. That Plaintiffs' Complaint alleges a non-frivolous claim based on the Fifth Amendment of the United States Constitution and that the Takings Clause is a money-mandating provision are not disputed. *See, Moden*, 404 F.3d at 1341.

Further, Plaintiffs must also show that their claim meets the criteria of the *Ridge Line* inquiry. That is, Plaintiffs must allege that (1) an authorized governmental activity manifested an intent to appropriate Plaintiffs' property and (2) appropriated a benefit to the Government at Plaintiffs' expense. *See*, *Ridge Line*, 346 F.3d at 1355-56. Because Plaintiffs' claim meet these criteria, Defendant's Motion should be denied.

1. **Defendant is Appropriately Charged with the (Implied) Intent to Take Plaintiffs' Property as the Natural Result of Its Authorized Land Management Policies Functioning as Designed.**

The first prong of the *Ridge Line* inquiry requires a showing that "the government intend[ed] to invade a protected property interest or [that] the asserted invasion [was] the direct, natural or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." *Id.* at 1355. In the same sense that property law is described as a "bundle of sticks", the "authorized activity" in this dispute is the expression of the directives, goals, statutes, etc. (referred to collectively as Defendant's "land management policies") which inform and drive Defendant's management of its National Forests, including the land comprising the CNF. Examples of statutes informing Defendant's land management policies are the Organic Administration Act (16 U.S.C. §475 et seq.), the National Environmental Policy Act ("NEPA") (42 U.S.C. §4321 et seq.), the Federal Advisory Committee Act (5 U.S.C. Appendix 2), the Endangered Species Act ("ESA") (16 U.S.C. §1531 et seq.), the Clean Water and Clean Air Acts (33 U.S.C. §1251 et seq., and 42 U.S.C. §7401 et seq.), and the National Forest Management Act (16 U.S.C. §1600 et seq.).

It should be noted that Defendant does not dispute that the pertinent land management policies were duly authorized activities.[4] For example, it is not disputed that from at least 1911

---

[4] Defendant notes, "the government acts about which Plaintiffs complain are the Forest Service's former policy of extinguishing all forest fires, and the Forest Service's existing policy of

until 1968, Defendant's practice was to suppress all wildfires in National Parklands, including the CNF, so as to preserve timber and water for the use of the public. (*See* 16 U.S.C. §475; Complaint, ¶39; *and Review and Update of the 1995 Federal Wildland Fire Management Policy* ("1995 Wildfire Policy Review"), p.1 (attached as Exhibit A).) Although this practice changed in 1968, when the suppression of *all* wildfires was no longer explicitly mandated, Defendant continued to suppress fires in the CNF in order to preserve natural resources for the public's use, whether based on safeguarding a watershed, defending timber, protecting endangered species, or encouraging public recreational access to the CNF. (*See* Complaint, ¶40; *and* 1995 Wildfire Policy Review, p. 5.) The Forest Service admits that even after the Cedar Fire, "Ninety-seven percent of all wildland fires in California *are extinguished on the first day*." (USDA Forest Service, *California Fire Siege 2003: The Story* (attached as Exhibit B), p. 7.) In other words, despite a shift in policy in the 1960s and 1970s allowing some naturally caused fires to burn for as long as they remained within established parameters, most wildfires are still suppressed.

Plaintiffs also claim that Defendant's "land management policies not only permitted, but encouraged the CNF to be increasingly used by the public for various recreational purposes". (Complaint, ¶44.) Beyond merely "allowing the public to use and enjoy public land" (Motion, p. 12), Defendant has chosen to encourage public use of the CNF at all times, barring the public only "as a last resort when there is no other option available to protect forest resources and provide for public safety." (*Fire Restriction and Closure Plan for Cleveland National Forest* ("CNF Closure Plan"), p. 2 (attached as Exhibit C).)

