**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

(Filed Electronically July 20, 2007)

| | |
|---|---|
| RICHARD AND SUSAN CARY, et. al.,<br>Plaintiffs,<br>vs.<br>THE UNITED STATES,<br>Defendant. | No. 06-707 L<br>Senior Judge Wiese |

**DECLARATION OF TODD C. HARSHMAN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

I, Todd C. Harshman duly declare as follows:

1. I am an attorney duly licensed to practice law in the state of California and am an associate with Grotefeld & Hoffmann, L.L.P., 100 Spear Street Suite 310, San Francisco, CA 94105, of counsel for Plaintiffs, CARY, et al., in the above matter.
2. I am a member of the Court of Federal Claims Bar Association.
3. The attached exhibits are true and correct copies of public documents or excerpts of public documents as obtained from the United States, Government websites or other public sources.
4. Exhibit A is a true and correct copy of "*Review and Update of the 1995 Federal Wildland Fire Management Policy*" Chapter 1, pages 1-8 and APPENDIX C, pages 39-42.
5. Exhibit B is a true and correct copy of "USDA Forest Service, *California Fire Siege 2003: The Story*" pages 1-7.

///

6. Exhibit C is a true and correct copy of *Fire Restriction and Closure Plan for Cleveland National Forest.*

7. Exhibit D is a true and correct copy of U.S. General Accounting Office, GAO/T-RECED-98-273, *Western National Forests: Catastrophic Wildfires Threaten Resources and Communities* 1 (1998).

8. Exhibit E is a true and correct copy of the State of California Governor's Blue Ribbon Fire Commission, Transcript of Proceedings, 12/04/03, San Bernardino, California, pages 1 and 74-77.

9. Exhibit F is a true and correct copy of the USDA Forest Service, *Draft Land Management Plan Part 1: Southern California National Forest Vision*, May 2004, Table of Contents and Vision 5-6.

10. Exhibit G is a true and correct copy of *Urban Wildland Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire*, 66 Fed. Reg. 43,384 (August 17, 2001).

11. Exhibit H is a true and correct copy of USDA Forest Service, Gen. Tech. Rep. PSW-7, *Can Southern California Wildland Conflagrations be Stopped?* (1974).

12. Exhibit I is a true and correct copy of Haines, Terry, et al., USDA Forest Service, *Influences on Prescribed Burning Activity in the United States National Forest System*, International Forest Fire News, September, 1998.

13. Exhibit J is a true and correct copy of "USDA Forest Service, *The Use of the National Forest Reserves: Regulations and Instructions* (1905)," pages 1-11 and 62-71.

14. Exhibit K is a true and correct copy of "USDA Forest Service, *Draft Environmental Impact Statement for Revised Land Management Plans, Pacific Southwest Region*, R5-MB-045, May 2004," Table of Contents, List of Tables, Table of Contents Appendices, 1-1, 3-302-306, Tables-5, Tables-50.

15. Exhibit L is a true and correct copy of "Benefield, Mike, *Southern California Fuels Treatment Effectiveness Review*"

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed on this 20th day of July, 2007 at San Francisco, California.

Todd C. Harshman
GROTEFELD & HOFFMANN, L.L.P.
100 Spear Street, Suite 310
San Francisco, California 94105
Telephone: (415) 344-9970
Facsimile: (415) 989-2802

GH#161604

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

(Filed Electronically July 20, 2007)

| | |
|---|---|
| RICHARD AND SUSAN CARY, et al., on behalf of themselves and all others similarly situated, who sustained damage to a property interest as a result of the Cedar Fire<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 06-707 L<br><br>Senior Judge Wiese |

**APPENDIX OF EXHIBITS**

**FILED IN SUPPORT OF**

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S**

**MOTION FOR JUDGMENT ON THE PLEADINGS**

# APPENDIX OF EXHIBITS
# TABLE OF CONTENTS


*Review and Update of the 1995 Federal Wildland Fire Management Policy* .......... A

USDA Forest Service, *California Fire Siege 2003: The Story* .......... B

*Fire Restriction and Closure Plan for Cleveland National Forest* .......... C

U.S. General Accounting Office, GAO/T-RECED-98-273, *Western National Forests: Catastrophic Wildfires Threaten Resources and Communities* 1 (1998) .......... D

State of California Governor's Blue Ribbon Fire Commission, Transcript of Proceedings, 12/04/03, San Bernardino, California .......... E

USDA Forest Service, *Draft Land Management Plan Part 1: Southern California National Forest Vision*, May 2004 .......... F

*Urban Wildland Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire*, 66 Fed. Reg. 43,384 (August 17, 2001) .......... G

USDA Forest Service, Gen. Tech. Rep. PSW-7, *Can Southern California Wildland Conflagrations be Stopped?* (1974) .......... H

Haines, Terry, et al., USDA Forest Service, *Influences on Prescribed Burning Activity in the United States National Forest System*, International Forest Fire News, September, 1998 .......... I

USDA Forest Service, *The Use of the National Forest Reserves: Regulations and Instructions* (1905) .......... J

USDA Forest Service, *Draft Environmental Impact Statement for Revised Land Management Plans, Pacific Southwest Region* ("2004 EIS"), R5-MB-045, May 2004 .......... K

Benefield, Mike, *Southern California Fuels Treatment Effectiveness Review* .......... L

# EXHIBIT A
## Review and Update of the 1995 Federal Wildland Fire Management Policy

# REVIEW AND UPDATE OF THE 1995 FEDERAL WILDLAND FIRE MANAGEMENT POLICY

JANUARY 2001

U.S. DEPARTMENT OF THE INTERIOR
- Bureau of Land Management
- National Park Service
- U.S. Fish and Wildlife Service
- Bureau of Indian Affairs
- Geological Survey
- Bureau of Reclamation

U.S. DEPARTMENT OF AGRICULTURE
- U.S. Forest Service

DEPARTMENT OF ENERGY

DEPARTMENT OF DEFENSE

DEPARTMENT OF COMMERCE
- National Oceanic and Atmospheric Administration/National Weather Service

U.S. ENVIRONMENTAL PROTECTION AGENCY

FEDERAL EMERGENCY MANAGEMENT AGENCY

NATIONAL ASSOCIATION OF STATE FORESTERS

Additional copies of this report may be obtained from
the Bureau of Land Management Office of Fire and Aviation
at the
National Interagency Fire Center
Attn: External Affairs Office
3833 South Development Avenue
Boise, Idaho 83705-5354
(208) 387-5457

# TABLE OF CONTENTS


## EXECUTIVE SUMMARY

Overview .......... i
Background .......... ii
Principal Conclusions .......... ii
Implementation .......... iii
Guiding Principles .......... iii
Key Themes of the Review and Update .......... iv

## CHAPTER 1 — BACKGROUND AND SCOPE

Evolution of Federal Wildland Fire Management Policy .......... 1
1995 Fire Policy and Program Review .......... 2
Charge from the Secretaries of the Interior and Agriculture .......... 3
How the Review Was Done .......... 4
Important Fire Management Issues .......... 5

## CHAPTER 2 — FINDINGS OF THE WORKING GROUP

Introduction .......... 9
Findings .......... 9
Proposed Changes and Actions .......... 19

## CHAPTER 3 — 2001 FEDERAL WILDLAND FIRE MANAGEMENT POLICY

Guiding Principles .......... 21
2001 Federal Wildland Fire Management Policy .......... 22
Implementation Actions .......... 25

## CHAPTER 4 — APPENDICES

APPENDIX A: Bibliography .......... 33
APPENDIX B: Glossary and Acronyms .......... 35
APPENDIX C: Changes to the Guiding Principles and 1995 Federal Fire Policy, with Rationale for Changes .......... 39
APPENDIX D: Tabular Crosswalk between the 1995 and 2001 Federal Fire Policies .......... 43
APPENDIX E: Disposition of 1995 Action Items .......... 47
APPENDIX F: Wildland Fire Flowchart .......... 75
APPENDIX G: Working Group and Support Staff .......... 77

# CHAPTER 1 — BACKGROUND AND SCOPE

## EVOLUTION OF FEDERAL WILDLAND FIRE MANAGEMENT POLICY

The first national fire policy came after several years of severe fires between 1910 and 1935. In the context of the ecological theory of the time, fire exclusion was believed to promote ecological stability. In addition, fire exclusion could also reduce commodity damages and economic losses. In 1935, the USDA Forest Service instituted the "10 AM Policy," wherein the objective was to prevent all human-caused fires and contain any fire that started by 10 a.m. the following day.