---

allowing the public to use and enjoy public land." (Motion, p. 12 (citing, Complaint ¶¶39-50).) Plaintiffs object that this statement does not fully or correctly state Plaintiffs' claim. Further, the only government act about which Plaintiffs "complain" is Defendant's failure to compensate its citizens for the property it took. (Complaint, ¶50.) The Complaint does not dispute the propriety of Defendant's land management policies.

Plaintiffs have never claimed that the government explicitly intended to take the private property surrounding the CNF, and proof of such an explicit intent is not a prerequisite to liability. Rather, Plaintiffs argue that the intent to appropriate Plaintiffs' property for the public should be implied because the destruction of Plaintiffs' homes by fire was "the direct, natural or probable result of an authorized activity". *Ridge Line*, 346 F.3d at 1355. The "tort-taking inquiry… requires consideration of whether the effects [Plaintiffs] experienced were the predictable result of the government's action, and whether the government's actions were sufficiently substantial to justify a takings remedy." *Id.*

In *Ridge Line*, the Court of Appeals for the Federal Circuit clarified that where a plaintiff "does not allege that the government intentionally appropriated its property" the trial court must determine whether the asserted injuries were "the direct, natural, or probable result of the [government action], rather than merely an incidental or consequential injury." *Id.* at 1356. Specifically, "a property owner must prove that the asserted government invasion of property interests allegedly effecting a taking 'was the predictable result of the government action' either because it was 'the direct or necessary result' of the act or because it was 'within contemplation of or reasonably to be anticipated by the government.'" *Vaizburd v. United States,* 384 F.3d 1278, 1282-83 (Fed. Cir. 2004) (citing *Ridge Line,* 346 F.3d at 1356); *see also, Sanguinetti v. United States,* 264 U.S. 146 (1924). Most recently, the *Ridge Line* inquiry was examined in *Moden*, which holds that "an inverse condemnation plaintiff must prove that the government should have predicted or foreseen the *resulting injury*." 404 F.3d at 1343 (emphasis added).

Illustrative of the foreseeability standard is its application in inverse condemnation cases arising from damage by flood. One such case relied upon by *Ridge Line* and its successor Federal Circuit decisions is *Cotton Land Co. v. United States*, 109 Ct.Cl. 816, 75 F.Supp. 232

(1948). *Cotton Land* involved flooding of land situated on the Colorado River between the Hoover Dam (approximately 86 miles upstream) and the Parker Dam (approximately 53 miles downstream). 75 F.Supp at 232. The Parker Dam began impounding water in 1938 for the purpose of creating a reservoir (known as Lake Havasu) and producing needed hydroelectric power for the public. *Id.* at 232-33. However, Cotton Land Company did not allege that impounding of water behind Parker Dam included its land within the bed of Lake Havasu, which could be "a plain case of taking", but instead asserted that the construction and operation of the Parker Dam altered the river ecology, ultimately causing the taking of its land. *Id.*

The river ecology was changed because the Colorado River, "upon flowing into the lake, lost its velocity and dropped the large quantities of sand and smaller quantities of silt and clay which it had scoured out of its bed in the canyon below Hoover Dam. This deposition of sand began early in 1939 and has progressed upstream since that time." *Id.* As it advanced, this phenomenon caused the level of the river to rise "except as it overflowed its banks." *Id.* at 233. Eventually, sand was being deposited over 50 miles upstream from the dam, raising the Colorado River to a point where the plaintiff's lands were flooded.[5] *Id.*

The court was not receptive to Government arguments that the injury was remote or consequential, holding that a taking had occurred because "a succession of events was initiated which, when the events had all occurred in their natural order, deprived the company of the beneficial use of its land." *Id.* at 233. The court added that "[i]f engineers had studied the question in advance they would, we suppose, have predicted what occurred." *Id.* at 233-34. .

---

[5] "The river flowed into the lake; deposited its sand where it collided with the still water; the deposit of the sand placed another obstacle to the full and rapid flow of the river; this filling up of the bed of the river raised the level of its water; it overflowed its banks, they being low, and spread out over the company's land, it being still lower." *Cotton Land*, 75 F.Supp at 233.