By the 1960s, fire management costs were increasing exponentially. The 1964 Wilderness Act, Tall Timbers Research Conferences, and Southern Forest Fire Lab research demonstrated the positive benefits derived from natural and prescribed fire. As a result, national fire policy began to evolve to address both the economic and ecological benefits of not aggressively controlling, and even using, fire. In February 1967, the USDA Forest Service permitted leeway for early- and late-season fires. In 1968, the National Park Service changed its policy to recognize the natural role of fire, allow natural ignitions to run their course under prescribed conditions, and use prescribed fires to meet management objectives. In 1971, the USDA Forest Service 10-Acre Policy was added, which set a pre-suppression objective of containing all fires within 10 acres.

In 1977 a new fire policy was selected by the USDA Forest Service that replaced both the 10 AM and 10-Acre policies. The new policy encouraged a pluralistic approach — fire by prescription. Even for suppression, once initial attack failed, alternatives to full suppression were to be considered. Fire suppression became fire management.

The 1989 review of the 1988 Yellowstone fires continued fire policy evolution. The review report affirmed the positive benefits of fire, but also identified the inherent risks and liabilities of using fire and recommended greater planning, preparation, cooperation, and management oversight.

The 1994 fire season with its 34 fatalities (14 at South Canyon, Colorado) precipitated the ***1995 Federal Wildland Fire Management Policy & Program Review*** (1995 Report). This review again affirmed the positive benefits of fire. It recognized that fire was part of a larger problem, one of several symptoms of natural ecosystems becoming increasingly unstable due to altered ecological regimes. It talked about the needs for landscape-level resource management, the integration of fire into land management planning and implementation, and the involvement of all affected landowners and stakeholders.

In light of the extensive fires in the summer of 2000, President Clinton asked the Secretaries of the Interior and Agriculture to prepare an analysis of actions and requirements. Their report, ***Management the Impact of Wildfires on Communities and the Environment: A Report to the President in Response to the Wildfires of 2000*** focused on several key points: restoring landscapes and rebuilding communities, undertaking projects to reduce risks, working directly with communities, and establishing accountability. The Congress expressed its support with substantial new financial resources in the two Departments' Fiscal Year 2001 appropriations, along with direction for aggressive planning and implementation to reduce risks of wildland fire in Wildland Urban Interface areas.

## 1995 FIRE POLICY AND PROGRAM REVIEW

The 1995 Report resulted in the first comprehensive statement of wildland fire policy coordinated between the Departments of the Interior and Agriculture. In addition to the two Departments joining together in unified policy, the 1995 Report articulated clear direction on important issues of safety, the role of fire in natural resource management, and the relative roles of federal and non-federal agencies in the Wildland Urban Interface. The 1995 Report also contained significant background narrative and documentation on the importance of these policy positions.

This Review and Update builds on the 1995 background and rationale for the underlying body of Federal Wildland Fire Management Policy. In particular, the following ideas from the 1995 Report remain valid:

1. Protection of human life is the first priority in wildland fire management.

2. Every firefighter, every fireline supervisor, every fire manager, and every agency administrator takes positive action to ensure compliance with established safe firefighting practices.

3. Fire exclusion efforts, combined with other land-use practices, have in many places dramatically altered fire regimes so that today's fires tend to be larger and more severe. It is no longer a matter of slow accumulation of fuels; today's conditions confront us with the likelihood of more rapid, extensive ecological changes beyond any we have experienced in the past. To address these changes and the challenge they present, we must first understand and accept the role of wildland fire, and adopt land management practices that integrate fire as an essential ecosystem process.

4. The task before us – reintroducing fire – is both urgent and enormous. Conditions on millions of acres of wildlands increase the probability of large, intense fires beyond any scale yet witnessed. These severe fires will in turn increase the risk to humans, to property, and to the land upon which our social and economic well being is so intimately intertwined.

5. Agencies must create an organizational climate that supports employees who implement a properly planned program to reintroduce wildland fires.
6. Where wildland fire cannot be safely reintroduced because of hazardous fuel build-ups, some form of pretreatment must be considered, particularly in Wildand Urban Interface areas.
7. The Wildland Urban Interface is defined as the line, area, or zone where structures and other human development meet or intermingle with undeveloped wildland or vegetative fuels.
8. The Wildland Urban Interface has become a major fire problem that will escalate as the nation moves into the 21st Century. People continue to move from urban to wildland areas. They give little thought to the wildfire hazard, and bring with them their expectations for continuation of urban emergency services. Further, property owners believe that insurance companies or disaster assistance will always be there to cover losses. There is a widespread misconception by elected officials, agency managers, and the public that Wildland Urban Interface protection is solely a federal concern.
9. Fire protection problems in the Wildland Urban Interface are complex. Complicated barriers must be overcome to address them. These barriers include legal mandates, zoning regulations, fire and building codes, basic fire protection infrastructure, insurance and fire protection grading and rating systems, environmental concerns, and Fire Protection Agreements. Political, social, and psychological factors further complicate the problems. There is no one simple solution. Leadership and cooperation are essential.
10. The problem is not one of finding new solutions to an old problem, but of implementing known solutions. Deferred decision making is as much a problem as the fires themselves. If history is to serve us in the resolution of the Wildland Urban Interface problem, we must take action on these issues now. To do anything less is to guarantee another review process in the aftermath of future severe fires.

## CHARGE FROM THE SECRETARIES OF THE INTERIOR AND AGRICULTURE

Following the investigation, and subsequent report by the Independent Review Board, of the May 2000 Cerro Grande Prescribed Fire in New Mexico, the Secretary of the Interior announced that he and the Secretary of Agriculture would reconvene the Working Group that developed the 1995 Federal Fire Policy to assess the status of the policy and its implementation.

In a June 27, 2000, memorandum the two Secretaries outlined their direction for reviewing the 1995 Policy and its implementation. This memorandum identified five specific review tasks:

1. Review the status of the implementation of the 1995 Federal Fire Policy and provide recommendations to the Secretaries for completing full implementation of the policy.
2. Address specific issues raised in the Cerro Grande Prescribed Fire Investigation Report and the subsequent Independent Review Board Report, and provide recommendations to the Secretaries for resolving these issues.
3. Provide recommendations to the Secretaries for strengthening the organizational aspects of the wildland fire management programs in the two Departments to ensure effective implementation of the 2001 Federal Fire Policy.
4. Provide any other recommendations to the Secretaries that would improve the wildland fire management programs in the two Departments.
5. Recommend a management structure for completing implementation of the recommendations.