Similarly, Plaintiffs have alleged and will show that Defendant's management policies and practices have altered the fire ecology in the CNF. Plaintiffs claim that suppressing the natural fire regime so as to preserve timber, watersheds, air quality, and wildlife has caused an "increasing number of large, intense, uncontrollable, and catastrophically destructive wildfires." Tellingly, Defendant admits the truth of these allegations:

> It appears that the increasing number of large, intense, uncontrollable, and catastrophically destructive wildfires is the most extensive and serious national forest health-related problem in the interior West. Past management practices, especially the Forest Service's decades-old policy of suppressing fire in the national forests, disrupted the historical occurrence of frequent low-intensity fires. As a result, vegetation accumulated, creating high levels of fuels for catastrophic wildfires and transforming much of the region into a tinderbox. The number of large wildfires, and of acres burned by them, has increased over the last decade, as have the costs of attempting to suppress them. These fires not only compromise the forests' ability to provide timber, outdoor recreation, clean water, and other resources but they also pose increasingly grave risks to human health, safety, and property, especially along the boundaries of forests where population has grown rapidly in recent years.[6]

(U.S. General Accounting Office, GAO/T-RECED-98-273, *Western National Forests: Catastrophic Wildfires Threaten Resources and Communities* 1 (1998) (attached as Exhibit D).) Just as in *Cotton Land*, "a succession of events was initiated which, when the events had all occurred in their natural order, deprived [Plaintiffs] of the beneficial use of [their] land." *Cotton Land*, 75 F.Supp. at 233. However, unlike the situation in *Cotton Land*, Defendant's experts did "stud[y] the question in advance", and Defendant in fact did "predict[] what occurred." *Id.* at 234.

---

[6] Defendant may attempt to mitigate the impact of this admission by claiming that it no longer advocates the suppression of all wildfires in National Forests and/or that the noted effects of its land management policies were unintended. While the policy of suppressing *all* wildfires may have been repealed, the practice continues relatively unabated (*see* section III.D.1., *supra*); also, that Defendant did not intend a consequence is not a defense to a taking claim (*see* section III.E.2, *infra*).

**a. Defendant Not Only Should Have But In Fact Did Foresee Plaintiffs' Injuries.**

Although Plaintiffs are required to prove only that Defendant should have foreseen the injury to Plaintiffs' property rights, this burden is easily met because Defendant actually predicted that its land management practices, especially its fire suppression policies, would result in damage by wildfire to those living adjacent to the CNF. On December 4, 2003 (approximately one month after the Cedar Fire was completely contained), Ray Quintanar, Director of Fire and Aviation Management for the USDA Forest Service, testified on its behalf before the Governor's Blue Ribbon Fire Commission in San Bernardino, California. With respect to the Cedar Fire, Mr. Quintanar acknowledged the foreseeability of a catastrophic fire in the CNF, stating:

> **I want you to realize that this was no surprise, what was happening here, what was about to happen.** If I look at the February seasonal fire outlook, the most critical areas that we identified in California were the southern forests, the four southern forests, where we have a significant population and limited means of egress into that area. The February seasonal fire outlook also, as we are looking again on those forests, the concentrations of standing and dead trees, as well as brush died back.... **The incident potential for this fire, as we look at that, existed for a long time. This is nothing new that was happening.** It was well recognized early on that something needed to be done.

(State of California Governor's Blue Ribbon Fire Commission, Transcript of Proceedings, 12/04/03, San Bernardino, California, at 75 (emphasis added) (attached as Exhibit E).) Similarly, in its May 2004, Draft Land Management Plan, the Forest Service admitted that it foresaw the very injury that forms the basis of Plaintiffs' takings claim:

> **Fire is a fact of life in southern California. Fire is not a question of if, rather, it is a question of when and how much. Fire staff have concluded that under the right conditions, any fire started anywhere on any of the forests may be a threat to adjacent communities.**[7] The four southern California forests include

[7] Defendant was specifically aware that the areas in which Plaintiffs lived were threatened by wildfire from the CNF. (*See*, *Urban Wildland Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire*, 66 Fed. Reg. 43,384 (August 17, 2001) (attached as Exhibit G).)