## HOW THE REVIEW WAS DONE

The Secretaries of the Interior and Agriculture asked that the Working Group that developed the 1995 Federal Fire Policy be reconvened. To honor this request, the structure and membership of the earlier group was replicated as nearly as possible, using as many of the same individuals as available. In some cases, individuals had retired or moved to other positions, so their successors or individuals in similar positions or with similar backgrounds were asked to serve. As in 1994-95, the Working Group was co-chaired by the USDA Forest Service and the Department of the Interior.

In recognition of the importance of wildland fire in other agencies, the Departments of Energy and Defense and the Bureau of Reclamation were invited to join the Working Group. In addition, the National Association of State Foresters was invited to join the group to represent the important perspectives of non-federal wildland fire agencies. The resulting group included a broad mix of fire and resource managers, line managers, and program managers from programs closely associated with fire management. Professional staff from all of the participating agencies supported the Working Group.

To respond to the tasks in the memorandum from the Secretaries, the Working Group used the following principal sources of information:

- ***Status of the implementation of the specific Action Items in the 1995 Report*** – each of the five bureaus with fire management programs (USFS, BLM, NPS, BIA, FWS) was asked to report on the status of the Action Items. Their responses were tabulated and reviewed.
- ***Survey of Employees*** – the Brookings Institution was commissioned to survey a random sample of fire managers, resource

managers, and agency administrators in each bureau around the country regarding their views on adequacy and implementation of the 1995 Federal Fire Policy.

- ***Employee Input***- employees were invited to provide their views on the 1995 Federal Fire Policy and its implementation through a Web site.
- ***Non-governmental Input*** – letters were sent to non-governmental organizations requesting their views on the 1995 Federal Fire Policy and its implementation.
- ***Reports, Reviews, Studies*** – a variety of internal and external reports, reviews, studies, and investigations of various aspects of wildland fire were reviewed.
- ***Program Data*** – statistical and other descriptive sources of information about wildland fire scope and activity were compiled and reviewed.
- ***Issue-specific Analyses*** – a number of short papers or oral presentations on specific issues were developed by professional staff.

The 2001 Federal Wildland Fire Management Policy (2001 Federal Fire Policy) contained in this Review and Update replaces the 1995 Federal Fire Policy. It should be adopted by all federal agencies with fire-management-related programs and activities as appropriate through directives, manuals, handbooks, and other documents.

The Working Group focused its efforts on "strategic" issues surrounding the 1995 Federal Fire Policy and its implementation. More specific implementation issues are best addressed at the program management level. Thus, a number of important but specific operational or policy implementation issues were raised in the course of the Working Group's discussions, but not addressed in this Review and Update.

## IMPORTANT FIRE MANAGEMENT ISSUES

### HISTORICAL CONTEXT

Historically, fire has been a frequent and major ecological factor in North America. In the conterminous United States during the preindustrial period (1500-1800), an average of 145 million acres burned annually. Today only 14 million acres (federal and non-federal) are burned annually by wildland fire from all ignition sources. Land use changes such as agriculture and urbanization are responsible for 50 percent of this 10-fold decrease. Land management actions including land fragmentation and fire suppression are responsible for the remaining 50 percent.

This decrease in wildland fire has been a destabilizing influence in many fire-adapted ecosystems such as ponderosa pine, lodgepole pine, pinyon/juniper woodlands, southern pinelands, whitebark pine, oak savanna, pitch pine, aspen, and

tallgrass prairie. Fuels increased and understory vegetation became more dense. As a result, those wildland fires that did occur were larger and more severe than historical fires. Eliminating fire also affected individual plant species. For example, Hessl and Spackman (1995) found that, of the 146 threatened, endangered, and rare plant species found in the conterminous U. S. for which there is conclusive information on fire effects, 135 species benefit from wildland fire or are found in fire-adapted ecosystems.




This decrease in wildland fire has also provided positive human health and welfare benefits by significantly decreasing natural air pollution (e.g., particulate matter less than 10 microns in size: PM-10.).



## CURRENT CONDITION OF FEDERAL LANDS

In 1999, Hardy et al. published a preliminary course-scale analysis of current fire regimes and land condition classes in the conterminous U. S. This analysis, for the first time, provided a complete fuels management assessment of all federally managed lands, and a picture of the magnitude of the ecological effects of the exclusion of landscape-scale fire. Refinement of this preliminary data (e.g., chaparral) is currently underway and will eventually provide greater resolution and improved usefulness.

The federal government has management responsibility for approximately 415 million acres of fire-adapted land in the conterminous United States. Approximately 200 million of these acres were historically subject to *frequent* fire regimes with fire return intervals of less than 35 years. Included in these lands are ponderosa pine forests, southern pinelands, and prairie grasslands. Another 215 million acres were historically subject to *infrequent* fire regimes with fire return intervals greater than 35 years. Examples include lodgepole pine, northern hardwoods, and desert shrublands.

The federal lands in these two fire regimes have been further classified into three condition classes (Hardy et al. 1999):

| Condition Class | Frequent | Infrequent | Total |
|---|---|---|---|
| | ........Millions of Acres...... | | |
| 1 | 69 | 135 | 204 |
| 2 | 93 | 48 | 141 |
| 3 | 38 | 32 | 70 |
| Total | 200 | 215 | 415 |

Over 200 million acres of federal land are in Condition Class 1, where human activity has not significantly altered historical fire regimes, or adequate land management activities have successfully maintained ecological integrity. These areas usually pose relatively low public safety and ecological risks, and need little corrective management. However, current maintenance management actions such as prescribed fire need to continue.

On the 141 million acres of Condition Class 2 land, human activity has moderately altered historical fire regimes, and/or land management actions have been ineffective, partially compromising ecological integrity. One or more fire return intervals have been missed, resulting in moderate increases in fuel load and fire size, intensity, and severity. These areas pose a moderate public safety and ecological risk from severe fire, and need moderate levels of restoration treatments (e.g., mechanical fuel removal, prescribed fire). Without any management action, these lands will degrade to Condition Class 3. Continued maintenance treatments following restoration are also needed to prevent severe fires and sustain ecological integrity.

Ecological integrity has been significantly compromised on 70 million acres of Condition Class 3 lands, and fires are a high risk factor because of their potential risk to human values (public safety and health, property, economies) and natural resource values (watersheds, species composition). Several fire return intervals have been missed, resulting in considerable accumulation of live and dead fuels, and increasing the potential of high-severity fires. These lands pose the greatest risk to public safety and are in most danger of ecological decline. They require extensive restoration and diligent maintenance.

### THE 2000 FIRES

More acres burned in 2000 than in any other year in the last half-century. By mid-December, approximately 4.8 million acres had been burned by wildland fires and 1.0 million acres by prescribed fires on federal lands alone.

With a better understanding of the magnitude of the fire management problem, the federal land management agencies are now planning aggressive actions to mitigate the situation. The USDA Forest Service has proposed fuels management treatments (prescribed fire and mechanical) of up to 3 million acres annually. Department of the Interior bureaus and the Department of Defense have also proposed similar activities. Fiscal Year 2001 fire management appropriations for the Department of the Interior and the USDA Forest Service have been increased to begin to address these landscape stewardship responsibilities.

# APPENDIX C: CHANGES TO THE GUIDING PRINCIPLES AND 1995 FEDERAL FIRE POLICY, WITH RATIONALE FOR CHANGES

## GUIDING PRINCIPLES

Rewrite the existing guiding principle on coordination and cooperation to add "international" coordination and cooperation.