> approximately 3.6 million acres with thousands of structures in or around their borders that are threatened by wildfire. The forests are located in one of the driest, most fire-prone areas in the United States. **The situation is compounded by decades of fire suppression practices that have resulted in the development of unnaturally dense stands of trees and the accumulation of brush and other flammable fuels in many areas.**

(USDA Forest Service, *Draft Land Management Plan Part 1: Southern California National Forest Vision*, May 2004, at Vision-6 (emphasis added; attached as Exhibit F).

As early as 1974, if not earlier, the Forest Service specifically acknowledged that the natural and seasonal fire ecology in the Southern California Forests had been disturbed by Defendant's management practices and that "fuel modification is required to prevent California conflagration fires". (USDA Forest Service, Gen. Tech. Rep. PSW-7, *Can Southern California Wildland Conflagrations be Stopped?* ("USDA-FS 1974 Technical Report") 6 (1974) (attached as Exhibit H)). Fuel modification efforts have not been successful in preventing these fires. In fact, the same policy considerations which led to the state of forests like the CNF in the first place also limit the ability of Defendant to perform fuel modification activities. (*See* Haines, Terry, et al., USDA Forest Service, *Influences on Prescribed Burning Activity in the United States National Forest System*, International Forest Fire News, September, 1998, at 43-46 (attached as Exhibit I).) As such, Defendant not only should have foreseen, but in fact, knew that its forest management and fire suppression policies would result in Plaintiffs' injuries.

The U.S. Forest Service's famous mission statement, "the greatest good for the greatest number in the long run", as applied to the CNF, has provided San Diego County with potable water, preserved endangered species and archeological treasures, and provided the public with access to the wildlands of Southern California, to name a few public benefits. (USDA Forest Service, *The Use of the National Forest Reserves: Regulations and Instructions* ("The Use Book") 63 (1905) (attached as Exhibit J).) Pursuit of these goals however, required the Forest

Service to severely alter the unique natural fire regime in the CNF, with the specific knowledge that the resulting increased fuel loads would inevitably threaten adjacent private properties.

**b. The Ignition Of The Cedar Fire Was Not An Intervening Cause.**

Defendant claims that it should not have to compensate Plaintiffs for the destruction of their homes because it

> could not have foreseen, as a "direct, natural, and probable consequence" of its decisions to suppress forest fires and to permit public use of public lands, that on an extremely hot day in Southern California, with low humidity and high winds, a lost hunter would take the inadvisable, and illegal, step of setting a signal fire....[and because t]here is no way for Plaintiffs to prove that, but for the Forest Service's policy of extinguishing forest fires from 1911 through 1968, the hunter would not have gotten lost, would not have illegally started a fire, and his fire would not have spread throughout the Cleveland National Forest, and onto Plaintiffs' property.

(Motion, pp. 8-9.) Even if true[8], these statements are not germane to the question of jurisdiction over a takings claim. Defendant admits, "In order to satisfy the first prong of the [*Ridge Line*] inquiry, Plaintiffs must not only show that *their injuries* were in fact caused by Defendant's action, but also, that the Defendant 'should have predicted or foreseen *the resulting injury*." (Motion, pp. 5-6 (citing *Moden*, 404 F.3d at 1343) (emphasis added).) Defendant has not, and cannot, provide authority for the proposition that Defendant must have foreseen the exact manner in which the events leading to Plaintiffs' injuries would unfold. Neither is there a requirement that Defendant must have "caused" every aspect of those events in order to be required to compensate the Plaintiffs for a taking. (*See* section III.D.1.b., *infra*.)