## POLICY

### New Policies

a. **Ecosystem Sustainability**

- ***The full range of fire management activities will be used to achieve ecosystem sustainability including its interrelated ecological, economic, and social components.***

**Rationale::** The concept of ecosystem sustainability was not fully considered in the original concept of fire management, as incorporated in the 1995 Federal Fire Policy. Using the full range of fire management activities is essential for achieving ecosystem sustainability, including ecological sustainability and socio-economic considerations. Under this policy, fuels management activities will be designed to support ecological and socio-economic sustainability.

b. **Rehabilitation and Restoration**

- ***Rehabilitation and restoration efforts will be undertaken to protect, and sustain ecosystems, public health, safety, and to help communities protect infrastructure.***

**Rationale:** Rehabilitation and restoration activities are essential components of achieving ecosystem sustainability when areas are not expected to recover through natural processes Protection of community infrastructure, public health and safety, endangered species habitat, and other resource values must be considered in developing rehabilitation and restoration strategies and plans.

c. **Science**

- ***Fire management plans and programs will be based on a foundation of sound science. Research will support ongoing efforts to increase our scientific knowledge of biological, physical, and sociological factors. Information needed to support fire management will be developed through an integrated interagency fire science program. Scientific results must be made available to managers in a timely manner and must be used in the development of land management plans, Fire Management Plans, and implementation plans.***

**Rationale:** Scientific information is essential to develop and implement land and fire management programs and to evaluate their potential benefits and consequences. Information will be developed through an interagency, integrated fire science program. The fire science program should include federal science agencies, academic institutions, and independent research groups. The program needs to support ongoing efforts to increase our scientific knowledge of biological, physical, and sociological factors. Science organizations must produce tangible, accessible, and useful research products that can be incorporated in Fire Management Plans and programs. It is incumbent on fire managers to actively incorporate and implement the results of scientific research.

d. **Communication and Education**

- ***Agencies will enhance knowledge and understanding of wildland fire management policies and practices through internal and external communication and education programs. These programs will be continuously improved through the timely and effective exchange of information among all affected agencies and organizations.***

**Rationale:** The 1995 Federal Fire Policy is not fully understood by internal and external audiences. Shortfalls exist in disseminating the information and integrating the policy into affected disciplines needed to implement the policy. The addition of more cooperating agencies into the wildland fire management mission makes coordinated and enhanced communication programs essential.

e. **Evaluation**

- ***Agencies will systematically evaluate the effectiveness of projects through implementation of the 2001 Federal Wildland Fire Management Policy. The evaluation will assure accountability, facilitate resolution of areas of conflict, and identify resource shortages and agency priorities.***

**Rationale:** There is no systematic method or program for evaluating federal fire policy and its implementation, especially across agency and program or discipline boundaries. No performance measures or other means exist to determine the status of implementation or the effectiveness of the policies. The review of the 1995 Federal Fire Policy found substantial actions that were not completed. There is no ongoing or established process for tracking status of policy implementation within or among agencies.

## Modifications to the 1995 Federal Fire Policy Statements

These are explanations of changes to the 1995 Federal Fire Policy. The full text of the original 1995 and the new 2001 statements are in Appendix D.

a. **Safety**: No change.

b. **Planning**:

**Rationale:** This policy statement was changed to clarify the role and nature of Fire Management Plans as the fundamental strategic documents, based on land use plans, to guide the full range of fire management related activities in a unit or area. Fire Management Plans are supplemented by operational plans such as preparedness plans, dispatch plans, prescribed fire plans, and prevention plans. Resource management objectives and activities addressed in Fire Management Plans include activities to restore and sustain ecosystems or to protect communities or public safety. Fire Management Plans must address concerns and discuss consequences for air and water quality, endangered species, and similar issues. Fire Management Plans should be developed and implemented across agency boundaries to ensure consistent approaches to similar conditions.

c. **[Response to] Wildland Fire:**

**Rationale:** The policy statements for Wildland Fire and Use of Fire were modified to more clearly distinguish between the two. The Wildland Fire policy statement was re-titled as Response to Wildland Fire and clarifies and emphasizes that the context or circumstances of the fire are to dictate the appropriate response, based on an approved Fire Management Plan. This policy is intended to minimize the use of different personnel, qualification systems, dispatch and resource allocation protocols, and so on for different "types" of fire. Rather, emphasis is on pre-planning by agencies to determine the appropriate management response to the occurrence of fire, regardless of ignition source or location. The term "be based on best available science" was dropped from this policy statement since a new policy statement on science has been added.

d. **Use of [Wildland] Fire:**

**Rationale:** The use of Fire Policy Statement was re-titled to the Use of Wildland Fire. Along with the above change in Wildland Fire, this policy statement now clarifies and emphasizes the critical importance of Fire Management Plans and operational plans in determining the appropriate response to a fire, regardless of its source of ignition or location.

e. **Preparedness:**

**Rationale:** This statement was revised to include a reference to management oversight. There is no process for ongoing integrated, interagency oversight and monitoring of preparedness activities. This change clarifies and emphasizes the importance of oversight and monitoring to ensure that fire management preparedness activities are appropriate, especially across agency lines.

f. **Suppression:** No change.

g. **Prevention:**

**Rationale:** This statement was changed to clarify the intent of the 1995 Federal Fire Policy, not to change it substantively. The addition of the word "partners" makes the revised policy statement more inclusive.

h. **Protection Priorities:**

**Rationale:** This policy statement was revised to clarify policy related to human health and protection of structures. The 1995 Federal Fire Policy statement on

protection priorities provides a solid framework for decision making in fire situations. Conflicting protection priorities are resolved through the Wildland Fire Situation Analysis (WFSA) and through the process of allocating resources at the geographic and local levels. However, two significant protection considerations are not specifically recognized in the 1995 Federal Fire Policy. First, human health, including the potential effects of smoke, is not explicitly considered in either the WFSA process or the process for allocating resources. Second, the 1995 Federal Fire Policy does not distinguish between the concept of property and the concept of community and community infrastructure. Recent experience has dramatically demonstrated the threat that uncontrolled wildland fire poses to human communities. While property may simply represent isolated structures, communities and their associated infrastructure are the social and economic fabric that supports life in rural areas. However, the primary responsibility for protecting private property and rural communities lies with individual property owners and local governments. This responsibility is usually achieved through proactive pre-fire actions such as those promoted in the FIREWISE Communities program.

**i. Interagency Cooperation:**

**Rationale:** This policy statement was revised to highlight education, prevention, restoration, and rehabilitation in interagency cooperation. This highlights the importance of doing prevention and education initiatives in an interagency, collaborative environment.

**j. Standardization:** No change.

**k. Economic Efficiency:** Dropped

**Rationale:** This statement was dropped because it duplicated a Guiding Principle.

**l. Wildland Urban Interface:**

**Rationale:** This statement was changed to clarify the 1995 Federal Fire Policy, not to change it substantively. The revised policy more accurately distinguishes between the terms "structure protection" and "structure suppression."

**m. [Agency] Administrator and Employee Roles:**

**Rationale:** This statement was changed to recognize that wildland fire management is not the sole responsibility of dedicated fire management personnel. In the past in federal land management agencies, wildland fire activities took precedence over all agency functions and activities except the safeguarding of human life. The notion that a broad cross-section of employees need to be trained, certified and available for wildland fire assignment has gradually diminished over time, both on the part of Agency Administrators and employees themselves. Further, because of the diminishing federal workforce, the need to mutually support each other for wildland fire activities—locally, regionally and nationally—is increasingly important. The intent of the policy is to require every employee to be available to support wildland fire if the situation demands. Also, the intent is to strike a common-sense balance between requiring *every employee* of any agency to be trained, certified, and available for wildland fire assignment, and the notion that *only fire management personnel* have any responsibility to respond to wildland fire activities.