Defendant's argument that a lost hunter ignited the fire is at most a "remoteness of cause defense" in that there was a succession of events between Defendant's actions and Plaintiffs'

---

[8] Plaintiffs do not admit the truth of these claims. For one thing, the majority of forest fires are started by recreational visitors. (*See* below.) Also, the "policy of extinguishing forest fires" is a misleadingly simplistic characterization of the claims set forth in the Complaint. (*See* Complaint, ¶¶ 34-50.)

injuries. *See, Cotton Land,* 75 F.Supp. at 233. As discussed above, even if the authorized activity is remote, (such as erecting a dam or accumulating unnatural fuel loads in a Southern California forest), where the injury (flooding of distant lands or the escape of a conflagration fire) is foreseeable there is no intervening cause breaking the chain of causation. *Id.* at 1343-44.

In any event, that the Cedar Fire was ignited by a lost hunter is not an intervening cause that makes Plaintiff's injuries unforeseeable. The manner in which the fire began does not change the fact that Defendant knew *for decades* that its land management policies had created a situation where a catastrophic fire escaping the CNF and damaging homes in adjacent communities was inevitable. In fact, the ignition itself was unquestionably a foreseeable event.

The Forest Service's own research regarding fire ignitions informed Defendant that human ignitions have long been the primary source of fires in the CNF. (USDA Forest Service, *Draft Environmental Impact Statement for Revised Land Management Plans, Pacific Southwest Region* ("2004 EIS"), R5-MB-045, May 2004, Table 110 (attached as Exhibit K).) Notably, Defendant even determined that "human-caused fires… account for most of the damaging wildfires." (2004 EIS at 3-303.) Specifically, the 2004 EIS states that in the 1990s, 921 out of a total of 996 fires in the CNF were human-caused. (2004 EIS at Table-110)

The Forest Service also keeps track of how many hunters use the national forests. The 2004 EIS states that of approximately 800,000 forest visits in the CNF in 2003, 17% (136,000) were for hunting, and another 14% (112,000) were for fishing.[9] In other words, Defendant was aware that nearly one-third of the visitors to the CNF came to hunt or fish and that over 92% of the fire occurrences were human-caused. Not only was it foreseeable that a hunter would ignite

[9] Notably, although the other forests in the region experienced more visits, significantly fewer of those were for hunting purposes. For example, the Angeles National Forest received 3,500,000 visits, of which only 3% (105,000) were for hunting; and the Los Padres National Forest received 1,500,000 visits, only 1% (15,00) of which were for hunting. (2004 EIS at Table-263.)

a fire in the CNF – it was probable. In fact, October 25, 2003 – the day the Cedar Fire began – was also the first day of the deer hunting season in the CNF.

Despite Defendant's in-depth knowledge with respect to fire occurrence in the CNF, Defendant need not predict every aspect and event leading up to Plaintiffs' injuries to constitute a taking. Rather, Plaintiffs' injuries need only be a "predictable result of government action, either because it was the direct or necessary result of the act or because it was within contemplation of or reasonably to be anticipated by the government." *Vaizburd,* 384 F.3d at 1282-83 (citations omitted). Plaintiffs have alleged and shown that their injuries were the predictable result of Defendant's land management policies in the CNF not only because their injuries were not only foreseeable but also because Defendant in fact knew that Plaintiffs' property interests were at risk as a direct result of its alteration of the CNF fire regime.

Fire in the CNF is not an unusual phenomenon, but rather a known natural condition of its ecosystem, irrespective of its ignition source. At issue in Plaintiffs' Complaint is not that fires occur in the CNF, or how fires occur in the CNF, but that the Cedar Fire became a mega-fire and escaped the CNF as the direct, natural, and probable result of Defendant's authorized management of the forest.