# EXHIBIT B
## USDA Forest Service,
## *California Fire Siege 2003: The Story*


CALIFORNIA FIRE SIEGE 2003
THE STORY
OCTOBER 21–NOVEMBER 4,

# Preface

In October of 2003, Southern California experienced the most devastating wildland fire disaster in state history. The facts are staggering—750,043 acres burned, 3,710 homes lost and 24 people killed including one firefighter.

There is nothing we can say here to lessen the impact of the terrible loss of life and property—we can only make an effort to learn all we can from this disaster. It is in that spirit that we established an interagency team, even before the smoke had cleared, to chronicle the Fire Siege of 2003. This report is a result of this team's effort. Tasked with a very short timeframe, this document provides a synopsis of the key decisions and significant actions that impacted the Siege. We attempt to note the range of factors affecting decision-makers, including the influence of social and political pressures which added to the complexity of the event and influenced strategic decisions. Our goal was to produce a document as quickly and accurately as possible so that it could be put to use immediately in multiple arenas by a diverse group of people. In-depth details of each incident, analysis and recommendations will be left to the many other after-action reports, reviews and investigations that will follow this catastrophe.

We are grateful for the firefighters and citizens whose efforts saved so many lives and communities. Our condolences go out to those who suffered losses. Already we see efforts underway to restore and rebuild. That is what California does.

Wildfire and humanity are intertwined in the West. Similar fire events will happen again. It is our hope that this report can help to mitigate future losses and promote proactive fire planning.

**Jack A. Blackwell**
*Regional Forester,*
*Pacific Southwest Region*
*U.S. Forest Service*

**Andrea Tuttle**
*Director*
*California Department of*
*Forestry and Fire Protection*

*On the cover: The satellite photo shown on the cover was taken during the peak of the fire siege. The use of satellite technology as well as other advances has greatly improved the ability of strategic commanders to make real-time decisions. Photo courtesy of NASA.*

# Table of Contents

**4** Introduction

**8** Prelude to the Siege
*Decisions, history, policies and environmental factors*

**12** The Daily Update
*Day-by-day chronology of the Fire Siege of 2003*

**51** Issues and Strategies

**63** Appendix
- 64 *Appendix 1—Statistical Information*
- 67 *Appendix 2—Fire Summaries*
- 76 *Appendix 3—Resource Commitment*
- 78 *Appendix 4—The Fire Environment*
- 80 *Appendix 5—Fire Safe Councils*
- 81 *Appendix 6—Cost Apportionment*
- 82 *Appendix 7—Proclamations and Declarations*
- 92 *Appendix 8—List of Interviewees*
- 94 *Appendix 9—Acknowledgments*

**95** Glossary of Terms



*Multi-Agency Coordinating System (MACS) group sets incident prioritization and resource allocation.*

# Introduction

The October Fire Siege of 2003 tested the modern fire service like no other time. The combined efforts of the largest wildland fire agencies in the world, the United States Forest Service and the California Department of Forestry and Fire Protection (CDF), along with armies of local fire departments across the state mustered ground and air resources into the firefight as never before. At the peak of the fire siege over 14,000 firefighters were on the line. Never in California's history were so many homes and lives in danger by fire at one moment. By the time the 14 major fires were extinguished, 24 lives were lost, 3,710 homes were destroyed and 750,043 acres were blackened. In addition, countless miles of power lines were damaged, communication systems destroyed, watersheds reduced to bare scorched soils and thousands of people were forced into evacuation centers, unsure if they would have a home to return to—many did not.


*Old Fire crosses Highway 18.*

## The Purpose

Although an event of this magnitude is laden with stories of heroism, loss, relief and anguish, the purpose of this document is to objectively capture the events, issues and resulting strategies involved in the siege. It is not about the firefighters on the ground, but about the events and strategic decisions made that mobilized them.

The fire service and citizens threatened by the siege benefited from the foundations built prior to this disaster. FIRESCOPE, the Incident Command System, the California Fire Plan and the National Fire Plan all resulted from lessons learned from previous fires. The tools given to us by our predecessors prepared us for this fire siege. It is our obligation to provide our successors with an even stronger foundation. This document is the beginning of building that foundation.

## The Contents

The events leading up to the Fire Siege of 2003 have an undeniable influence on how the incident was managed. In the ***Prelude to the Siege*** section, some major historic fire events are described. The Prelude describes a selection of previous fires, legislation, programs and projects that impact pre-planning and fire attack today.

> ***Never in California's history were so many homes and lives in danger by fire at one moment. By the time the 14 major fires were extinguished; 24 lives were lost, 3,710 homes were destroyed and 750,043 acres were blackened.***

In planning a fire attack, incident commanders base strategic decisions on numerous factors including community impacts, weather, environment, availability of resources, and social-political influences. Many of the day-by-day events and issues that influenced the decisions made by incident commanders are chronicled in the ***Daily Update*** section.

The ***Issues and Strategies*** section that follows the chronology is the most important component of this document in reducing the threat of future catastrophe. This section is the result of interviewing 68 key commanders and decision makers within a week of containing the fires. Using their comments, the interviewers identified key social-political issues that impacted the strategic decisions made by



*One of thousands of single family homes destroyed.*

the various incident commanders. Managing a disaster unprecedented in scope, the fire commanders struggled to make the best decision to support the fire fight, on the ground and in the air. If it could have been done better, they want to figure out how.

## The Fires

As the fire season of 2003 approached, policy makers understood the potential for a calamitous fire season in Southern California. The dramatic numbers of dead, dying and diseased trees in the wildland/urban interface was obvious and pandemic. With that recognition came action at the federal, state and local levels. Evacuation plans were developed, fuel reduction projects were underway, firefighter staffing was increased and citizens were informed. One can only imagine how much worse it could have been without these pre-planning measures—and in hindsight how much more could have been done.

There were 14 fires that are part of the October Fire Siege: Roblar 2, Grand Prix/Padua, Pass, Piru, Verdale, Happy, Old, Simi, Cedar, Paradise, Mountain, Otay and Wellman. The names of some will not be remembered. Others will never be forgotten. Any one of the larger fires would have reduced the state's wildland firefighting forces to minimum draw down (that level where the success of extinguishing a fire with initial attack forces is compromised). With 14 fires burning, not only was initial attack firefighting compromised, but the firefighters and support resources needed for the major fires were depleted.

On October 21, 2003 a fire was ignited in the practice range at Camp Pendleton Marine Corps Base in San Diego County, California. This ignition would be the beginning of the fire siege. The ***Roblar 2 Fire***, as it was named, was not unusual for a large fire. But this fire became important as it began the mobilization of firefighters first from Southern California, then from Northern California, and then from across the United States as 13 more major fires ignited. In this introduction all the fires cannot be mentioned. Here are just a very few:



*A CDF inmate fire crew prepares for structure protection on the Cedar Fire.*

**CEDAR FIRE:** The Cedar Fire would prove to be a monster that had no regard for the lives in its path. As night fell on October 25th, incident commanders arrived at a deceptively small, but inaccessible fire making containment impossible. Orders for more firefighters were placed, but by then the numerous firestorms that were burning in Ventura, Los Angeles and San Bernardino Counties had drawn down resources to minimums. By midnight the devil winds hit.