**2. Defendant's Land Management Policies Appropriated a Benefit to the Government at Plaintiffs' Expense.**

Although Plaintiffs' Complaint is concerned primarily with the costs associated with Defendant's land management policies, for purposes of takings analysis it is important to assess the benefits associated with the authorized activities. In addition to causation, Plaintiffs must show that the "invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners [sic] right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." *Ridge Line*, 346 F.3d

at 1356. The parties do not dispute that the Plaintiffs' property was destroyed in the Cedar Fire.[10] The question remains, then, whether the land management policies asserted to have caused this destruction also worked to benefit the government.

The simple answer to that question can be found in the initial purpose for the administration of the National Forests: "to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States". 16 U.S.C. §475. In fact, the Forest Service's initial internal charter admits, "Probably the greatest single benefit derived by the community and the nation from forest reserves is insurance against the destruction of property, timber resources, and water supply by fire." (The Use Book at 63.) Defendant's initial policy of suppressing all wildfires in the National Forests was aimed at appropriating the benefits of clean water and timber for the benefit of the public. Today, even more benefits are recognized. As one example, the Forest Service noted that the "decrease in wildland fire has … provided positive human health and welfare benefits by significantly decreasing natural air pollution". (1995 Wildfire Policy Review, p. 6.)

Although the rule of suppressing all wildfires is no longer officially promoted, in practice little seems to have changed because Defendant's land management policies and activities, including fire management, are necessarily affected by, *inter alia*, NEPA, ESA, and the Clean Air and Water Acts, all of which were enacted for, and continue to provide, significant benefits to the public. Even the use of fuel treatments, including prescribed burns, which Defendant is aware can have a tremendous effect on the spread of a fire, are often restricted due to land management policies. (Benefield, Mike, *Southern California Fuels Treatment Effectiveness*

---

[10] Defendant states, "For the purposes of our motion for judgment on the pleadings only, the factual allegations presented in the Complaint are assumed to be true." (Motion, p. 2 fn. 1.)

*Review* (attached as Exhibit J), bates no. 34.) With respect to the Cedar Fire, areas where prescribed burns had taken place "served to deflect the [fire's] spread", while areas where "fuels treatment was omitted because of concern for the critical habitat of the Arroyo Toad" allowed the fire to spread by spotting into the untreated vegetation and beyond. (*Id.* at bates nos. 33-34.) By refusing to compensate the Plaintiffs for the destruction of their lands, Defendant is effectively abandoning individuals to the consequences of activities such as maintaining clean air and protecting endangered species.

An important principle behind takings jurisprudence is that individual members of society should not be required to shoulder the costs of Government activity designed to benefit the public. Because Plaintiffs have shown that they bore the expense of the land management policies executed by the Government explicitly for the public welfare and benefit, Defendant's Motion should be denied.

## E. DEFENDANT'S FORESEEABILITY AND CAUSATION ARGUMENTS DO NOT RELIEVE THE GOVERNMENT OF THE CONSTITUTIONAL OBLIGATION TO PAY "JUST COMPENSATION".

Defendant seems to present several arguments in support of its position that its authorized projects did not cause the taking, and that even if a causal relationship existed, the taking was not foreseeable. None of these arguments, however, vitiate Plaintiffs' claim.

### 1. <u>A Claim for Inverse Condemnation Is Not Defeated by the Presence of Other "Contributing Factors".</u>

Defendant cites the Complaint for the proposition that, besides its land management policies, "there were other contributing factors" to the spread of the Cedar Fire. (Motion, p. 8.) According to Defendant, these factors include "the existence of dried vegetation, low humidity, high temperatures, high winds, and other seasonal weather conditions in Southern California". (Id.) Defendant summarily concludes that because the Complaint refers to these conditions as

"other known precipitating factors", "Plaintiffs establish the multiple intervening events that break the causal chain." (Motion, pp. 8-9.)

Plaintiffs assume that Defendant attempts to invoke the holding in *Thune* to which it referred in the previous paragraph:

> after a finding that the plaintiff's property loss was partially attributable to an authorized government project, the court still found that there was an intervening cause between the defendant's igniting what was intended to be a controlled burn, and the plaintiff's property being damaged.