All resources staged for the morning shift were pressed into immediate service. The town of Ramona was threatened and commanders knew they were going to lose homes. With the few resources they had, they did as much as could be done. Bump and run structure protection tactics were employed. At approximately 2:00 a.m. the Barona Indian Casino in Wildcat Canyon was threatened. The fire was splintering into multiple heads. Evacuation of the Casino was impossible. Sheltering in place was the only option. The fire tore through Wildcat Canyon destroying homes, trapping firefighters, sheriffs and citizens in choking smoke with zero visibility. Fire and law enforcement commanders knew they could not protect all the homes and resorted to search and rescue following behind the flame front, checking for survivors—and victims. As the sun came up the first fatalities were discovered near the Barona Indian Reservation. Many houses were lost, but many more were saved by firefighters. As the east winds started to diminish on Sunday, October 26, crews were able to take the offensive by building firelines on the western flank. They knew the west winds were coming and the heel of the fire would become the new head. The new head indeed materialized and destroyed the community of Cuyamaca and threatened to destroy the historic town of Julian. Structure protection engines were placed in front of the fire to defend what they could. Gallant efforts were made by crews, many of which had traveled from long distances and were pressed into the fight in unfamiliar country. One such crew was Novato Engine 6162 that was overrun by fire killing one firefighter and injuring the rest of the crew. When this fire was finally contained on November 4, 2003 it was recorded as the largest wildland fire in California's fire history; 273,246 acres consumed, 2,232 homes destroyed, and 14 lives lost.



*Firefighters are silhouetted in front of a blaze on the Old Fire.*

**GRAND PRIX FIRE and OLD FIRE:** In San Bernardino County, the Grand Prix Fire and the Old Fire began miles apart from each other on different days. These two fires eventually joined as they swept down on the Incident Command Post. With Santa Ana east winds howling, these two fires ripped through subdivisions at the base of the San Bernardino Mountains. The fire ran through the foothill communities of Devore, Lytle Creek, Del Rosa



*House surrounded by Eucalyptus catches fire.*

and Rancho Cucamonga. The Old Fire looked like a repeat of the 1980 Panorama fire, which destroyed 325 homes. This time, however, there was competition for firefighting resources leaving fewer firefighters to engage the fire. The western flank of the Grand Prix Fire crossed into Los Angeles County. With a vengeance, it threatened one subdivision after another. Finally, the winds died down enough to go on the offensive. With the ceasing of the east winds it was only a matter of time before the prevailing west winds would surface and the vulnerable forest communities including Crest Forest, Running Springs, Lake Arrowhead, Cedar Glen and Mt. Baldy Village would be threatened. The race was on. Law enforcement implemented the Mountain Area Safety Task Force (MAST) evacuation plan which had been written only months before. Firefighters scrambled into the diseased forest to protect the homes and backfire off of Highway 18 under worsening conditions. Hundreds of homes were destroyed, but thousands were saved. No burn fatalities occurred as the largest evacuation in San Bernardino County's history was successfully completed.



*A news crew gets some close footage on the Old Fire.*

**SIMI, VERDALE, PIRU FIRES:** The fires burning on the Los Angeles and Ventura County line moved at extraordinary rates of spread. The Simi Fire, fanned by Santa Ana winds burned at the incredible rate of 80,000 acres in 16 hours. Contingency plans were developed early on in the firefight to prevent the predictable spread of the fire to the west. Out of the last eight major fires to burn in this area none have ever been contained south of Highway 118. Previous fires had burned all the way to the ocean. The contingency plan called for an aggressive burn out operation along Highway 118 which was implemented and successful. As the fire reversed direction with the changing wind conditions, the community of Stevens Ranch was threatened. Fortunately this community was built with fire safe designs allowing residents to shelter in place and



giving firefighters the opportunity to protect all the structures. For 30 years Ventura County and more recently Los Angeles County have had aggressive fuel reduction programs and defensible space requirements. This contributed to only 37 homes being destroyed even though 6,800 homes were directly in the path of the fire.



*A U.S. Forest Service Hot Shot Crew gears up and heads for the fireline on the Grand Prix Fire.*

## The Future

The wildland fire agencies have spent the last 100 years striving to mobilize and engage firefighting resources effectively and safely. Since the "Big Blow Up" of the 1910 fire season, war has been waged on fire. Most of the time California wildland firefighting is an efficient and skilled engagement that saves lives, homes and natural resources. Ninety-seven percent of all wildland fires in California are extinguished in the first day with limited destruction. But that is not enough. The threat is great for those fires that escape early control and become major fires. And worse yet, sometimes that threat becomes a conflagration that becomes a catastrophe like those of this siege.



*Firefighters unable to save home.*

The term "wildland fire" has become a misnomer for most of California. In the past, firefighting efforts focused on perimeter control. Top priority has now been shifted to the protection of the millions of citizens who have moved to the wildland/urban interface. Now confronted with people and homes out in front of the fire, firefighters are forced into a defensive posture, often with their backs against a house defending it. Although the risk will always be present during a firefight, by creating a defensible space around homes and building in fire resistive construction, firefighters are given a chance to save lives and homes without undue risk.




*Major highways across the southland closed.*

Pre-planning successes like those of the mountain communities of San Bernardino who created the Mountain Area Safety Task Force (MAST), Ventura and Los Angeles County's aggressive vegetation management program, and Fire Safe Councils demonstrate that we can have a positive impact on saving lives and property.

The fires of the October siege are indicative of the future. The way fires burned in the past is how they will burn in the future. Fire officials know that there will continue to be large fires like the Grand Prix that will burn down the San Gabriel and San Bernardino Mountains into the foothill communities. They know that there is potential for a repeat of the deadly Cedar fire ravaging canyon communities in the rocky terrain of San Diego County. It is understood that the old decadent brush of the mountains above Santa Barbara once again shows great potential for a difficult, destructive fire like the Painted Cave Fire of 1990. Firefighters expect that a fire similar to the Old Fire has the potential to burn through other mountain communities plagued by dying trees like Big Bear, Idllywild and Lake Arrowhead. Will the next fire be in Malibu? Will a fire threaten Ojai? Will it burn in the old Monterey Pine Forest of Cambria or Monterey or could it once again come down on the cities of Southern California? The real question is not where, when, or if the next big fire will occur. The question is, are we prepared for it?

***The term "wildland fire" has become a misnomer for most of California...Top priority has been shifted to the protection of the millions of citizens who have moved to the wildland/urban interface.***

# EXHIBIT C
# Fire Restriction and Closure Plan for Cleveland National Forest

# FIRE RESTRICTION and CLOSURE PLAN

for

# CLEVELAND NATIONAL FOREST

Prepared By: ______________________ 4/23/92
Forest Fire Management Specialist — Date

Reviewed By: ______________________ 4/23/92
Forest Fire Management Officer — Date

Approved By: ______________________ 4/24/92
Forest Supervisor — Date

USFS01-00001

FIRE RESTRICTION AND EMERGENCY CLOSURE PLAN
CLEVELAND NATIONAL FOREST
U.S. FOREST SERVICE, REGION FIVE
APRIL, 1992

I. *INTRODUCTION*

This plan establishes the minimum guidelines the Forest will use when implementing fire restrictions and closures. The Forest is divided into 7 Fire Management Area Zones (FMAZ's) identified on the attached maps (exhibit A). Under this plan, each FMAZ will be managed independently according to the established criteria. Closures will be implemented under authority granted to the Forest Supervisor by Title 36 of the Code of Federal Regulations, Section 261.50 and 261.50(a) and (b), and specifically the Cleveland National Forest Supervisor's Fire Closure Order.

II. *OBJECTIVE*

The objective of this plan is to reduce human-caused fires on National Forest Lands providing safety to the public and protection of Forest resources associated with wildfires. Restrictions will be in effect at all times on the Cleveland due to the year-long fire season and the severe fire weather the forest often experiences during the winter months.