(Motion, p. 8 (citing *Thune*, 41 Fed. Cl. at 54).) The intervening cause referred to in *Thune* was the district court's finding "that *unexpected* wind changes caused the fire to escape" the Government's control and ultimately damage the plaintiff's property. *Thune*, 41 Fed. Cl. at 52 (emphasis added). The problem with Defendant's argument before this Court is that *Thune* simply does not stand for the proposition that winds – or even high winds or other climatological factors – are an intervening cause merely because they affect a fire. As Defendant admits, and critical to the holding in *Thune*, "an intervening cause *must be unforeseeable* in order to cut off a defendant's potential liability." (Motion, p. 6 (emphasis added; citations omitted).) In fact, one of the cases cited by Defendant for this proposition continues, "An intervening cause is a new and independent cause of the harm *which is neither anticipated nor reasonably foreseeable by the defendant*." *Napier v. F/V DEESIE, Inc.*, 454 F.3d 61, 68 (1st Cir. 2006) (emphasis added). In contrast to the situation in *Thune*, the weather conditions attendant the Cedar Fire were not unanticipated, but actually predicted by Defendant.

At no point does Defendant argue that any of the "precipitating factors" it believes to be intervening causes were unforeseen or unexpected. The fact is that the CNF is situated in an area well known for its periodic wildfires. Defendant is well aware of the weather and vegetation conditions that can be expected in the CNF at all times of the year, not just during the peak of

fire season. For example, Regional General Fire Restrictions are "in effect at all times on the [CNF] due to the year-long fire season and the severe fire weather the forest often experiences during the winter months." (CNF Closure Plan, p. 2.) Further, it is common knowledge that the conditions pled by Plaintiffs are not unexpected for the CNF.

> The Santa Ana [wind] "season" ordinarily starts in middle or late September. Santa Ana periods increase in frequency during October and November and begin taper off [sic] in December.... Santa Ana periods that occur in fall and early winter, before the rains begin, generally create the greatest conflagration hazard, as the moisture content of both dead and living fuel is then likely to be at its lowest ebb.

(USDA-FS 1974 Technical Report, p. 2.) These weather conditions, therefore, were not unexpected events and therefore can not be seen as intervening causes of Plaintiffs' injuries.

**2. <u>An Intent to Avoid Property Damage by Fire Does Not Defeat Plaintiffs' Taking Claim.</u>**

Defendant also argues that Plaintiffs' injuries "could not be seen as a natural consequence of the Forest Service's policy as designed" because "the land management policy about which Plaintiffs complain was a policy of attempting to extinguish all forest fires. Such a policy is specifically designed to avoid damage to person and property." (Motion p. 7 (internal quotations omitted).) Although an admirable goal, Defendant should be aware that such an argument simply has no applicability to a takings claim. *See*, *Pashley v. United States*, 140 Ct.Cl. 535, 156 F.Supp. 737, 738 (1957) ("Defendant's liability depends not on its want of care, but on the fact of taking as the natural consequence of defendant's acts.").

Again, Plaintiffs have not pled and do not argue that Defendant has failed to act or to act properly, but that Defendant has pursued a program of land management in the CNF which not only provided substantial benefits to the Government and the public but also directly, naturally, and foreseeably altered the CNF's fire ecology to a point where massive, uncontrollable conflagrations were inevitable, expected, and imminent.

## IV. CONCLUSION

For all the foregoing reasons as well as any oral arguments which may be made, Plaintiffs respectfully request the Court to deny Defendant's Motion for Judgment on the Pleadings in its entirety and allow the parties to proceed to discovery.

Dated this 20th day of July, 2007

Respectfully submitted,

/s/ Mark S. Grotefeld

Mark S. Grotefeld
GROTEFELD & HOFFMANN, L.L.P.
105 West Adams Street, Suite 2300
Chicago, Illinois 60603
Telephone: (312) 601-2398
Facsimile: (312) 601-2402

Counsel for Plaintiffs.

GH#161139