III. *SUMMARY OF FIRE RESTRICTIONS AND EMERGENCY CLOSURE PLANS*

This plan is designed to provide greater safety for people and property within the individual Forest FMAZ's during periods of emergency fire conditions. As restrictions will remain in effect year-long on the Cleveland National Forest, closures will be implemented as a last resort when there is no other option available to protect forest resources and provide for public safety. Closure is based on the fuel and weather conditions and the fire situation within each FMAZ.

The basic concept of this plan is to reduce the risk of unplanned fire occurrences, thus reducing the number of persons that might be exposed to danger as a result of an unplanned fire. This will be accomplished by reducing the number of persons in the Forest during critical fire situations. There are two basic methods of reducing the number of people using the Forest: one, by physically restricting access to the Forest utilizing gate and road closures and two, by informing the public utilizing mass media and roadside signing. Additional patrol of closed areas may be necessary in order to insure compliance with this closure.

IV. *DEFINITION OF RESTRICTIONS AND CLOSURES*

A. Regional General Fire Restrictions are imposed by Regional Order No. 91-1 (Exhibit B). These Fire Restrictions remain in effect year-round and are not influenced by minor daily weather fluctuations.

B. Year-round restrictions will be in effect on the Cleveland and are imposed by a Forest Order (Exhibit C). These restrictions prohibit persons from:

1. Building, maintaining, attending or using a fire, campfire, or stove fire, except a portable stove using gas, jellied petroleum or pressurized liquid fuel, outside of a developed recreation site. 36 CFR 261.52(a).



USFS01-00002

2. Smoking, except inside a building or vehicle, or while in an area at least three feet in diameter that is barren or cleared of all flammable materials. 36 CFR 261.52(d).

3. Welding or operating acetylene or other torch with open flame. 36 CFR 261.52(i).

4. Using an explosive. 36 CFR 261.52(e).

5. Operating an internal combustion engine except on a road. 36 CFR 261.52(h).

Pursuant to Title 36, Codet of Federal Regulations, Section 261.50(e) each of the following is exempt from this order:

1. Persons with a permit authorizing the otherwise prohibited act;

2. Any Federal, State, or local officer, or member of an organized rescue or fire fighting force in the performance of an official duty.

C. Emergency Fire Closure(s) are imposed by a special order (Exhibit D). Closures prohibit persons from:

1. Going into or being upon the area. 36 CFR 261.52(e).

2. Pursuant to 36 CFR 261.50(e), each of the following persons is in exempt from this order:

a. Persons with a permit authorizing entry,
b. Owners or lessees of land in the area,
c. Residents in the area,
d. Any Federal, State or local officer, or member of any organized rescue or firefighting force in the performance of an official duty.

V. *IMPLEMENTATION PROCEDURES FOR CLOSURES*

A. Closure implementation is based on the burning index and live fuel moisture levels. When the burning index and the live fuel moisture levels are met area closures may be authorized.

Live fuel moisture will be calculated on the 10th, 20th, and 30th of each month when burning indexes begin to approach levels of closure. Burning indexes are calculated proportional to the size of each National Fire Danger Rating System (NFDRS) area in a given FMAZ (Figure A).

FMAZ locations are listed below and identified on the attached maps (Exhibit A).

*FMAZ 2-T* (Exhibit A-1)

Location: The north half of the Trabuco Ranger District
Hazard Class: High
Weather Area: NFDRS Area 640

USFS01-00003

*FMAZ 3-T* (Exhibit A-1)

| | |
|---|---|
| Location: | The south half of the Trabuco Ranger District |
| Hazard Class: | Moderate |
| Weather Area: | NFDRS Area 640 |

*FMAZ 1-P* (Exhibit A-2)

| | |
|---|---|
| Location: | The community and surrounding area of Palomar Mountain. |
| Hazard Class: | Moderate |
| Weather Area: | NFDRS Area 675 |

*FMAZ 2-P* (Exhibit A-2)

| | |
|---|---|
| Location: | The Palomar Ranger District, north of Highway 76 excluding the community and surrounding area of Palomar Mountain. |
| Hazard Class: | High |
| Weather Area: | NFDRS Area 680 |

*FMAZ 3-P* (Exhibit A-2, A-3 & A-4)

| | |
|---|---|
| Location: | The Palomar Ranger District south of Highway 76 to the boundary of the Descanso Ranger District and the "Shotgun Area".. |
| Hazard Class: | Moderate |
| Weather Area: | NFDRS Area 630-10%, 675-15%, 680,30%, 685-45% |

*FMAZ 1-D* (Exhibit A-5)

| | |
|---|---|
| Location: | The lands in and adjacent to the Laguna Mountain Recreation Area. |
| Hazard Class: | Moderate |
| Weather Area: | NFDRS Area 675 |

*FMAZ 3-D* (Exhibit A-4 & A-5)

| | |
|---|---|
| Location: | All lands within the Descanso Ranger District excluding those directly and adjacent to the Laguna Mountain Recreation Area. |
| Hazard Class: | Moderate |
| Weather Area: | NFDRS 685 |

B. Weather and fuel moisture conditions are monitored by the District Ranger who will determine if the criteria for closure has been met. Closure criteria conditions must be sustained for a period of 48 hours, and predicted to continue, prior to closure implementation. When closure criteria have been met for a particular zone, the Forest Supervisor will make the final decision to implement closures. When closures are implemented, contacts will be made according to the procedures outlined in this plan (see Section VI). The following chart lists the criteria to be used for implementing closures.

USFS01-00004

Figure A
**CLOSURE IMPLEMENTATION**

| ZONE HAZARD CLASSIFICATION | RESTRICTIONS | EMERGENCY CLOSURE * |
|---|---|---|
| HIGH<br>FMAZ 2-T,2-P | Year long | Burning Index ≥120<br>and<br>Live Fuel Moisture ≤60% |
| MODERATE<br>FMAZ 3-T,1-P<br>3-P,1-D,3-D | Year long | Burning Index ≥150<br>and<br>Live Fuel Moisture ≤60% |

* Area closures may also be implemented under the following conditions:
(1) Red Flag wind warning of 25+ mph is in effect,
(2) multiple fires are occurring on the Forest,
(3) large or multiple fires off the Forest, have depleted fire suppression forces substantially.

VI. *IMPLEMENTATION PROCEDURES FOR CANCELLATIONS*

A. When a closure has been implemented in any FMAZ, the District Ranger will monitor the weather and fuel moisture conditions and determine if the criteria for cancellation have been met. Prior to removing the closure, criteria conditions will be sustained for a period of 48 hours, and predicted to continue. When cancellation criteria have been met, the Forest Supervisor will make the final decision to cancel a closure and contacts will be made according to the procedures outlined in this plan (see Part VII, Section C). The following chart lists the criteria to be used for cancelling closures.

Figure B
**CANCELLATION IMPLEMENTATION**

| ZONE HAZARD CLASSIFICATION | RESTRICTIONS | EMERGENCY CLOSURE * |
|---|---|---|
| HIGH<br>FMAZ 2-T,2-P | Year long | Burning Index ≤80<br>or<br>Live Fuel Moisture ≥60% |
| MODERATE<br>FMAZ 3-T,1-P,3-P<br>1-D,3-D | Year long | Burning Index ≤80<br>or<br>Live Fuel Moisture ≥60% |

* When area closures are implemented by criteria other than Burning Index and Live Fuel Moisture Content they may be cancelled when the condition that caused the closure ends, (e.g, red flag wind warning is cancelled).

VII. *FOREST COORDINATION PROCEDURES*

A. Restrictions remain in effect on the Cleveland year-round, therefore the following actions are to be taken:

1. Districts will:

a. Post restriction signs reflecting the current situation.



USFS01-00005

b. Coordinate with cooperators, issue appropriate permits and conduct field compliance checks.

2. Forest Dispatcher will:

a. Monitor & record daily burning indexes from all of the reporting weather stations.
b. Monitor & record bi-monthly the live fuel moistures from specific sampling areas.
c. Notify the appropriate Fire Management Staff Officers when indexes approach the closure criteria.

3. Forest Fire Mangement Officer will:

a. Notify the Forest Supervisor as indexes meet the closure criteria.
b. Contact the South Zone Forests to coordinate closure(s) between the forests.

B. When an Emergency Closure(s) is declared the following actions will be taken:

1. Forest Supervisor will:

a. Notify the District Rangers and SO Staff of any decision to implement the forest closure.
b. Notify the Regional Office and the Zone Coordinator.
c. Notify the local cooperators.

2. Districts will:

a. District Ranger will notify Forest Supervisor.
b. Contact and coordinate with local fire and law enforcement agencies and other key cooperators in implementing the closure.
c. Contact Utility companies.
d. Mobilize all available personnel to implement the closure.
e. Post emergency closure signs.

3. Forest PAO will:

a. Be responsible for alerting the media through news releases pertaining to the closure implementation.

C. Cancellation of Emergency Closure(s)

1. Forest Dispatcher will:

a. Monitor the conditions and notify the appropriate Fire Management Staff Officers as emergency closure criteria subside and conditions are met for a period of 48 hours and predicted to continue.

2. Forest Supervisor will:

a. Prepare an order repealing the closure.
b. Notify the Regional Office

USFS01-00006

3. Districts will:

   a. De-activate the Forest closure.
   b. Notify local fire and law enforcement agencies of cancellation of closure.
   c. Notify utility companies of cancellation of closure.

4. Forest PAO will:

   a. Notify the media of cancellation of the Forest closure.

EXHBIT A

Forest Closure Map Boundries




USFS01-00009




USFS01-00010




USFS01-00011




USFS01-00012




USFS01-00013




USFS01-00014

EXHIBIT B

Order No. 91-1

ORDER NO. 91-1

FIRE RESTRICTIONS

PACIFIC SOUTHWEST REGION

Pursuant to 36 CFR 261.50(a) and (b), each of the following is prohibited on lands, or Forest Development Roads or Trails under my jurisdiction.

1. Building, maintaining, attending or using a fire, campfire or stove fire in any area outside a developed recreation site. 36 CFR 261.52(a).

   (a) In Zone A as defined in California Public Resources Code 4413.

   (b) In Zone B as defined in California Public Resources Code 4413, from May 1 until the date the hazardous fire conditions have been proclaimed abated for the year.

2. Using an explosive. 36 CFR 261.52(b).

3. Smoking, except within an enclosed vehicle or building, a developed recreation site, a designated smoking area, or while stopped in an area at least three feet in diameter that is barren or cleared of all flammable material. 36 CFR 261.52(d).

   (a) In Zone A as defined in California Public Resources Code 4413.

   (b) In Zone B as defined in California Public Resources Code 4413, from May 1 until the date the hazardous fire conditions have been proclaimed abated for the year.

4. Possessing, discharging or using any kind of firework or other pyrotechnic device. 36 CFR 261.52(f).

5. Welding or operating an acetylene or other torch with open flame. 36 CFR 261.52(i).

   (a) In Zone A as defined in California Public Resources Code 4413.

   (b) In Zone B as defined in California Public Resources Code 4413, from May 1 until the date that the hazardous fire conditions have been proclaimed abated for the year.

6. Operating or using any internal or external combustion engine, without a spark arresting device properly installed, maintained and in effective working order meeting either: (1) Department of Agriculture, Forest Service Standard 5100-1a; or (2) appropriate Society of Automotive Engineers (SAE) Recommended Practice J335(b) and J350(a). Motor trucks, truck tractors, buses and passenger vehicles, except motorcycles, are not subject to these provisions if the exhaust system is equipped with a muffler as defined in the California Vehicle Code. 36 CFR 261.52(j).

7. Violating any of the following California State Forest and Fire Laws on National Forest land, or on State or Private land inside the National Forest Boundary, or adjacent thereto, when such act or omission affects, threatens, or endangers property of the United States administered by the Forest Service. 36 CFR 261.52(k).

Public Resources Code

Section
4291 - Reduction of Fire Hazards Around Buildings
4292 - Powerline Hazard Reduction
4293 - Powerline Clearance Required
4296.5 Railroad Rights-of-way Clearance
4373 - Minimum Requirements for Rubbish Dumps (under permit)
4374 - Minimum Requirements for Rubbish Dumps
4423 - Written Permit Required for Burning
4427 - Clearance and Tools required
4428 - Firefighting Tools Required on Industrial Operations
4429 - Industrial Camp Tool Cache
4430 - Steam-operated Engine Equipment Requirements
4431 - Gasoline Power Saw - Firefighting Equipment Required
4438 - Forest Product Waste Disposal (enclosed)
4439 - Forest Product Waste Disposal (open)
4440 - Forest Product Waste Storage
4446 - Incinerator Standards

Pursuant to 36 CFR 261.50(e), each of the following are exempt from this Order:

a. Persons with a permit specifically authorizing the otherwise prohibited act or omission.

b. Any Federal, State, or local officer, or member of an organized rescue or fire fighting force in the performance of an official duty.

This order supersedes Order No. 83-2, issued August 16, 1983. These Prohibitions are in addition to the General Prohibitions in 36 CFR Part 261. This Order may be made more restrictive by temporary orders issued by the Regional Forester or a Forest Supervisor during periods of fire danger.

Executed in San Francisco, California this 24th day of July 1991.

/s/Laurence Bembry
for Ronald E. Stewart
Regional Forester
Pacific Southwest Region

Violation of these prohibitions is punishable by a fine of not more than $5000.00 or imprisonment for not more than six months or both. See Title 16 United States Code Section 551.

EXHIBIT C

Order No. 92-02-01

ORDER NO. 92-02-01

FIRE RESTRICTIONS

CLEVELAND NATIONAL FOREST

Pursuant to Title 36, Code of Federal Regulations, Sections 261.50(a) and (b), in order to promote public health, welfare and safety and further the protection and administration of the Cleveland National Forest, each of the following acts are prohibited as defined by the attached Cleveland National Forest Fire Restrictions and Closures Plan, dated April, 1992, on any National Forest land, forest development road or trail under my jurisdiction:

1. Building, maintaining, attending or using a fire, campfire, or stove fire. 36 CFR 261.52(a).
2. Smoking, except inside a building or vehicle, or while in an area at least three feet in diameter that is barren or cleared of all flammable materials. 36 CFR 261.52(d).
3. Welding or operating acetylene or other torch with open flame. 36 CFR 261.52(i).
4. Using an explosive. 36 CFR 261.52(b).

Pursuant to Title 36, Code of Federal Regulations, Section 261.50(e) each of the following is exempt from this order:

1. Persons with a permit authorizing the otherwise prohibited act;
2. Any Federal, State, or local officer, or, member of an organized rescue or fire fighting force in the performance of an official duty.

The following are exempt from 36 CFR 261.52(e):

1. Owner or lessee of land in the area;
2. Residents in the area.

This order supersedes and makes null and void, Order No. 81-02-3.

These prohibitions are in addition to the general prohibitions in Title 36, Code of Federal Regulations, Part 261.

Done at Rancho Bernardo, California, this 24th day of April, 1992.

Anne S. Fege
Forest Supervisor
Cleveland National Forest

Violation of these prohibitions is punishable by a fine of not more than $5,000.00 or imprisonment for not more than 6 months or both. Title 16, United States Code, Section 551.

EXHBIT D

Order No. 92-02-02