EXHIBIT H

USDA Forest Service Gen. Tech. Rep. PSW-7

*Can Southern California Wildland Conflagrations be Stopped?*

(1974)

# Can Southern California Wildland Conflagrations be Stopped ?

Clive M. Countryman

PACIFIC SOUTHWEST
Forest and Range
Experiment Station

FOREST SERVICE
U.S DEPARTMENT OF AGRICULTURE
P.O. BOX 245, BERKELEY, CALIFORNIA 94701

USDA FOREST SERVICE
GENERAL TECHNICAL
REPORT PSW- 7 /1974

# CONTENTS


| | Page |
|---|---|
| Introduction | 1 |
| The Fire Problem | 1 |
| Climate, Fuels, Topography, and People Create Fire Problem | 1 |
| Relatively Few Fires Become Conflagrations | 2 |
| Conflagrations Are Most Frequent During Santa Ana Winds | 2 |
| Suppression of Santa Ana Fires Is Difficult | 3 |
| Fire Control as a Solution | 4 |
| Fire Prevention Has Limited Value | 4 |
| Effect of Organizational Problems on Fire Size is Small | 4 |
| Firefighting Techniques and Equipment are Not Adequate | 4 |
| Increased Fire Control Force is Only a Partial Answer | 5 |
| A Solution Through Fuel Modification | 6 |
| Rotational Burning Creates a Mosaic of Age Classes | 6 |
| Adverse Effects | 7 |
| High Costs | 7 |
| Possible Increased Fire Hazard | 7 |
| Fuel-Breaks Provide Strips of Modified Fuel | 8 |
| Fuel-Type Mosaics Can Lower Energy Output | 9 |
| Fuel-Type Mosaics Can Be Created in Many Ways | 9 |
| Fuel-Type Mosaics Are Not a Quick Cure | 10 |
| Complete and Coordinated Planning is Essential | 10 |

Countryman, Clive M.
1974. Can southern California wildland conflagrations be stopped? Pacific Southwest Forest and Range Exp. Stn., Berkeley, Calif., 11 p. (USDA Forest Serv. Gen. Tech. Rep. PSW-7)

In southern California, many fires start and burn under conditions that permit their control with little burned acreage and fire damage. In contrast, under other conditions of weather and topography, on a small group of fires, control effort is relatively ineffective; they become large and destructive. A major reason for these "conflagration fires" is the extreme difficulty of stopping the head of a hot, fast-running fire in dry fuels and strong winds. No radically new concept of suppression can be anticipated. The best prospect for alleviation of the problem is modification of the vegetation to reduce fuel energy output. In a fuel-type mosaic containing large areas of light fuels, where conventional suppression will be effective, potential conflagrations could be brought under control while relatively small. Creation of the fuel-type mosaic will require coordinated area-by-area planning and a variety of techniques.

Oxford: 432.16(794):187x424.5

*Retrieval Terms:* fire management; southern California; high intensity fires; flash fuels; fuel modification; chaparral fires.

Tile 1970 Fire season was one of die worst in California's long history of disastrous fire seasons -- certainly the worst in recent years. More than 500,000 acres of watershed and timber were burned, most of them in the short period between September 25 and October 4. The loss of 16 lives can be attributed to the fire activity. More than 700 homes and other structures were burned, and fire damage and suppression costs have been estimated at $233,000,000. The damages will continue to mount, since the threat of flood and erosion will continue until protective vegetative cover returns to the denuded watersheds--in some areas this will take many years.

California does not have an exclusive corner on the large-scale, high-intensity fires often called conflagrations or conflagration fires. In 1970, several such fires in Washington State destroyed extensive areas of timber. The Trapper Peak and Sundance fires burned in Idaho and Montana in 1967. Other regions also have large wildland fires from time to time. But conflagrations in other areas are usually infrequent, with several to many years elapsing between "bad" seasons. In California, large and devastating fires occur nearly every year. Statistics compiled by the U.S. Forest Service indicate that the California region consistently accounts for about 42 percent of the burned area and 55 percent of the reported damage in the National Forests within the contiguous United States. Most of the California conflagrations occur in die southern half of the State, the area south of the Tehachapi Mountains being particularly susceptible.

The gravity of the southern California fire problem has long been recognized. But despite years of effort by control agencies and research, die fires continue to occur with alarming regularity, arid damages and suppression costs continue to grow,

This paper describes the causes and characteristics of die conflagration fires in southern California, and evaluates present arid proposed efforts to find a solution. A unified program aimed at the one element of conflagration fires that can be practicably modified - the fuel - is outlined.

## THE FIRE PROBLEM

### Climate, Fuels, Topography, and People Create Fire

Why are there so many fires in southern California? Primarily because the Mediterranean climate and a distinctive complex of topography and fuel create conditions favorable to major fires during every month of the year. The winters are mild, with infrequent short rainy periods. A long period without rain often extends from early spring to late fall or early winter. Steep and rugged mountains, cut by numerous canyons, border most of the major cities. Much of the mountain land is covered with a dense growth of flammable chaparral shrubs, such as chamise, manzanita, ceanothus, and scrub oak. On the lower slopes and foothills, this heavy growth gives way to lighter, but extremely flammable vegetation, such as sage, buckwheat, and various grasses and forbs. Some of the higher ridges are covered with conifers -mostly pine- interspersed with chaparral and grass. During the late winter and early spring growing season, the vegetation usually contains large amounts of moisture -providing there has been enough rain to start growth at all. But with the onset of the long rainless season, the annual plants die, and the shrubs lose much of their moisture. By September, some of the living plants, such as chamise, can be ignited with a match, and the dead and dry annuals can be touched off by a spark. After a fire, many of the plant species sprout prolifically, and others re--generate from seed left in the soil. Within 10 to 20 years, enough standing fuel has developed and dead material accumulated to permit the area to burn hot and fast again.

The great population influx into southern California has vastly complicated the fire hazard created by natural conditions. Residential subdivisions and individual houses have been pushing farther and farther into the mountains. Houses are often perched on ledges bulldozed into the steep slopes, or are crowded on sharp ridges and in narrow canyons. The conifer-
covered ridges do not escape this influx -wherever

private land is available, homes and resort communities abound. Campgrounds, picnic areas, and organization camps dot the public lands in these areas. The result is a fire control problem probably without parallel elsewhere in the world.

**Relatively Few Fires Become Conflagrations**

All fires that start in California do not have the potential for becoming large and damaging. Local variations in weather, fuels, topography, and the location of the fire may limit the rate and extent of fire spread, and create wide variations in the difficulty of fire control. And wildland fire control forces are highly effective. As a result, the vast majority of fires are controlled while still small. In the 5-year period ending in 1968, less than 1 percent of the fires on California National Forests became 300 acres or larger, and less than 4 percent larger than 100 acres. Even during the unusually severe conditions between September 25 and October 4, 1970, less than 5 percent of the fires reached 300 acres or more. It is the few fires that escape early control, however, that do most of the damage -80 to 90 percent of the total. And it is these fires that must be stopped if the southern California conflagration problem is to be solved.

**Conflagrations Are Most Frequent During Santa Ana Winds**

During most of the year, southern California has westerly winds and a marine climate. Hot days can Occur almost any time during the year, but are most frequent during the summer and early fall. Because of the marine influence, the air is seldom excessively dry. Overcast days even in summer are not unusual. Relative humidity, and hence fuel moisture also, usually reach fairly high levels at night. Under these conditions, fires can usually be controlled when small -most within a short time after they start. Occasionally, however, when the weather is particularly dry or windy, a fire will escape early control and become large and damaging. Such fires are relatively rare under the marine climate, however.

Most of the large fires in southern California occur when the marine airflow is replaced by the foehn-type Santa Ana winds. Originating as cold, dry air high in the troposphere, these winds sweep down from die Great Basin area, warming by compression and becoming more dry as they come. Reaching the ground near the desert rim, they roar down the mountain slopes and canyons to the sea. Wind speeds may reach 100 miles per hour in exposed areas, and relative humidity frequently approaches the vanishing point. The rough, broken topography and high wind speeds create highly turbulent air flow in the many canyons. Wind direction in these areas may switch 180 degrees and back again in a few seconds.

The Santa Ana "season" ordinarily starts in middle or late September. Santa Ana periods increase in frequency during October and November and begin taper off in December. A second peak in Santa Ana frequency may occur in March *(table 1)*.

Table 1—*Number of Santa Ana periods by months southern California 1951-60*

| Month | Frequency | Average day |
|---|---|---|
| September | 11 | 4.4 |
| October | 19 | 4.5 |
| November | 26 | 5.0 |
| December | 18 | 3.7 |
| January | 7 | 1.7 |
| February | 10 | 1.9 |
| March | 17 | 2.5 |
| April | 8 | 1.8 |
| May | 7 | 1.4 |
| June | 4 | 4.5 |
| July | 2 | 2.5 |
| August | 0 | 0 |

Santa Ana periods that occur in fall and early winter, before the rains begin, generally create the greatest conflagration hazard, as the moisture content of both dead and living fuel is then likely to be at its lowest ebb. Because of the rapid drying of all fuels under Santa Ana conditions, however, major fires can occur later in the year, particularly when winter rain-fall is light. For example, three fires starting in the mountains at the edge of Los Angeles during a Santa Ana on March 16, 1964, burned a total of 11,650 acres, destroyed 20 houses, and severely damaged 10 others.

The Santa Ana winds usually follow a typical pattern of development and regression. In their initial phase, the strong winds reach the ground suddenly and follow the terrain configurations. The temperature is often high, and the relative humidity remains low both day and night. With these conditions, living fuels become parched and the dead fuels quickly become tinder dry. Because the dry Santa Ana air is relatively heavier than the more moist marine air, the winds tend to "channel," flowing through the moun- tain passes and down the main drainages. Between these areas the wind is often light. The initial phase the Santa Ana can usually be measured in hours, but occasionally may last 2 or 3 days.

When the area on die lee side of the mountains fills with the dry, heavy air, and the offshore pressure gradient begins to weaken, the strong Santa Ana

winds begin to lift above the ground, bringing some moderation in the wind speed at the surface. This process begins at low elevations first, and then progresses upward until only the higher slopes and ridges have the strong winds. The high-speed winds may surface again intermittently, particularly at night. Where winds are light, thermal up-slope and up-canyon airflow will develop during this phase of the Santa Ana, as it normally does under the marine climate. The air remains extremely dry, however, and the wind over the ridges is opposite in direction to marine airflow. This phase of the Santa Ana lasts for varying times usually 2 or 3 days, but sometimes a week or more.

As the offshore gradient continues to weaken, the marine air begins to intrude again, first along the coast, and then pushing further inland as onshore pressure gradient builds. Although burning conditions in this phase of a Santa Ana have been greatly moderated, it is a period of high hazard for firefighters. In the area where the marine and Santa Ana air meet, the wind can be highly variable in speed and direction. The fuels remain extremely dry, and fires can flare up quickly and move rapidly, particularly in rough terrain. Most firefighting accidents in southern California occur during this phase of a Santa Ana. Finally the Santa Ana winds cease, the fuels begin to pick up moisture from the marine air, and normal weather conditions again prevail.

**Suppression of Santa Ana Fires is Difficult**

Controlling a fire that starts in a wind affected area during the initial phase of a Santa Ana is an enormously difficult task. The dry fuels permit fires to start easily and build up quickly. Within a few minutes spot fires begin to appear. The fire is then so widespread that it is usually beyond hope of control by initial attack forces. Driven by the strong wind, the fire spreads rapidly. It is not unusual for a fully developed fire in chaparral to enlarge at the rate of 4 to 6 square miles per hour during the initial phase of a Santa Ana. Spot fires are numerous, sometimes up to a mile ahead of the main fire and occasionally as much as 4 miles. Because of the spot fires, rough topography, and turbulent wind, the fire front is often extremely ragged-the effective fire front may be very deep, with rapidly enlarging spot fires and moving tongues of fire as much as a mile ahead of the main body of fire. The smoke from the fire is field close to the ground by the wind, cutting visibility to near zero in many areas.

As the fire grows, so does the difficulty of controlling it. Barriers that could have been used by firefighting crews to make a stand against a fire under the marine climate become ineffective as a hail of burning embers is driven into the unburned fuel ahead of the fire -Santa Ana fires have been known to cross freeways without slowing. Long distance spotting becomes more prevalent as the fire enlarges. Dense smoke, and blowing sand, dust, and ashes make control work slow and arduous. Because of the rapid fire spread, numerous spot fires, poor visibility, and the large and deep fire front, the hazard to the firefighting force is extreme. Some of the usual firefighting tools and techniques also become ineffective.

Thus, the fire often continues to spread rapidly with the wind until the fire head runs out of fuel or the initial phase of the Santa Ana ends. But even then, the fire is not over. Control forces are still faced with the monumental task of constructing many miles of fireline to stop the lateral and rearward spread of the flames. If the wind continues, additional rapid fire runs, parallel to the initial run, may occur. Because of the rugged topography, access to the fire edge is nearly impossible in many places, and feasible locations for control lines are few and far between. Also, considerable time is required to construct effective control lines. As a result, the fire may double or even triple in size during the final control operations, even though burning conditions have moderated.

Usually, little can be done to stop the head of a fire during the initial phase of a Santa Ana, but effective work is often possible at the rear and much of the flanks of the fire. Because of the strong wind, large sections of the rear of the fire oftentimes go out, and frequently the flanks are relatively free of many of the problems that plague firefighters at the head of the fire. Thus, it would appear that if firefighting efforts were concentrated on the rear and flanks of the fire, control could be effected soon after the head of the fire stops. And this technique is frequently used in other areas where fires bum under strong winds. Unfortunately, however, the "people" problem often precludes the effective use of this strategy in southern California. In this area it is now unlikely that a fire can become large without homes, communities, and various other improvements being in its path. Because of this threat, it is frequently necessary to divert a large part of the available control force to the evacuation of people and the protection of structures and improvements. Often only token effort can be made toward control of the rear and flanks of the fire until the fire head stops. This problem becomes particularly acute when several major fires are burning at once and fire control forces are thinly spread.

## FIRE CONTROL AS A SOLUTION

Much effort has been devoted to the abatement of the conflagration fire problem through improved fire control, and further endeavors in this area are being made or have been proposed. They include fire prevention activities, development of organizational structures and procedures for multi-fire and multi-agency fire suppression, increases in fire control forces and their efficiency, and improvements in firefighting techniques and equipment. Over the years, substantial increases in the effectiveness and efficiency of fire control operations in general have been achieved. No apparent drop in the number of conflagration fires has resulted, however, and the economic and human losses directly attributable to these fires continue to mount. There are several reasons for this condition.

### Fire Prevention Has Limited Value

Fire prevention has received considerable attention as a possible means of eliminating or reducing the number of conflagration fires; obviously a fire that does not start will not have to be controlled. During the critical fire weather period of September 25 to October 5, 1970. the fire control agencies greatly intensified their fire prevention efforts. This action undoubtedly prevented many fires that would otherwise have further overloaded the fire control forces. But fire prevention programs appear to have little effect on those indifferent to the consequences of careless use of fire and fire starting agents. Arson fires are not susceptible to fire prevention programs, and neither are accidental fires such as those caused by motorized vehicle and other equipment accidents. Despite intensive fire prevention in 1970, the number of fire starts set a record.

All fires do not have conflagration potential; fires starting in some areas and from some causes are more likely than others to become conflagrations. Although fire prevention programs may reduce the total number of fire starts, even the best of fire prevention is not likely to significantly affect the number of fire starts that can become conflagrations.

In one area, however, fire prevention action could have significant impact. In California during 1970, about 55 percent of the burned area resulted from fires started by powerlines. In southern California, the figure was 68 percent, and included some of the most devastating fires. Although these 1970 figures were probably higher than normal, powerlines are known to be consistently a major cause of conflagration fires. Usually caused by strong winds, most such fires start in extreme fire weather, and often in posed areas of difficult access. Almost all powerline fires are started by secondary or "feeder" lines, not the major transmission systems. New types of con- ductors and techniques to put these powerlines underground have been developed. Application of this technology could virtually eliminate powerline fires and would substantially reduce the burned acreage in southern California-perhaps by as much as 50 percent.

### Effect of Organizational Problems on Fire Size is

In southern California, several fire control agencies often must work together and provide mutual assistance during fire control operations on large fires during multiple fire situations. The mutual aid between agencies in this area is perhaps the best anywhere in the nation, and it has been effectively used many times. It is probably inevitable, however, that some problems will arise between agencies that differ in organizational structure and power to act -especially during the confusion of multiple fires of major proportions.

Changes in fire control organization and procedures, particularly for critical fire situations, have been considered as a means of reducing the conflagration fire problem. Studies aimed at the development of sophisticated organizational structures and of techniques and procedures for highly centralized control of fire suppression operations have been undertaken. But interagency problems have been largely procedural and administrative. They have had little effect on the number of conflagration fires or the area that they burn. Thus, although more sophisticated organization and operational procedures may possibly effect more economic fire suppression, this line of attack does not appear to hold much promise for abatement of the conflagration fire problem.

### Firefighting Techniques and Equipment Are Not Adequate

A fire that starts in an exposed area under a strong wind and dry fuel conditions, and with extensive areas of dense chaparral ahead of it, has a high possibility of becoming a major fire unless it is suppressed almost immediately. Most chaparral fuels have nearly ideal characteristics for rapid combustion under dry and windy conditions, and the heat energy produced by a large and rapidly moving fire is tremendous. For example, a fire enlarging at the rate of 4 square miles per hour will produce 400 to 800 *billion* Btu's per hour -about the same as burning 3 to 6 million

gallons of gasoline. And the greatest heat production is at the head of the fire. Because of the enormous energy output of an intense chaparral fire, present fire suppression methods and equipment are generally ineffective in stopping the head of a hot, fast-running fire in a strong wind. *This is the primary problem in the control of conflagration fires.*

Fire suppression methods have not changed basically since organized fire control began; equipment and techniques already in use have been improved and modified. Thus, bulldozers and other mechanical equipment are now used for much of the firebreak construction that was formally done manually, but firebreaks still remain the basic fire control method. Fire tankers and portable pumps have replaced the bucket brigade, and these have been supplemented with aerial delivery of water and fire retardants. Chemical retardants have been used in fire suppression since ancient times, but today better formulations and delivery methods have made their use more widespread.

Further improvement in firefighting techniques and equipment has been strongly supported in the search for an answer to conflagration fires. For example, soon after the 1970 fire disaster, the suggestion was made that massive air attack with fire retardants would provide quick control of conflagration fires. Overall, however, the potential for "victory through air power" does not appear bright. The use of air tankers in the conditions in which conflagration fires burn is beset with difficulties. The hazard of low-level flying in rough terrain and turbulent winds may often preclude the use of aircraft at all. Air tankers do not provide an efficient method of retardant application; a sizable part of the retardant delivered is wasted-even under favorable conditions. And on the many spot fires and deep ragged front of a conflagration fire, delivery of extremely large volumes of fire retardants or water is required for any significant effect on fire behavior.

The effectiveness of fire retardants also decreases rapidly as fire intensity increases. Fire retardants are just that; they can be used to retard or slow a fire, but seldom extinguish it even hinder moderate burning conditions. It is essential that fire crews and equipment be able to work on the fire edge very soon after the retardant is applied if fire spread is to be stopped and the retardant drop is to be of any value. In conflagration fires, the opportunities to do so are usually limited to the flanks and rear of the fire because of difficult access and die extreme hazard at the head of the fire. Like other fire control techniques, air attack is stymied by the nature of the conflagration fire and the conditions under which it burns.

Quick control of conflagration fires will probably require a radically new concept or technique in fire suppression. Such a breakthrough is not imminent, and it is improbable that one will appear soon. Suppression of conflagration fires does not appear amenable to solution with present technology.

### Increased Fire Control Force Is Only a Partial Answer

Public wildland firefighting forces in southern California are probably the best of their kind in the world. Well trained and well led, and with a large amount of generally good equipment, they do an extraordinary job of suppressing fires and protecting property in difficult and hazardous situations. Without a firefighting force of this quality, losses from wildland fires would be vastly greater. But higher wages, greater operating and equipment costs, and appropriations that have not kept pace with these rising costs, are resulting in erosion of the strength and quality of public firefighting forces. Highly trained and experienced initial attack crews are becoming smaller or fewer in number. Some firefighting equipment cannot be fully manned, or cannot be used at all because of lack of manpower. The effect of this shrinking firefighting capability is felt most when critical fire weather and numerous fires occur over wide areas. When this happens there are not enough fire crews and equipment to handle the situation, and some fires become large that otherwise could have been stopped when small.

On the National Forests, the manpower problem has recently been ameliorated to some extent by increased authorization to use emergency firefighting funds during the fire season. But this must be considered a stop-gap measure -it does not provide the cadre of well trained and experienced firemen needed to direct season personnel and to insure safety and efficiency in firefighting.

Since present firefighting techniques are not generally effective in stopping the head of a conflagration fire, most of the effect of strengthened firefighting resources can be expected for non-conflagration situations. And fires under such conditions account for only 10 to 20 percent of the burned acreage. The impact on conflagration fires is not likely to be great. Many of the fires that start during Santa Ana and other severe fire weather are beyond hope of early control before firefighting forces can reach them -- some before they are discovered -because of rapid spread, difficult access, or both. Under these condi-

tions, it simply is not economically feasible to have enough crews and equipment to stop all fires immediately after they start; the protected area is too large, the access too difficult, and the number of days during the fire season they are really needed in large numbers too few. While augmented fire control resources can ease the strain on firefighting agencies, reduce the number of fires and burned area for nonconflagration situations, and possible effect earlier control of some conflagrations, the final answer to the conflagration fire problem is not likely to be found in more men and equipment alone.

## A SOLUTION THROUGH FUEL MODIFICATION

If conflagration fires cannot be prevented from starting, and cannot be controlled before becoming large, must such fires be accepted as inevitable in southern California? I think not. The behavior of wildland fire is detemtined primarily by the weather, the topography, and the fuel. Little can be done about weather or topography. But wildland fuels, which supply the energy that makes some fires uncontrollable, are subject to modification and management. Limited fuel modification is, in fact, the basic principle of most control methods now in use. Depriving a fire of continued energy by removing all of the fuel in a band or firebreak around the fire, or putting water and chemicals on the fuel so that it will bum slowly or not at all, is fuel modification.

People have been changing the characteristics of vegetation as a fuel, intentionally and unintentionally, since prehistoric times. World-wide, vast areas have been cleared of native vegetation to provide farming and grazing lands, and sites for cities. Today, road construction, timber harvesting, silvicultural practices, grazing use, watershed development, recreational use, wildlife management practices -all result in modification of wildland fuels. In some areas, man-made air pollution has altered the vegetation and added to the amount of high flammable dead material. Man-caused fires quickly change the vegetation, and repeated fires may effect long-term changes in the fuel characteristics. Fire prevention and quick control of fire in areas where fires have occurred naturally in the past can result in the build-up of flammable vegetation that makes fires more intense and damaging when they do occur.

What kind of fuel modification is needed to stop southern California conflagration fires? The crux of the problem is the high energy output of chaparral fuels in extreme burning conditions. When a fire reaches an extensive area of low fuel loading, or slow-burning fuel, or where the chaparral is interspersed with such fuel, the energy output drops over the fire front or at least many segments of it. Fire suppression methods then again become effective along much of the fire front, and firefighting forces can safely concentrate effort on the few relatively high-intensity sections and can take quick advantage of lulls in burning conditions. *What is needed then, is to create a fuel complex whose energy output even in the worst burning conditions is low enough to permit firefight forces to contain the fire.*

Fuel modification is an accepted practice to reduce fire hazard and to aid in fire control. In timber areas, debris left from logging and silvicultural treatments is often reduced by burning or mechanical treatment. Prescribed fire is used in forest stands in the southern United States and some parts of West to reduce the amount of fuel. In some regions extensive areas of brush have been converted to grass or timber.

Although some fire control experts have long recognized the extensive areas of heavy chaparral as primary cause of southern California's conflagration problem, no comprehensive plan has been put forth to reduce the hazard through extensive fuel modification and management. The disastrous 1970 season, however, and the growing realization that further large increases in fire control and fire prevention may not be helpful, have focused attention on fuel modification and management as a solution. Several approaches have been proposed or undertaken.

### Rotational Burning Creates a Mosaic of Age Classes

Rotational burning is one method of fuel modification that has recently been strongly recommended for southern California. After a wildfire, chaparral does not burn easily again until the shrubs have grown and dead fuel has accumulated. This regrowth may require 10 to 20 years or more, depending on the weather, soils, and intensity of the wildfire. In an area that has been subject to numerous fires over a period of years, the chaparral tends to appear in a mosaic of some parts of the mosaic not having sufficient fuel to support an intensive fire. If the mosaic contains enough areas of young chaparral and these areas are favorably distributed, conflagration fires are unlikely, as the large expanses of fuels needed for such fires are lacking. Under the rotational burning concept, the mosaic of age classes would be artificially created by intentionally burning portions of the area each year under conditions in which a fire can be controlled and confined to a

sired size. The mosaic is to be maintained by repeated burning at intervals sufficiently short to prevent accumulations of highly flammable material.

This general technique has been successfully applied for many years in the pine timber stands of the Southern States, where low intensity fires are used at intervals to remove accumulated dead material and unwanted understory vegetation. It has also been extensively applied in the eucalyptus forests of Australia.

But chaparral stands are not the same as timber stands. Although rotational burning is a valuable technique for fuel modification in the areas for which it was developed, its application to southern California chaparral presents certain problems.

### Adverse Effects

Southern California chaparral can become flammable enough to bum intensely within 20 years after a wildfire. Hence, for rotational burning to be effective, the interval between prescribed bums must be short-perhaps 15 years or less. Wildfires seldom bum an area with this frequency; it is more probable that 40 to 50 years will elapse between successive large fires over the same area-some areas have not burned for 70 years or more. Because of the shorter time between burns, the average annual burned area can be substantially greater under a full rotational burning program than without. Thus, rotational burning will not necessarily reduce the amount of area burned; it may just replace a few large fires with numerous smaller ones.

Loss of buildings and other improvements directly from prescribed fire is unlikely. Flood and erosion damage, impairment of water quality, air pollution from smoke, and similar undesirable fire effects will occur from prescribed burning, however, just as from wildfire. Esthetically, rotational burning is not likely to be much of an improvement over wildfires-a few large fire scars will be replaced with many smaller ones. In time, the accumulated adverse effects of rotational burns may not be smaller -and may even be greater-than those that would occur from wildfires.

### High Costs

Unlike timber stands, much of the chaparral in southern California has little readily burnable surface fuel. Most of the fuel is standing, and a large part of it -65 to 85 percent- is living, with high moisture content. The dead fuel is fairly uniformly distributed through the living material. The chaparral fuel beds are also quite porous-a little solid material occupies a large volume of space. For example, in a typical stand of chamise 6 feet tall, to total standing fuel is equivalent to a solid layer less than one-fourth inch thick. With these characteristics, southern California chaparral does not bum easily in its natural condition unless the burning conditions are well up in the scale of severity-relatively dry fuels and at least moderate wind speeds.

Under such circumstances, fire burns and spreads just as hot and fast outside a planned burn area as inside. Thus, prescribed burning in the natural fuel would require considerable prefire firebreak construction and a sizable control force on hand during the burning to reduce the risk of escape fires to an acceptable minimum. This would be costly, and the costs would recur each time the area is burned. There are also relatively few days during the year when the fuels are dry enough to bum well and burning conditions are such that risk of fire escape is not excessive. Hence rotational burning over an area the size of southern California would require that manpower and equipment be available in quantity.

To increase the amount of fuel consumed and to allow effective burning during periods when vegetation will not normally bum, the chaparral may be treated. Mechanical crushing of part or all of the brush in place is most effective. This reduces the fuel bed porosity and decreases the moisture content of the living material to a point where it will bum well. Herbicides or desiccating agents to increase the amount of dead and dry material may also be used. But these treatments materially increase costs, and also must be repeated each time the area is burned.

### Possible Increased Fire Hazard

Whether rotational burning in chaparral will actually reduce the fuel loading and fire hazard for more than a short time is open to question. Wildfires during severe burning conditions remove a large part of the fuel; in the more intense fires nearly all of it is burned. Under the moderate conditions in which prescribed fires must be conducted, the aboveground portions of most of the shrubs will be killed. But of such material, only the portions less than one-half inch in diameter can normally be expected to be consumed by the fire. In the dry southern California climate, little of the dead and standing shrub skeletons will decay before the next prescribed burn. Thus, rotational burning can add to the amount of dead fuel present- the fuel that is so important in determining the flammability of chaparral.

The possible long-range effects of rotational burning on fuel characteristics must also be considered. Fire has long played a role in the species composition

of southern California chaparral. Those species that could not withstand occasional fires were simply eliminated. Mien lightning was the main source of ignitions, most fires were probably small and burned with low intensity, since lightning is usually associated with poor burning conditions and also tends to occur in the same general areas. Although it is likely that there were some large fires, it is also likely that most of these burned with low or moderate intensity, because the development of the weather and fuel moisture conditions needed for intense fires following an ignition by lightning is a rare event. But with the advent of man-caused fire sources, the fire potential has changed. Man-caused fire ignitions now occur much more frequently than those from lightning, and often occur when intense fires can develop.

The intensive fire protection which has kept the number and frequency of large fires low despite the large number of fire starts, is sometimes cited as the cause of fuel buildup and conflagration fires. There is little evidence, however, that the fuel buildup was less and that the chaparral lands of southern California burned over more frequently under the lightning fire regime than under present conditions. Rather, the low- or moderate-rate-intensity lightning fires appear to have been replaced with high-intensity man-caused fires.

Since man has become the primary fire starting agent, it is quite probable that the species composition of the chaparral has been changing. Species that can survive occasional low- or -moderate-intensity fires can be eliminated by repeated high-intensity fires, and such fires now burn most of the area. For example, there is some indication that the hard chaparral in some areas is being replaced by buckwheat and sage, which burn hot and have an extreme rate of fire spread. Long-lived species, such as big-cone spruce, that withstood earlier fires are disappearing.

To be effective, rotational burning must be done at intervals that are shorter than wildfires are likely to burn the same area. Prescribed fires will generally be of lower intensity than conflagrations, but the repeated burning at short intervals can be expected to increase the fire stress on the chaparral and the species composition may move to a more flammable type.

Although rotational burning, in concept, may seem an appropriate step toward alleviation of the conflagration fire problem, the difficulties of putting the method into practice and its potential adverse effects suggest that its widespread use in southern California may be inadvisable. Rotational burning should probably be confined to situations where other and more permanent fuel modification is feasible.

### Fuel-Breaks Provide Strips of Modified Fuel

During the 1930's, a program was undertaken to break up the extensive areas of chaparral in southern California through a system of firebreaks. Along many of the major ridges all fuel was removed in a band 300 to 500 feet wide, and lesser firebreaks of the same type were constructed along the spur ridges. The primary purpose of the firebreak system was to provide barriers that would stop the spread of fire without the necessity of using fire crews in hazard situations or in areas of difficult access. This attempt at conflagration control had disadvantages, however. The firebreaks were expensive to construct and maintain even with the relatively low cost manpower supplied by the Civilian Conservation Corps and similar programs. The swaths cut through the chaparral were unsightly, and erosion from the bared soil was a major problem. Perhaps most important, the unmanned firebreaks failed to stop the spread of fire in the conditions under which conflagrations occur. With the termination of the emergency labor programs, the firebreak concept was largely abandoned.

When the difficult fire season of 1955 again emphasized the problem of extensive areas of chaparral without adequate access, the general concept of constructed firebreaks was revived; but with important differences. Now, instead of leaving the treated areas completely devoid of vegetation as was done in firebreak construction, the tall and dense chaparral is removed and replaced with vegetation that burns intensely -usually grass. Only a narrow strip near the middle of the modified band of fuel is kept free of vegetation to serve as an access way and a place where backfiring or burning out can be started. The edges of the band are usually made irregular and a few shrubs may be left within the band to give a more natural appearance. These modified bands or "fuel-breaks" vary in width, but are usually 100 to 400 feet wide and are strategically located for fighting fires. Their chief value comes from the rapidity with which a barrier can be made in the light fuel, either by removal of the vegetation with manpower and equipment, or more often by burning the fuel in advance of the wildfire.

Fuel-breaks are intended to be manned for use in fire control. But like the firebreaks that preceded them, they are not effective in stopping the head of a hot, fast-running fire in a strong wind. As the band of modified fuel is relatively narrow, the hazard at the head of' the fire is still great; often precluding man-

ning of the fuel-break at all. And the spotting problems, along with the difficulty of safely burning out even light fuel in adverse wind conditions, frequently makes fuel-breaks an ineffective barrier to fire in extreme conditions.

A considerable number of miles of fuel-breaks have been constructed. But because of their limitations in fire control, and also because they are generally widely spaced, fuel-breaks have not had a great impact in reducing the burned area or damage caused by conflagration fires. Fuel modification of this type can be effective for less than severe conditions, however, and on some parts of conflagration fires. And a more intensive fuel-break system than presently exists could broaden their usefulness. But fuel-breaks alone are not a complete answer to conflagration fires.

### Fuel-Type Mosaics Can Lower Energy Output

The basic philosophy of both fuel-break construction and rotational burning -the replacement of dense chaparral with low energy fuels- holds promise for solution of the conflagration fire problem. In practice, however, each method has limitations. The best approach to conflagration control through fuel modification appears to be the creation of a mosaic of fuel types rather than the mosaic of chaparral age classes envisioned in rotational burning. Extensive areas of chaparral can be broken up by areas of low-energy fuels, thereby providing the fuel situation in which fire suppression techniques are now effective in conflagration conditions. Native chaparral will still be present, but will tend to appear in "islands" rather than uninterrupted stands.

The primary purpose of wildland fire control is the minimization or prevention of fire damage; if fires did not do damage there would be no need to suppress them. Because it is unrealistic to expect that all fires can be prevented, some fire damage is bound to occur even with the best of fire control and any reasonable type and amount of fuel modification. The fuel-type mosaic is designed to assure the control of a Fire before it can do an unacceptable amount of damage. The amount of fuel modification needed, then, is partly determined by the direct and indirect fire damage potential in any given area. For high-value watersheds, the acceptable fire size may be less than 100 acres, while in areas of low Fire damage potential, burns of several thousand acres may not represent intolerable damage.

Fire behavior also determines the amount and kind of fuel modification required, and this is controlled by the weather, the fuels, and the topography. Topography varies widely over southern California, and local weather also varies greatly from place to place even under severe conditions. Natural fuel patterns are controlled largely by the soils and climate and these are also variable-some areas cannot support the kind and amount of vegetation that creates a conflagration hazard. In some areas little or no fuel modification will be needed, in others the conventional fuel-break will be adequate, and in still others the fuel modification must be extensive to keep the fire damage within acceptable limits. The amount and kind of fuel modification, then, must be determined by a broad survey of southern California.

### Fuel-Type Mosaics Can Be Created in Many Ways

The opportunities and methods for developing fuel-type mosaics are numerous. Where soils and climate permit, chaparral can be replaced with grass as it often is on fuel-breaks. Low-volume and slow-burning plants adaptable to harsh sites are being sought out and developed through research and can be used to replace native vegetation-some plantings have already been made. Use of waste water to irrigate selected plant species to create "green belts" of hard-to--burn vegetation has been demonstrated to be feasible. Thinning of native vegetation to develop recreation areas, such as campgrounds and picnic areas, when combined with modification of fuel on adjacent areas can provide zones where fire can be readily stopped. Golf courses and land planted to useful crops make excellent fire barriers, and encouragement through zoning, tax policies, or subsidies of the use of private land in selected areas for these purposes will aid in the development of fuel-type mosaics.

Many communities in southern California now have ordinances requiring the clearing of dense vegetation from around structures. Along with these ordinances have come intensive education and information programs for homeowners in landscaping techniques to lessen the fire hazard to their homes, and in self-help measures that can be used to help protect their property from wildfire. When applied, all these have been effective in reducing fire losses. Most fire control agencies would like to see existing ordinances strengthened and expanded to include provision for adequate water supplies and access roads for firefighting in housing developments in wildlands, and also to include requirements for fire-resistant building material and construction. There is also growing interest in revamping zoning regulations to prevent building at all in areas where protection of structures from fire would be extremely hazardous and difficult, if not impossible.

Although fuel reduction around individual struc-

tures can be effective in reducing fire losses, this action does little to reduce fire size, since the modified fuel areas are seldom continuous -enough to provide an adequate fire barrier. But the fuel reduction measures could be expanded community-wide, extended into adjacent wildlands, and combined with adequate access roads, water supplies, and fire-resistant buildings. Then areas so modified would be relatively safe from wildland fire, and would also provide a barrier to the spread of conflagrations. In effect, housing developments in wildlands could become an asset to conflagration control instead of a liability.

In southern California, compared with other parts of the State, relatively little effort has been made to convert chaparral to grass, particularly on public lands. Mainly this is because suitable areas for conversion are generally too small and grass production too low to make their use attractive for grazing-the economic benefits gained from grazing use alone do not offset the conversion and maintenance costs and the costs of handling livestock in small and scattered areas. But for grass areas to be most effective in conflagration control, the volume of grass must be kept low. An effective way to do this is through livestock grazing. Thus, a land management policy for public lands allowing for free or subsidized use of converted chaparral lands could be justifiable in the interst of fire control.

Few chaparral shrubs are palatable to livestock or game; hence fuel reduction or modification through livestock use is not generally workable. Many of the saltbrush species, however, including natives, are highly palatable and nutritious-some have a nutritional value comparable to alfalfa. Because of their high mineral content, the living material in most saltbrushes burns slowly, and they are well adapted to harsh sites. They develop considerable dead material with age, however, and can become nearly as flammable as chaparral when mature. But managed livestock use of chaparral lands converted to saltbrush can keep both the amount of dead material and total fuel loading low. Hence, free or subsidized use of such lands can result in an effective and durable conflagration barrier.

Similarly, low-cost leasing or subsidized use of public lands for agriculture, or for recreational development by private interests, where the area affected can be of sufficient extent, would encourage the chaparral modification needed for conflagration control.

### Fuel-Type Mosaics Are Not a Quick Cure

In an area the size of southern California, development of fuel-type mosaics cannot be accomplished in a short time. Means of financing must be found, and enabling legislation and policies may have to be formulated to permit effective development of types of mosaics. And public acceptance of widespread changes in the wildlands must be obtained.

First, costs of fuel-type mosaics are likely to be high. But besides quick control of fires during severe conditions and substantial reduction of fire damage, important side benefits can accrue. Recreation opportunities should be increased, wildlife habitat improved, more forage produced, and in some areas water yield increased. When properly planned, fuel-type mosaics can also result in a more pleasing, landscape than extensive areas of a uniform vegetative type.

Because fire damage is the major consideration in fire control, first priority in the development of fuel-type mosaics should be given to areas where fire damage is likely to be great. When these are reasonably secure, the mosaics can then be expanded to areas of lesser damage potential. It is possible that in some areas adequate fuel-type mosaics cannot be created because of extremely steep terrain and poor soils. In these, rotational burning may be judiciously used

### Complete and Coordinated Planning Is Essential

In essence, the envisioned fuel modification will replace the present wildland vegetation patterns planned and managed ones. To achieve this, complete and coordinated plans must be developed. As fire does not recognize administrative boundaries, such planning will involve not only fire control agencies, but also local governments, land use planning commissions, and sometimes private interests. Social, economic, land use, and environmental impacts must be determined and evaluated, and the best combination of fuel modification to achieve adequate fuel-type mosaics for a given area established. Inputs into these plans will be needed from fire control and fire behavior experts, meteorologists, land-use planning specialists, economists, landscape architects, plant ecologists, biologists, recreation planners, and wildland research groups.

Much of the technology needed to create fuel-type mosaics is now available, is being developed, or is susceptible to development through research. Many of the techniques by which type conversion can be done have been demonstrated to be feasible. What is needed now



G. P. O. 794-477/4635

To some, the extensive "monkeying with nature" required to replace the present wildland vegetation patterns with planned and managed ones may seem abhorrent. But the impact of man and man-caused fires has already had a massive effect on the natural vegetation, so much so that it is difficult if not impossible to specify what a "natural" vegetative pattern in southern California really is. And this impact will continue as long as conflagrations are a part of the environment. The only alternative to planned and managed vegetation patterns in southern California appears to be acceptance of the great economic damage, threat to human life, and the unpleasant esthetic and environmental effects of unmanageable wildfire.

The Author

CLIVE M. COUNTRYMAN heads fire behavior studies at the Pacific Southwest Forest and Range Experiment Station, with headquarters at the Forest Fire Laboratory, Riverside, Calif. He earned a bachelor's degree in forestry at the University of Washington in 1940, and joined the Forest Service the following year.

**The Forest Service of the U.S. Department of Agriculture**

... Conducts forest and range research at more than 75 locations from Puerto Rico to Alaska and Hawaii.

. . Participates with all State forestry agencies in cooperative programs to protect and improve the Nation's 395 million acres of State, local, and private forest lands.

. Manages and protects the 187-million-acre National Forest System for sustained yield of its many products and services.

**The Pacific Southwest Forest and Range Experiment Station**

represents the research branch of the Forest Service in California and Hawaii.

EXHIBIT I

Haines, Terry, et al. USDA Forest Service

*Influences on Prescribed Burning Activity in the United States National Forest System*

International Forest Fire News, September, 1998

# Influences on Prescribed Burning Activity in the United States National Forest System

(IFFN No. 19 - September 1998,p. 43-46)

---

## Introduction

Recent analyses of fire policy have called for increased prescribed burning to prevent future wildfire damage and enhance fire-dependent ecosystems and commercial forests (Mutch 1994, USDA Forest Service 1994, USDI 1995, Bell et al. 1995). The USDA Forest Service has set a goal of burning 1.2 million hectares per year by the year 2010 (Bell et al. 1995). Wise allocation of prescribed fire resources will require a solid baseline assessment of current activity and an understanding of the barriers to implementation of burning programs. Despite its ecological benefits, prescribed burning is being increasingly scrutinized and regulated as a source of air pollution (Sandberg 1978), traffic hazards (Mobley 1990), and escaped wildfire (Mobley 1985, Hoover 1989, Craig 1990, Cleaves and Haines 1997).

This report summarizes the results of a survey conducted to quantify prescribed burning activity on Forest Service lands, and to identify resource objectives and barriers to increased burning. No comprehensive assessment of the area treated by prescribed burning has been made; and Forest Service administrative units only recently have begun to consolidate their estimates of prescribed burning needs. Such information, as well as a characterization of the physical, social, legal, economic, and managerial factors that shape the burning programs on National Forests will be necessary to effectively develop expanded burning programs.

## Methods

Analyses of prescribed burning activity levels, as well as resource objectives and constraints, were based on responses to a questionnaire mailed to Forest Service fuels management officers (FMO's) in December 1995. For the period 1985-1994, the FMO's were asked to provide estimates for the following variables: (1) acres burned annually and number of burns for each of four burn types--slash reduction, management-ignited burns in natural fuels, prescribed natural fires, and brush, range and grassland burns (Slash reduction includes burns to reduce debris from logging, road construction or natural events. Management-ignited fire is understory burning in an established stand. Prescribed natural fires are those ignited by lightning or spontaneous combustion. Brush, range, and grassland burns do not include fires for cropland management.) ; (2) major intended resource benefits or purpose of burns; (3) historic trends in and expectations for burned acreage by type of burn; (4) barriers to expanding the use of prescribed fire; and (5) annual acreage of prescribed burning needed to achieve resource management goals. The FMO's ranked resource objectives and constraints on a scale of 0 to 5 with 5 being most important.

We received completed surveys from 95 of the 114 FMO's contacted; and those responding units accounted for about 85 percent of the total National Forest System acreage, excluding Alaska. National forest-level estimates were aggregated into regional and national totals.

## Results

### Activity Levels and Resource Objectives

The total prescribed fire area averaged 367,511 hectares per year. The Southern Region reported the highest annual average burned area at 175,686 hectares (Fig.1).

The total acreage treated was not evenly distributed by burn type. Management-ignited prescribed fires accounted for the most at 62.2 percent of the system total; followed by slash reduction (25.3 percent), brush and rangeland (8.3 percent), and prescribed natural fire (4.2 percent). Overall, the national forests conducted an average of 6,763 burns per year, of which 75 percent were for slash reduction and 20 percent were management-ignited burns in natural fuels. Accordingly, regions with significant slash burning acreage reported the most burns.




**Fig.1.** Annual prescribed burning area (ha) by U.S. Forest Service Region

The most important resource objective or purpose for burning was wildfire hazard reduction, followed by ecosystem management (using prescribed burning to reestablish natural fire intervals), game habitat enhancement, site preparation for reforestation, nongame habitat enhancement, control of competing vegetation in timber stands, threatened and endangered species habitat enhancement; insect and disease management; and rangeland improvement. The average burn size was 54 hectares. This varied from 17 hectares in the Pacific Southwest Region to 185 hectares in the Southern Region. The largest burns were prescribed natural fires (251 hectares) and smallest

were slash burns (18 hectares). Management-ignited burns were the second largest(166 hectares) followed by brush and range burns (124 hectares). This relationship of relative burn size was similar among most regions. Estimates of burning levels needed to achieve management goals totalled 0.82 million hectares per year, more than twice the average achieved during the survey period. Desired acreage, as a percent of the acreage attained, ranged from 145 percent in the Northern Region to 672 percent in the Intermountain Region.

**Trends in Burning Activity**

Because of reductions in timber harvesting between 1985-1994, the slash burn acreage had decreased in more forests (60 percent) than any other burn type. Conversely, increasing fuel treatment budgets and greater emphasis on the use of prescribed fire for silviculture, ecosystem, and wildlife purposes resulted in a 76 percent increase in the number of forests using management-ignited burning. Prescribed natural fire levels remained fairly constant servicewide (62 percent), except in the Southwestern Region where there was a large increase. Brush and rangeland burns either increased (43 percent) or remained stable (44 percent) Servicewide.

Over the next ten years (1995 to 2004), estimated trends for all burn types range from a 57 percent chance of increase to a 15 percent chance of decrease. There is a 28 percent chance it will remain about the same. The likelihood for increasing management-ignited burns, prescribed natural fires, and brush and rangeland burns are 79, 66, and 51 percent, respectively. Conversely, there is only a 31 percent chance that slash burning will increase.

**Barriers to Burning**

The FMO's rated 14 factors on a 5-point "scale of importance," representing the degree to which each factor imposed a barrier to expanding the use of prescribed fire. The environmental law factor, which includes laws to protect water quality, endangered species, archaeological sites, and other resource values -- but does not include laws governing smoke management or protecting air quality -- received the highest mean rating (3.82). Environmental laws also include planning and evaluation procedures to be followed when conducting land management activities on Federal lands. Lack of adequate funding was the second most important factor, with a mean of 3.66. Also highly rated were: personnel (shortages of qualified professionals and technicians); narrow window (the prescription window for conducting burns); planning costs; public opinion; liability (for smoke intrusion and escaped fires); and regulations (air quality and smoke management laws). Barriers that received low ratings in all regions included: the use of alternative management practices, uncertainty about burning as an effective fuels management practice (such as effects on soil composition or tree growth), and the availability of insurance.



**Fig.2.** Prescribed burning operation in the Sierra Nevada, California.
Photo: J.G.Goldammer

**Discussion and Conclusions**

Prescribed burning is an important activity in the National Forest System. At about 364,225 hectares accomplished each year, it may be the most common planned disturbance, a distinction formerly held by timber harvesting. Changes are occurring quickly. For example, Forest Service fuel management budgets have increased substantially, from historic levels of about US$20 million, to US$60 million in 1997. The acreage of natural fuels burned each year has been increasing, for both management-ignited and prescribed natural fire. There is some uncertainty about the prescribed natural fire program; the use of prescribed natural fire is controversial and subject to conflicting political, physical, and managerial objectives.

The FMO's who responded to our survey confirmed the need for an increased use of fire. Less than half of the desired level is being met, although recent increases in appropriated funds has narrowed the gap. Barriers consist chiefly of environmental restrictions, funding shortfalls, and a shortage of available personnel.

The perceived importance of the environmental barrier may be due to a combination of factors: ambiguity in the application of regulatory standards, actual restrictions on burning practices, and reaction to the prospect of increasing regulation. Potential legal actions by interest groups or concerned citizens may also contribute to the importance of this factor. Although appropriated funds have increased since 1995, the availability of personnel for prescribed burning may become critical, especially with increasing competition from the wildfire control burden. Burning helps managers achieve a variety of resource objectives. The Forest Service prescribed burning program is linked to the future of many of its other programs, e.g., wildlife, threatened and endangered species, range, and ecosystem management.

Many respondents identified the shift from slash reduction burns to natural fuels burns as indicative of a trend towards fewer and larger burns. Although such a trend could have positive implications

EXHIBIT J

USDA Forest Service

*The Use of the National Forest Reserves: Regulations and Instructions*

(1905)

*(p. 1)*

# 1905 "Use Book"

## U. S. DEPARTMENT OF AGRICULTURE.

FOREST SERVICE.
GIFFORD PINCHOT, Forester.

# THE USE OF THE NATIONAL FOREST RESERVES.

## REGULATIONS AND INSTRUCTIONS.

Issued by the Secretary of Agriculture.
To take effect July 1, 1905.

*(no p. 2)*

*(p. 3)*

U. S. DEPARTMENT OF AGRICULTURE, FOREST SERVICE,
*Washington, D. C., June 13, 1905*

SIR: I have the honor to present for your approval a draft of regulations and instructions for the use of forest reserves.
Very respectfully,

GIFFORD PINCHOT,
*Forester.*

Hon. JAMES WILSON, *Secretary.*

U. S. DEPARTMENT OF AGRICULTURE, OFFICE OF THE SECRETARY,
*Washington, D. C., June 14, 1905.*

The accompanying regulations bearing date June 13, 1905, are, by the authority conferred by law upon the Secretary of Agriculture, hereby approved, made, and established to take effect July 1, 1905, and all previous regulations in conflict with the same are hereby repealed; The Forester is authorized to issue instruction in conformity with these regulations and regulation hereafter established.

JAMES WILSON,
*Secretary.*

*(p. 5)*

## CONTENTS.

To the public..........6
History and objects of forest reserves.........7
Relation of forest officers to the public..........12
Private and State rights.......... 13
Jurisdiction..........14
Duration of and charge for permits.......... 16
Free use of timber and stone..........16
Grazing.......... 20
Sale of timber..........31
Special occupancy privileges..........49
Roads and trails..........52
Canals, ditches, reservoirs, etc..........56
Private railroads, telephone lines, etc.......... 58
Trespass and violations.......... 58
Protection against fire..........63
Permanent improvements..........72
Marking reserve boundaries.......... 72
Special investigations upon forest reserves..........73
Field and office equipment..........73
Supervisor's accounts..........75
Records, reports, and correspondence..........78
Protection of game..........81
The Forest Service upon forest reserves..........82
Surveys within forest reserves..........92
Creation of forest reserves--additions and eliminations..........93

APPENDIX.
Laws and decisions..........99
Index..........135

*(p. 6)*

## TO THE PUBLIC.

The timber, water, pasture, mineral, and other resources of the forest reserves are for the use of the people; They may be obtained under reasonable conditions, without delay; Legitimate improvements and business enterprises will be encouraged.

Forest reserves are open to all persons for all lawful purposes.

Persons who wish to make any use of the resources of a forest reserve for which a permit is required should consult the nearest forest officer.

No one but the Special Fiscal Agent, Forest Service, Washington, D. C., is authorized to receive payments for the use of the reserves.

Complaints should be made in writing both to the immediate superior of the officer complained against and to the Forester, at Washington.

Every user of a forest reserve will be held responsible for knowing the regulations and obeying them.

Throughout this book general information and directions are printed in this type.

**Regulations are printed in this type.**

Special instructions to forest officers are printed in this type.

---

*(p. 7)*

# THE USE OF THE NATIONAL FOREST RESERVES.

### HISTORY AND OBJECTS OF FOREST RESERVES

Forest reserves are for the purpose of preserving a perpetual supply of timber for home industries, preventing destruction of forest cover which regulates the flow of streams, and protecting local residents from unfair competition in the use of forest and range. They are patrolled and protected, at Government expense, for the benefit of the community and the home builder.

We know that the welfare of every community is dependent upon a cheap and plentiful supply of timber; that a forest cover is the most efficient means of maintaining a regular stream flow for irrigation and other useful purposes; and that the permanence of the livestock industry depends upon conservative use of the range. The injury to all persons and industries which results from the destruction of forests by fire and careless use is a matter of history in older countries, and has long been the cause of anxiety and loss in the United States. The protection of forest resources still existing is a matter of urgent local and national importance. This is shown by the exhaustion and removal of lumbering centers, often leaving behind desolation and depression in business;

*(p. 8)*

the vast public and private losses through unnecessary forest fires; the increasing use of lumber per capita by a still more rapidly increasing population; the decrease in the summer flow of streams just as they become indispensable to manufacture or irrigation; and the serious decrease in carrying capacity of the summer range. It can not be doubted that, as president Roosevelt has said, "the forest problem is, in many ways, the most vital internal problem of the United States."

As early as 1799 Congress provided for the purchase of timberlands to supply the needs of the Navy, and in 1817 further legislation directed the setting apart of public lands for the same purpose, and provided penalties for the unauthorized cutting of any public timber. Other acts, from time to time, made similar provisions for setting apart forestland for specific purposes, but the first attempt to secure a comprehensive administration of the forests on the public domain was in 1871, by a bill introduced in the Forty-second Congress, which failed of passage.

In 1876, $2,000 was appropriated to employ a competent man to investigate timber conditions in the United States, and on June30, 1886, an act was approved creating a Division of Forestry in the Department of Agriculture. On July 1, 1901, this Division became the Bureau of Forestry (now the Forest Service), employing practically all the trained foresters in the United States, and engaged in almost every branch of forest work in every State and territory, except the actual administration of the Government forest lands. This remained in the Department of the Interior, which, although possessing complete machinery for the disposal of lands, was provided with neither system nor trained men for conservative forest management.

*(p. 9)*

In the meantime, with the increasing realization that the Nation's timber supply must be protected, and with the immense growth of irrigation interests in the West, the necessity for retaining permanent Federal control over selected forest areas was recognized by a brief section inserted in the act of March 3, 1891, which authorized the President to establish forest reserves. The first exercise of this power was in the creation of the Yellowstone park Timberland Reserve, proclaimed by President Harrison March 30, 1891.

The mere creation of forest reserves, however, without provision for their administration, was both ineffectual and annoying to local interests dependent upon their resources. Consequently the Secretary of the Interior, in 1896, requested the National Academy of Sciences to recommend a national forest policy. This resulted in the passage of the act of June 4, 1897, under which, with several subsequent amendments, forest reserves are now administered.

On the theory that the management of land, not of forests, was chiefly involved, this law gave the Secretary of the Interior authority over reserves, and provided that their surveying, mapping, and general classification should be done by the United States Geological Survey, and the execution of administrative work by the General Land Office.

*(p. 10)*

The result was not satisfactory. The technical and complex problems arising from the necessary use of forest and range soon demanded the introduction of scientific methods and a technically trained force, which could not be provided under the existing system. The advice and services of the Bureau of Forestry were found necessary, but, under the law, could be but imperfectly utilized. The necessity of consolidating the various branches of Government forest work became apparent and was urged upon

Congress by the president and all of the executive officers concerned. Finally, the act of February 1, 1905, transferred to the Secretary of Agriculture entire jurisdiction over the forest reserves except in matters of surveying and passage of title.

The regulations and instructions for the use of the national forest reserves here published are in accordance with the act last mentioned and with that of March 3, 1905, making appropriations for the department of Agriculture, which changed the Bureau of Forestry into the Forest Service. They are based upon the following general policy laid down for the Forest Service by the Secretary of Agriculture in his letter of February 1, 1905, to the Forester:

"In the administration of the forest reserves it must be clearly borne in mind that all land is to be devoted to its most productive use for the permanent good of the whole people, and not for the temporary benefit of individuals or companies. All the resources of the forest reserves are for *use*, and this use must be brought about in a thoroughly prompt and businesslike manner, under such restrictions only as will insure the permanence of these resources.

*(p. 11)*

"The vital importance of forest reserves to the great industries of the Western States will be largely increased in the near future by the continued steady advance in settlement and development. The permanence of the resources of the reserves is therefore indispensable to continued prosperity, and the policy of this Department for their protection and use will invariably be guided by this fact, always bearing in mind that the *conservative use* of these resources in no way conflicts with their permanent value.

"You will see to it that the water, wood, and forage of the reserves are conserved and wisely used for the benefit of the homebuilder first of all, upon whom depends the best permanent use of lands and resources alike. The continued prosperity of the agricultural, lumbering, mining, and live-stock interests is directly dependent upon a permanent and accessible supply of water, wood, and forage, as well as upon the present and future use of these resources under businesslike regulation, enforced with promptness, effectiveness, and common sense. In the management of each reserve local questions will be decided upon local grounds; the dominant industry will be considered first, but with as little restriction to minor industries as may be possible; sudden changes in industrial conditions will be avoided by gradual adjustment after due notice, and where conflicting interests must be reconciled the question will always be decided from the standpoint of the greatest good of the greatest number in the long run."

*(p. 12)*

**RELATION OF FOREST OFFICERS TO THE PUBLIC**

The administration of forest reserves is not for the benefit of the Government, but of the people. The revenue derived from them goes, not into the general fund of the United States, but toward maintaining upon the reserves a force of men organized to serve the public interests. This force has three chief duties: To protect the reserves against fire, to assist the people in rather use, and to see that they are properly

*(p. 62)*

INJUNCTION.

An injunction may be obtained to restrain trespass on forest reserves.

DAMAGES.

Civil actions may also be brought to recover damages caused by any trespass or breach of contract. Damages recovered in such actions are in addition to and exclusive of criminal penalties.

COMPROMISE.

The Secretary of Agriculture has no power to compromise criminal cases, and "a proposition of settlement submitted with the understanding that, if accepted, criminal proceedings for the trespass will be waived will be rejected."

SETTLEMENT.

The Secretary of Agriculture has power to settle with any trespasser for the actual civil damages of such trespass. The rule for measure of damages for timber cut without permit is as follows: When the trespass is willful, the value of the timber where found; when unintentional, the stumpage value only.

Forest officers will notify trespassers that they may make, upon the prescribed form, offers of settlement to accompany their reports, but no such offer will be considered unless the amount offered in settlements is remitted by postal or express money order or national bank draft on New York to the Special Fiscal Agent, Forest Service, Washington, D. C.

*(p. 63)*

PUNITIVE DAMAGES.

When trespass can be shown to be of a malicious nature, or due to such negligence as implies malice "or a reckless indifference to the rights of the Government," especially when a person trespasses after his attention has been called to the nature of the trespass, punitive damages may be recovered "notwithstanding the act constitutes an offense punishable under the criminal statutes."

STRUCTURES WRONGFULLY PLACED ON FOREST RESERVES.

When any structure is erected upon forest reserve land without a permit, it becomes the property of the United States immediately upon its construction.

*(p. 63)*

## PROTECTION AGAINST FIRE.

Probably the greatest single benefit derived by the community and the nation from forest reserves is insurance against the destruction of property, timber resources, and water supply by fire. The direct annual loss from this source on unprotected lands reaches many millions of dollars; the indirect loss is beyond all estimate. The burden of adequate protection can not well be borne by the State or by its citizens, much as they have to gain, for it requires great outlay of money to support a trained and equipped force, as well as to provide a fund to meet emergencies. Only the Government can do it, and, since the law does not provide effective protection for the public domain only in forest reserves can the

Government give the help so urgently needed.

*(p. 64)*

Through its watchful fire patrol the Forest Service guards the property of the resident settler and miner, and preserves the timber and water supply upon which the prosperity of all industries depends. The help it can give to the development of the West may be greatly increased by the cooperation of citizens. Destructive forest fires are not often set willfully, but far too commonly they result from failure to realize that carelessness will be followed by injury and distress to others. The resident or the traveler in forest regions who takes every precaution not to let fire escape, and who is active in extinguishing fires which he discovers, contributes directly to the development and wealth of the country and to the personal safety and profit of himself and his neighbors. He who does not, assumes a great responsibility by endangering not only his own welfare but that of countless others.

Citizens' fire brigades have been organized successfully on many reserves. Not only is the prevention of fire to the interest of all property owners, but men under obligation to fight fire because they hold permits will profit greatly by any means of reducing the work which they may be called upon to do. An organization which will put out a fire before it gathers headway may save them many days' hard work. A good leader should be chosen to direct the work and to communicate with the forest officers. The local ranger should keep this leader informed of his movements as far as practicable, so that no time need be lost.

Care with small fires is the best preventive of large ones. The following simple regulations may easily be observed by all:

*(p. 65)*

**REG. 58. Camp fires must not be larger than necessary.**

**REG. 59. Fires must not be built in leaves, rotten wood, or other places where they are likely to spread.**

**REG. 60. Fires must not be built against large or hollow logs, where it is difficult to be sure when they are completely out.**

**REG. 61. In windy weather and in dangerous places, camp fires must be confined in holes, or by clearing all vegetable matter from the ground around them.**

**REG. 62. A fire must never by left, even for a short absence, before it is completely extinguished.**

Officers of the Forest Service, especially forest rangers, have no duty more important than protecting the reserves from forest fires. During dry and dangerous periods all other work should be subordinate. Most careful attention should be given to the prevention of fires. Methods and equipment for fighting them should be brought to the highest efficiency. No opportunity should be lost to impress the fact that care with small fires is the best way to prevent large ones.

The reserves must be thoroughly posted with fire warnings. The fact that some of them are destroyed is no excuse for neglecting this important duty. Often the warning notices can be posted on or near signboards along trails, or notices of reserve boundaries, limits of districts, or excluded parts in grazing ranges, etc. The destruction of these notices is willful trespass, punishable by law.

Forest officers should cheerfully and politely tell hunters, campers, and others about the rules and regulations governing camp fires. An officer who loses his temper or uses improper language in talking with persons who are careless because

they do not know about the rules, or have no experience in camping, fails in one of his principal duties. He should call their attention to the mistake and instruct them courteously in the proper way of building and handling fires.

*(p. 66)*

**REG. 63. Lumbermen and settlers within forest reserves are cautioned against making dangerous slashings, and must not fire them in very dry weather. If it is necessary to make slashings, or to burn them, ample notice must always be given the nearest forest officer before burning, so that he may take steps to reduce the danger to the minimum. If notice is not given, or if the ranger's instructions are not followed, the person responsible for the burning will be held strictly responsible for all damage to the reserve, and liable, in aggravated cases, to criminal prosecution.**

There is no desire to hamper the work of settlers and lumbermen, nor to limit the rights of property holders, but it is not just that other forests and improvements, whether owned privately or by the Government, should be endangered by carelessness.

The utmost tact and vigilance should be exercised where settlers are accustomed to use fire in clearing land. Public sentiment is rightly in sympathy with home builders and the control of their operations should give the least possible cause for resentment and impatience with the reserve administration, but it should be exercised firmly none the less. Settlers should be shown the injury to their own interests, as well as to the public, which results from forest fires. Methods and times of burning should be discussed with them and, if possible, an amicable agreement secured to have no burning except when authorized by the forest officer and when he is present. But while the aim ought always to be toward cooperation and good will, it is equally important to have it well understood that reserve interests will be protected by every legal means. Where any tendency to ignore instructions is observed, notice must be given that action will be brought for any damage sustained by the United States and that willful negligence will be prosecuted criminally. If this is ignored and damage does result prosecution must be prompt and vigorous. Where there is sufficient reason to anticipate danger, as from a large slashing which it is announced will be burned at a dangerous time, injunction may be secured.

*(p. 67)*

Similar means should be employed when reserves are endangered by railroads or logging operations on private lands, and prompt report of such conditions should be made to the Forester.

## FIRE LAWS AND PENALTIES.

There is ample legal provision for the punishment of malice or carelessness with fires. The act of June 4, 1897, instructs the Secretary in charge of forest reserves to make provisions for their protection against fire, and provides for the punishment of any violation of his regulations. The act of May 5, 1900, prescribes a maximum fine of $1,000, or one year's imprisonment, or both, for building a fire and leaving it before it is totally extinguished. Any officer of the Forest Service may arrest violators of these laws.

The fire laws of any State or Territory are applicable to forest reserves within its boundaries and the United States has recourse to them whenever necessary.

The United States may also bring civil action to recover damages caused by fire, no matter how it was set. It is not necessary to prove malice, or even carelessness, or that the fire was set upon Government land. Any person responsible in any way for injury to Government property is liable for the actual damage.

## PATROL.

Each supervisor is responsible for the patrol of his reserve, and will devise systems best suited to the locality.

*(p. 68)*

Every ranger or guard must go to and fight every fire he sees or hears of at once, unless he clearly can not reach it, or is already fighting another fire. If he can not reach it, or is already fighting another fire. If he can not put it out alone, he must get help. The fact that it may not be on his district has no bearing unless he is certain another ranger is there already.

Rangers on fire-patrol duty should avoid spending time and work in places or along routes where there is little danger or small outlook. Hours spent or miles ridden are in themselves small indications of efficient patrol. Often a short trip to a commanding point is better than a long ride through a wooded valley. During dry and dangerous periods the selection of headquarters, camping places, and routes should be made with the single object of preventing and discovering fires.

Fires caused by lightning are not rare, especially in dry mountain regions. After every electric storm a special effort is needed to locate and extinguish any such fires before they are well under way.

## HOW TO FIGHT FIRE.

When once a fire has spread over an acre or more, especially where much dead and down material makes it very hot, it may be so far beyond the control of one man that it is best to leave it and get help. The character and condition of the woods, the weather, and even the time of day, have so much to do with such cases that general directions have little value and all depends upon the experience and good judgment of the ranger.

Generally, it may be said that the best tools for fighting fire are the shovel, mattock, and ax. The ranger should always carry at least shovel and ax during all the dangerous season.

In damp, heavy timber usually travels slowly, and a few men, if persistent, can keep it in check by trenching, even though they may not extinguish it, and must continue the watch until rain falls.

*(p. 69)*

In dry, open woods fire travels faster, and it is often best to go some distance to the most open and clean ground, and back fire from there. In handling back fires great care is needed to avoid useless burning; therefore, they should never be set except by forest officers, unless in great emergencies.

The night or the early morning hours are the best time to work, whenever any choice of time exists, for nearly all forest fires die down more or less during the cool of the night and flare up again during the heat of the day.

Following are several general principles to be borne in mind:

*(a)* Protect the valuable timber rather than the brush or waste.

*(b)* Never leave a fire, unless driven away, until it is put out.

*(c)* Young saplings suffer more than old mature timber.

*(d)* A surface fire in open woods, though not dangerous to old timber, does great harm by killing seedlings.

*(e)* A fire rushes up hill, crosses a crest slowly, and is more or less checked in traveling down. Therefore, if possible, use the crest of the ridge and the bottom as lines of attack.

*(f)* A good trail, a road, a stream, an open park, check the fire. Use them whenever possible.

*(g)* Dry sand or earth thrown on a fire is usually as effective as water and easier to get.

*(h)* A little thinking often saves labor and makes work successful. Ill-planned efforts suggested by haste and excitement rarely lead to success.

*(p. 70)*

ACTION AND REPORT.

Small fires, extinguished without difficulty by the officer who discovers them, may be reported at the end of the month. The supervisor should be notified at once of large ones which require help from residents or other rangers, purchase of supplies, or attendance for several days. But if help is needed, the forest officer on the ground should get it at once. He should hire men and messengers, if necessary, send for supplies, and notify the supervisor of the action taken. The supervisor will furnish any further help needed and telegraph the Forester if special authorization is required.

In reporting upon fires, three classes should be distinguished, as follows:

*(a)* Camp fires and other small fires covering not more than a few square rods.

*(b)* Small forest fires, extinguished without any extra help or expense and generally not covering over 5 acres.

*(c)* Large fires, requiring extra help and expense.

Those of the first two classes may be included in one report at the end of the month. Give the number and location of each, with such information as to course and damage as seems necessary or is required by general instructions from the supervisor. Fires of the last class should be reported on separately. Cover all of the following points:

1. Location.

2. Damage done.

*(a)* Number of acres burned over.

*(b)* Number of acres of merchantable timber burned.

*(c)* Number of feet B. M. of:

(1) Green timber destroyed.

(2) Dry timber destroyed.

*(d)* Value of all timber destroyed.

3. Probable cause.

4. By whom was fire discovered?

5. When was it discovered?

6. When was it brought to notice of forest officer?

7. When was the work of checking the fire begun?

8. When was the work finished?

*(p. 71)*

9. How many extra men were employed?

10. Cost of fire:

*(a)* For help (outside of rangers)

*(b)* For materials, tools, etc.

*(c)* Total cost.

## EXPENDITURES FOR FIGHTING FIRE.

Every forest supervisor is authorized, in person or through a subordinate, to hire temporary men, purchase material and supplies, and pay for their transportation from place to place to extinguish a fire; but when it is evident that the expense is liable to be over $300, he must at once telegraph the Forester for instructions to incur the additional expense. No expense for fighting a fire outside a reserve must be incurred unless the fire threatens it.

Any person paid for services at a fire must sign a subvoucher for the amount received, to be transmitted with the supervisor's regular monthly account for the month in which the expense is incurred. Full directions for preparing accounts are printed on the back of all vouchers.

Government employees and person having grazing or other permits within a forest reserve are not entitled to compensation for fighting fire.

While the government is anxious to prevent and fight fires, only a limited amount of money can be devoted to this purpose. Experience has proved that usually a reasonable effort only is justified, and that a fire which can not be controlled by 20 to 40 men will run away from 100 or even more men, since heat and smoke in such cases make a direct fight impossible.

Extravagant expenditures will not be tolerated. Fires are sometimes started for the sake of a job. In and about every reserve it is possible to enlist the cooperation of the better citizens, so that in time of need enough men of the right kind will be on hand. A crowd of men hastily gathered about a town without organization, interest, or experience, is valuable only as a last resort in extreme need.

*(p. 72)*

## PERMANENT IMPROVEMENTS.

The forest officers will devote all time that can be spared from other work to building and keeping open roads and trails, to making other permanent improvements, and to study and mapping of the forest.

Supervisors will use every opportunity to work on a permanent system of roads and trails in their reserves. Whenever they can be spared and weather permits, rangers should be assigned to trail and cabin work. No work of importance should be done without careful previous location, approved by the supervisor, who is responsible not only for the work, but for economy in doing it.

Cabins and fenced pastures should be established wherever they are needed. Reasonable construction expenses will be allowed; but supervisors will be held strictly responsible for the selection of locations with the single object of improving the service. Abandoned settlers' improvements may often be used.

# EXHIBIT K

USDA Forest Service

*Draft Environmental Impact Statement for*
*Revised Management Plans,*
*Pacific Southwest Region*

("2004 EIS"), R5-MB-045, May 2004

USDA

United States Department of Agriculture

Forest Service

Pacific Southwest Region

R5-MB-045
May 2004

# Draft Environmental Impact Statement for Revised Land Management Plans

## Angeles National Forest
## Cleveland National Forest
## Los Padres National Forest
## San Bernardino National Forest



## Table of Contents - Chapter 1


Chapter 1. Purpose of and Need for Action....1-3
Document Structure....1-3
Background....1-4
Purpose and Need for Action....1-5
Proposed Action....1-5
Decision Framework....1-5
Public Involvement....1-6
Issues....1-6
Issues 1: Public Values and Uses (Public Use and Enjoyment, Facility Operation and Maintenance)....1-7
Issue 2: Ecosystem Elements and Function (Resource Management)....1-7
Issue 3: Commodity Values and Uses (Commercial Uses, Facility Operation and Maintenance)....1-8
Issue 4: Urban Development and Forest Habitat Linkages (Resource Management, Commercial Uses, Fire)....1-8
Issue 5: Special Area Designations (Public Use and Enjoyment, Resource Management)....1-9
Other Issues and Concerns....1-9
Other Related Efforts....1-9

## Table of Contents - Chapter 2

Chapter 2. Alternatives, Including the Proposed Action....2-3
Development of Alternatives....2-3
The Role of Science in Alternative Development and Environmental Consequences....2-3
Elements Common to All Alternatives....2-4
Land Use Zone Definitions and Comparison Tables....2-4
Alternatives Considered in Detail....2-5
Alternative 1....2-5
Alternative 2....2-6
Alternative 3....2-7
Alternative 4....2-8
Alternative 5....2-9
Alternative 6....2-10
The Preferred Alternative....2-11
Past Decisions Not Being Revisited in Plan Revision....2-12
Alternatives Considered but Eliminated from Detailed Study....2-12
Comparison of Alternatives....2-12
Resource Management....2-12
Special Designations....2-14
Public Use and Enjoyment....2-15
Management and Administration....2-16
Facility Operations and Maintenance....2-16
Commodity and Commercial Uses....2-17
Social and Economic Environment....2-18
Fire and Aviation Management....2-19

## Table of Contents - Chapter 3

Chapter 3. Affected Environment and Environmental Consequences........3-14
Resource Management........3-14
Vegetation Condition and Forest Health........3-14
Affected Environment........3-16
Alpine and Subalpine Habitats........3-16
Chaparral........3-17
Coastal Sage Scrub........3-18
Desert Montane........3-19
Desert Scrub........3-19
Gabbro Outcrops........3-19
Limestone and Carbonate Outcrops........3-20
Lower Montane Forest........3-20
Montane Conifer Forest........3-21
Montane Meadows........3-22
Monterey Coastal Habitats........3-23
Oak Woodland, Savanna and Grassland........3-24
Pebble Plain........3-25
Riparian Habitats........3-25
Serpentine Outcrops........3-26
Key Indicators........3-26
Environmental Consequences........3-27
Direct and Indirect Effects (General)........3-27
Alpine and Subalpine Habitats........3-27
Chaparral........3-28
Coastal Sage Scrub........3-30
Desert Montane........3-31
Desert Scrub........3-33
Gabbro Outcrops........3-33
Limestone and Carbonate Outcrops........3-34
Lower Montane Forest........3-34
Montane Conifer Forest........3-36
Montane Meadows........3-37
Monterey Coastal Habitats........3-39

Oak Woodland, Savanna and Grassland....3-40
Pebble Plain....3-42
Riparian Habitats....3-43
Serpentine Outcrops....3-46
Direct and Indirect Effects (Comparison of Key Indicators)....3-47
Alpine and Subalpine Habitats....3-47
Chaparral....3-47
Coastal Sage Scrub....3-48
Desert Montane....3-48
Desert Scrub....3-48
Gabbro Outcrops....3-48
Limestone and Carbonate Outcrops....3-49
Lower Montane Forest....3-49
Montane Conifer Forest....3-50
Montane Meadows....3-51
Monterey Coastal Habitats....3-52
Oak Woodland, Savanna and Grassland....3-52
Pebble Plain....3-52
Riparian Habitats....3-52
Serpentine Outcrops....3-53
Cumulative Effects....3-53
Biological Diversity....3-55
Affected Environment....3-56
Terrestrial Species: Plants and Animals....3-57
Aquatic Species....3-59
Species at Risk....3-61
Game Species....3-62
Management Indicator Species....3-62
Key Indicators....3-68
Resource Protection Measures....3-68
Biological Diversity....3-70
Environmental Consequences....3-70
General Effects Similar in All Alternatives and All Species or Groups....3-72
Terrestrial Plants, Animals and Habitat....3-73
Aquatic Species and Habitat....3-75

Species at Risk........3-76
Resource Management........3-76
Public Use and Enjoyment........3-79
Facility Operations and Maintenance........3-82
Commodities and Commercial Use........3-84
Fire and Aviation........3-86
Combined Effects of Management Uses........3-87
Game Species........3-89
Management Indicator Species........3-90
Direct and Indirect Effects (Comparison of Key Indicators)........3-95
Cumulative Effects to Biological Diversity........3-99
Invasive Nonnative Species........3-106
Affected Environment........3-106
Habitats At High Risk of Degradation by Invasive Species........3-108
Key Indicators........3-110
Resource Protection Measures........3-110
Environmental Consequences........3-111
Direct and Indirect Effects (General)........3-111
Direct and Indirect Effects (Comparison of Key Indicators)........3-112
Resource Management........3-112
Public Use and Enjoyment........3-113
Facility Operation and Maintenance........3-114
Commodity and Commercial Uses........3-116
Fire and Aviation Management........3-118
Risk Determination........3-120
Cumulative Effects........3-121
Watershed........3-121
Affected Environment........3-121
Surface Water........3-122
Surface Water - Quality........3-123
Surface Water - Uses........3-123
Riparian Ecosystems........3-124
Riparian - Quantity........3-125
Riparian - Quality........3-126
Riparian - Uses........3-126

Wilderness....3-171
Affected Environment....3-171
Wilderness Resources....3-171
Wilderness Recreation....3-172
Key Indicators....3-173
Resource Protection Measures....3-174
Environmental Consequences....3-174
Direct and Indirect Effects (General)....3-174
Direct and Indirect Effects (Comparison of Key Indicators)....3-174
Resource Management....3-174
Public Use and Enjoyment....3-175
Facility Operations and Maintenance....3-176
Commodity and Commercial Uses....3-176
Cumulative Effects....3-176
Lands (Real Estate)....3-177
Affected Environment....3-177
Key Indicators....3-178
Resource Protection Measures....3-178
Environmental Consequences....3-178
Direct and Indirect Effects (General)....3-178
Direct and Indirect Effects (Comparison of Key Indicators)....3-179
Cumulative Effects....3-180
Heritage Resources....3-180
Affected Environment....3-180
Key Indicators....3-182
Resource Protection Measures....3-182
Environmental Consequences....3-182
Direct and Indirect Effects (General)....3-182
Direct and Indirect Effects (Comparison of Key Indicators)....3-184
Alternative Comparison....3-184
Resource Management....3-184
Public Use and Enjoyment....3-185
Management and Administration....3-187
Facility Operations and Maintenance....3-187
Commodity and Commercial Uses....3-189

Fire and Aviation Management....3-190
Cumulative Effects....3-191
Public Use and Enjoyment....3-192
Recreation....3-192
Affected Environment....3-192
Recreation Setting....3-193
Current Recreation Situation....3-194
Visitor Use, Participation and Satisfaction....3-194
Developed Recreation....3-195
Dispersed Recreation....3-196
Dispersed Camping....3-196
Driving for Pleasure....3-197
Wildlife and Nature Viewing....3-197
Snow Play....3-198
Water Play....3-198
Hang Gliding....3-198
Rock Climbing....3-198
Recreational Target Shooting....3-199
Hunting and Fishing....3-199
Recreation Special Use Authorizations....3-200
Recreation Residences....3-200
Winter Sports....3-200
Trends and Projections....3-201
Front Country, Upland and High Country Places, Angeles National Forest....3-202
Figueroa/Santa Ynez Place, Los Padres National Forest....3-202
Hungry Valley/Mutau Place, Los Padres National Forest....3-202
Laguna Place, Cleveland National Forest....3-202
San Bernardino Front Country Place, San Bernardino National Forest....3-202
Conservation Education, Volunteers and Partnerships....3-203
Key Indicators....3-204
Resource Protection Measures....3-204
Environmental Consequences....3-204
Direct and Indirect Effects (General)....3-204
Recreation Setting....3-205
Visitor Use, Participation and Satisfaction....3-206

Developed Recreation....3-207
Dispersed Recreation....3-208
Driving for Pleasure....3-210
Wildlife and Nature Viewing, Snow Play, Water Play, Hang Gliding, Rock Climbing....3-210
Recreational Target Shooting....3-211
Hunting and Fishing....3-212
Recreation Residences....3-212
Winter Sports....3-212
Conservation Education and Partnerships....3-213
Direct and Indirect Effects (Comparison of Key Indicators)....3-213
Resource Management....3-213
Management and Administration....3-215
Facility Operations and Maintenance....3-215
Commodity and Commercial Uses....3-215
Fire and Aviation Management....3-217
Cumulative Effects....3-217
Landscape Management....3-220
Affected Environment....3-220
Scenic Integrity Objectives....3-221
Key Indicators....3-221
Environmental Consequences....3-221
Direct and Indirect Effects (General)....3-222
Resource Management....3-223
Commodities and Commercial Uses....3-223
Fire and Aviation Management....3-224
Communication Site Infrastructure and Utility Corridors....3-224
Direct and Indirect Effects (Comparison of Key Indicators)....3-224
Cumulative Effects....3-225
Law Enforcement....3-227
Affected Environment....3-227
Law Enforcement Offenses and Incidents....3-228
Major Law Enforcement Violation Types....3-228
Contributing Factors in Southern California....3-228
Key Indicators....3-230
Resource Protection Measures....3-230

Environmental Consequences....3-230
Direct and Indirect Effects (General)....3-230
Direct and Indirect Effects (Comparison of Key Indicators)....3-231
Resource Management....3-231
Public Use and Enjoyment....3-232
Facility Operations and Maintenance....3-233
Cumulative Effects....3-234
Facility Operations and Maintenance....3-234
Administrative Facilities....3-234
Roads....3-234
Affected Environment....3-235
National Forest System Roads....3-235
Key Indicators....3-237
Environmental Consequences....3-238
Direct and Indirect Effects (General)....3-238
Direct and Indirect Effects (Comparison of Key Indicators)....3-238
Management and Administration....3-240
Resource Management....3-240
Public Uses and Enjoyment....3-241
Commodities and Commercial Uses....3-242
Cumulative Effects....3-242
Trails....3-243
Affected Environment....3-243
Non-motorized Trails....3-243
Pacific Crest National Scenic Trail....3-244
Unclassified Trails....3-244
Key Indicators....3-244
Resource Protection Measures....3-245
Environmental Consequences....3-245
Direct and Indirect Effects (General)....3-245
Direct and Indirect Effects (Comparison of Key Indicators)....3-246
Cumulative Effects....3-246
Motorized Trails: Off-Highway Vehicles....3-247
Affected Environment....3-247
Key Indicators....3-249

Resource Protection Measures....3-249
Environmental Consequences....3-250
Direct and Indirect Effects (General)....3-250
Resource Management....3-253
Public Use and Enjoyment....3-254
Facility Operation and Maintenance....3-255
Fire and Aviation Management....3-255
Factors Considered in OHV Route Locations and Designation Changes....3-255
Direct and Indirect Effects (Comparison of Key Indicators)....3-255
Cumulative Effects....3-257
Management and Administration....3-258
Social and Economic....3-258
Affected Environment....3-258
Population Trends and Urban Envelopment....3-258
Population Characteristics....3-261
Social and Economic Conditions....3-262
Key Indicators....3-264
Environmental Consequences....3-264
Direct and Indirect Effects (General)....3-264
Direct and Indirect Effects (Comparison of Key Indicators)....3-264
Economic Efficiency....3-267
Environmental Justice....3-269
Civil Rights Impact Analysis....3-269
Tribal Relations....3-269
Affected Environment....3-270
Key Indicators....3-271
Resource Protection Measures....3-271
Environmental Consequences....3-271
Direct and Indirect Effects (General)....3-271
Activity Comparison....3-272
Resource Management....3-272
Public Uses and Designations....3-273
Management and Administration....3-274
Facility Operations and Maintenance....3-274
Commodity and Commercial Uses....3-275

Fire Management.....3-276
Direct and Indirect Effects (Comparison of Key Indicators).....3-276
Cumulative Effects.....3-277
Commodity and Commercial Uses.....3-277
Special Forest Products.....3-277
Affected Environment.....3-277
Key Indicators.....3-278
Resource Protection Measures.....3-279
Environmental Consequences.....3-279
Direct and Indirect Effects (General).....3-279
Direct and Indirect Effects (Comparison of Key Indicators).....3-280
Cumulative Effects.....3-281
Non-Recreation Special Uses.....3-281
Affected Environment.....3-281
Key Indicators.....3-282
Resource Protection Measures.....3-282
Environmental Consequences.....3-282
Direct and Indirect Effects (General).....3-282
Direct and Indirect Effects (Comparison of Key Indicators).....3-283
Cumulative Effects.....3-284
Minerals and Energy.....3-284
Affected Environment.....3-284
Key Indicators.....3-290
Resource Protection Measures.....3-290
Environmental Consequences.....3-290
Direct and Indirect Effects (General).....3-290
Resource Management.....3-290
Public Uses and Designations.....3-291
Commodity and Commercial Uses.....3-291
Direct and Indirect Effects (Comparison of Key Indicators).....3-293
Resource Management.....3-293
Facility Operations and Maintenance.....3-294
Cumulative Impacts.....3-294
Livestock Grazing.....3-94
Affected Environment.....3-294

Key Indicators....3-296
Resource Protection Measures....3-296
Environmental Consequences....3-296
Direct and Indirect Effects (General)....3-296
Direct and Indirect Effects (Comparison of Key Indicators)....3-298
Cumulative Effects....3-301
Fire and Aviation Management....3-301
Fire Suppression and Hazardous Fuels Treatment....3-302
Affected Environment....3-302
Key Indicators....3-305
Environmental Consequences....3-306
Direct and Indirect Effects (General)....3-306
Direct and Indirect Effects (Comparison of Key Indicators)....3-307
Cumulative Effects....3-311
Short-term Uses and Long-term Productivity....3-311
Unavoidable Adverse Effects....3-311
Irreversible and Irretrievable Commitments of Resources....3-312

## Table of Contents - Chapter 4

Chapter 4. Consultation and Coordination....4-3
List of Preparers....4-3
GIS Mapping....4-9
Editing Services and Administrative Support....4-9
Significant Contributors....4-9

## List of Tables

Table-100-Forest Soil Productivity ............ Tables-1
Table-101-Air Pollution Control District Significance Criteria.. ............ Tables-1
Table-102-Estimated Annual Wildland Fire Emissions -- tons/year. ............ Tables-2
Table-103-Suitability Study Summary for Candidate Wild and Scenic Rivers, LPNF. ............ Tables-2
Table-104-Major Developed Recreation Sites Capacity ............ Tables-3
Table-105-Recreation Special Use Authorization Summary ............ Tables-3
Table-106-Miles of Inventoried Trails by Forest. ............ Tables-3
Table-107-Designated Grazing Areas Status, Acreages, and Permitted AUMS by Forest ............ Tables-4
Table-108-Grazing Suitabilty by Forest by Alternative ............ Tables-4
Table-109-Vegetation (Uplands) and Riparian Conditions ............ Tables-4
Table-110-Cause of Fire Occurrence 1970-1999, by Forest ............ Tables-5
Table-111-Key Fire Management Issues Ranked by Alternative Under Current (CUR) and Enhanced (ENH) Budget Levels ............ Tables-5
Table-113-Results Of Threat Assessment For Animal Species Of Conservation Concern In The Plan Area, Number Of Species In Each Threat Category.. ............ Tables-5
Table-114-Results Of Threat Assessment For Plant Species Of Conservation Concern In The Plan Area, Number Of Species In Each Threat Category.. ............ Tables-6
Table-115-Threatened And Endangered Plant Species With No Substantial Threats To Persistence Or Distribution Identified From Forest Service Activities... ............ Tables-6
Table-116--Threatened and Endangered Animal Species with No Substantial Threats to Persistence or Distribution. ............ Tables-7
Table-117-Road Density With Road Miles By Forest (NFSR, Temporary And Unclassified) Roads, And State And Count. ............ Tables-8
Table-118-Conservation Emphasis. ............ Tables-9
Table-123-Watershed Acreage, Land Ownership And Summary Of Watershed Condition Ratings By Forest. ............ Tables-9
Table-124-Water Located Within The Southern California Planning Area ............ Tables-10
Table-125-Percentage Of Total Watersheds Allocated For Public Water Supplies. ............ Tables-10
Table-126-Percent Of Modeled RCA Acreage Relative To Total NFS Land Base ............ Tables-10
Table-164-Eligibility Inventory Summary for Candidate Wild and Scenic Rivers, ANF. ............ Tables-11
Table-165-Eligibility Inventory Summary for Candidate Wild and Scenic Rivers, CNF. ............ Tables-12
Table-166-Eligibility Inventory Summary for Candidate Wild and Scenic Rivers, LPNF ............ Tables-13
Table-167-Eligibility Inventory Summary for Candidate Wild and Scenic Rivers, SBNF ............ Tables-15
Table-168-Population Characteristics Compared for the U.S., Calif, and So. Calif Assessment Areas in 1990 and 2000 (Part 1 of 2) ............ Tables-17

## List of Tables (continued)

Table-169-Population Characteristics Compared for the U.S., Calif, and So. Calif Assessment Areas in 1990 and 2000 (Part 2 of 2). .......... Tables-18
Table-170-Language Spoken at Home, State of California, 2000) .......... Tables-18
Table-171-Comparative Median and Per Capita Income in 1999 Dollars .......... Tables-19
Table-172-Income and Employment Impacts. .......... Tables-19
Table-173-Regional Direct, Indirect, and Induced Employment Attributable to National Forests. .......... Tables-20
Table-174-Regional Direct, Indirect, and Induced Labor Income Attributable to National Forests. .......... Tables-21
Table-175-Forest Service-Related Contributions to the Four-Forest Economy .......... Tables-22
Table-176-Commodity Output Values Used for the Efficiency Analysis.. .......... Tables-22
Table-177-Present Values of Costs and Benefits by Alternative. .......... Tables-23
Table-178—Historical Grazing Use Trends for the Los Padres National Forest .......... Tables-23
Table-179—Acres Within Grazing Areas by Forest .......... Tables-23
Table-180—Number of Grazing Areas by Forest .......... Tables-24
Table-181—Land Acquisitions Analyzed as Grazing Areas, Los Padres National Forest. .......... Tables-24
Table-182—Acres Capable of Supporting Livestock.. .......... Tables-24
Table-183—Number of Vacant Grazing Areas Expected to be Available for Grazing by Alternative. .......... Tables-24
Table-184—Road Density (Miles Of Road Per Square Mile) By Forest Roads (National Forest System Roads, Temporary And Unclassified) And State And County Roads .......... Tables-24
Table-185—Percent Of Specific Habitat Types Within Dispersed Recreation Potential Area (Near Road, Less Than 15 Percent Slope, Not Chaparral)... .......... Tables-25
Table-186—Percentage Of National Forest System Lands That Consists Of Roads. .......... Tables-25
Table-187—Threatened, Endangered And Sensitive (TES) Aquatic And Semi-Aquatic Species Associated With Low And High Elevation Streams On Southern California National Forests (Adapted From Stephenson And Calcaron). .......... Tables-25
Table-188—Results Of Threat Assessment For Plant Species Of Conservation Concern In The Plan Area: Number Of Species In Each Threat Category.. .......... Tables-25
Table-189—Results Of Threat Assessment For Animal Species Of Conservation Concern In The Plan Area, Number Of Species In Each Threat Category. .......... Tables-26
Table-190—Percent Of Potential Species Of Conservation Concern Determined To Be At Risk On National Forest System Lands. .......... Tables-26
Table-191—Percent Of Land With At Least 0.5 Miles Of Road Per Square Mile By Alternative For Each National Forest In Southern California. .......... Tables-26
Table-192—Acres Potentially Accessible For Dispersed Recreation In Major Land Use Zones By Alternative .......... Tables-27

## List of Tables (continued)

Table-193—Miles Of Road Lost Due To Land Use Zoning By Alternative. This Specifically Relates To Those Land Use Zones With Fewer Allowable Uses (BCNM, CBZ, EF And RW)....Tables-27

Table-194—Projected Acres Of Hazardous Fuel Treatment Per Decade By Budget Level.....Tables-27

Table-195—Changes in Acres Managed for Motorized Use by Alternative....Tables-27

Table-196—Acres Of Fuel Treatment Opportunity By Type Of Treatment — 15 Year Projection (Mechanical Treatments Subtotal In First Row Followed By Total Treatment Per Forest).....Tables-27

Table-197—Variation In Program Management Emphases By Alternative (Percent Change From Current Situation).....Tables-28

Table-198—Distribution Of Plant Viability Outcomes On National Forest System Lands By Alternative.....Tables-28

Table-199—Distribution Of Invertebrate Animal Viability Outcomes On National Forest System Lands By Alternative ....Tables-28

Table-200—Vertebrate Animals Viability Outcomes By Alternative On National Forest System Lands....Tables-28

Table-201—Key Indicators Of Effects From Management Actions To Biological Diversity....Tables-29

Table-202—Alternative Comparisons With Respect To Conservation Emphasis Areas ....Tables-29

Table-203—Threats To Plant Species-At-Risk.....Tables-30

Table-204—Plant Viability Outcomes For Eighty-Eight Species At Risk For All Lands Summed By Alternative....Tables-30

Table-205—Plant Viability Outcomes For Eight Species-At-Risk On All Lands.....Tables-30

Table-206—Plant Viability Outcomes For Eight Species-At-Risk On National Forest System Lands....Tables-31

Table-207—Invertebrate Animal Viability Outcomes For Ten Species At Risk For All Lands Summed By Alternative....Tables-31

Table-208—Invertebrate Viability Outcomes For Two Species-At-Risk On All Lands.....Tables-31

Table-209—Invertebrate Viability Outcomes For Two Species-At-Risk On National Forest System Lands....Tables-31

Table-210—Vertebrate Animal Viability Outcome For 56 Species At Risk For All Lands Summed By Alternative....Tables-31

Table-211—Vertebrate Animal Viability Outcomes For Four Species-At-Risk On All Lands....Tables-32

Table-212—Vertebrate Animal Viability Outcomes For Four Species-At-Risk On National Forest System Lands....Tables-32

Table-213—Viability Outcomes For Arroyo Toad For All Lands By Alternative ....Tables-32

Table-214—Viability Outcomes For Mountain Lion For All Lands By Alternative (San Gabriel Mtns. South) ....Tables-32

Table-215—Viability Outcomes For California Spotted Owl For All Lands By Alternative.....Tables-32

## List of Tables (continued)

Table-216—Comparison Of Relative Potential Risks For Cumulative Effects To MIS By Alternative.......Tables-33
Table-217—Summary Of The Number And Percent Of Species At-Risk From Activities And Uses On NFS Lands.......Tables-33
Table-218—Potential Effects To Riparian Vegetation From Management Activities.......Tables-34
Table-219—Potential Effects To Streambanks From Management Activities.......Tables-34
Table-220—Potential Effects To Channel Morphology From Management Activities.......Tables-35
Table-221—Potential Effects To The Ability Of The RCA To Catch Sediment Before It Enters The Stream From Management Activities.......Tables-35
Table-222—Potential Effects To Water Quantity From Management Activities.......Tables-36
Table-223—Potential Effects To Water Quality (From Toxins) From Management Activities.......Tables-36
Table-224—Potential Loss Of NF Ownership Of RCAs From Management Activities.......Tables-37
Table-225—Potential Effects To Watershed Conditions From Management Activities.......Tables-37
Table-226—Activities With Potential To Affect Water Resources And Riparian Conservation Areas (RCAs).......Tables-37
Table-227—Soils Found Within the EUI Area.......Tables-38
Table-228—Landscape Soil Units And The Percentage Of Area That They Comprise In The Southern California National Forests.......Tables-38
Table-229—Federal Attainment Status.......Totals-39
Table-230—Southern California Counties With Nonattainment Status.......Tables-39
Table-231—Class I Areas (Airshed).......Tables-40
Table-232—Air Background Emissions.......Tables-40
Table-233—General Comparison of Alternative Air Quality Emissions.......Tables-40
Table-234—Estimated Daily Forest Visitor Mileage Driven Within The National Forests.......Tables-41
Table-235—Estimated Percent Change in Unpaved Road Mileage from the Present.......Tables-41
Table-236—Annual Wildfire Acres Burned.......Tables-41
Table-237—Southern California National Forest Existing Wilderness.......Tables-42
Table-238—Estimated Wilderness Visitors by Forest.......Tables-42
Table-239—Official Land Ownership.......Tables-43
Table-240—Important Land Adjustments.......Tables-43
Table-241—Roads Rights-of-way Needs Summary.......Tables-43
Table-242—Property Lines Surveyed.......Tables-44
Table-243—Mineral Withdrawal Status.......Tables-44
Table-244—Acres of Potential Increase to Mineral Withdrawal Status, by Alternative.......Tables-44
Table-245—Heritage and Tribal Data for Southern California Forests.......Tables-44
Table-246—National Register of Historic Places by Forest.......Tables-45

## List of Tables (continued)

Table-247—State Historic Landmarks by Forest ........ Tables-45
Table-248—Indigenous Groups at time of European Contact for Southern California Forests. ........ Tables-45
Table-249—Acres of Back Country Motorized by Alternative ........ Tables-46
Table-250—Back Country Motorized Acres in High Sensitivity Zone for Heritage Resources by Alternative ........ Tables-46
Table-251—Comparison of Heritage Resource Special Interest Area Acreage by Alternative ........ Tables-46
Table-252—High Sensitivity Heritage Acres in Wilderness (Existing and Recommended) by Alternative ........ Tables-46
Table-253—Alternative Comparison of Road Mileage Reduction ........ Tables-46
Table-254—Current Adopted Recreation Opportunity Spectrum (ROS) — Acres of NFS Lands by Forest ........ Tables-47
Table-255—Estimated Developed Sites Activity Participation Range by Forest ........ Tables-47
Table-256—Current Acres of Potential Dispersed Vehicle Camping by Forest ........ Tables-47
Table-257—Estimated Dispersed Camping Activity Participation Range by Forest ........ Tables-47
Table-258—Estimated Driving for Pleasure Activity Participation Range by Forest ........ Tables-48
Table-259—Estimated Wildlife and Nature Viewing Activity Participation Range by Forest ........ Tables-48
Table-260—Estimated Water Play Activity Participation Range ........ Tables-48
Table-261—Hang Gliding Take-Offs In Southern California National Forests ........ Tables-49
Table-262—Recreational Target Shooting ........ Tables-50
Table-263—Estimated Hunting and Fishing Activity Participation Range. ........ Tables-50
Table-264—Angeles National Forest Developed Ski Area Capacity (SAOT–Skiers At One Time) ........ Tables-50
Table-265—San Bernardino National Forest Developed Ski Area Capacity (SAOT–Skiers At One Time) ........ Tables-51
Table-266—Estimated Future Visitor Use ........ Tables-51
Table-267—Alternative 1 Acres of Potential Dispersed Vehicle Camping by Forest ........ Tables-51
Table-268—Alternative 2 Acres of Potential Dispersed Vehicle Camping by Forest ........ Tables-51
Table-269—Alternative 3 Acres of Potential Dispersed Vehicle Camping by Forest ........ Tables-52
Table-270—Alternative 4 Acres of Potential Dispersed Vehicle Camping by Forest ........ Tables-52
Table-271—Alternative 5 Acres of Potential Dispersed Vehicle Camping by Forest ........ Tables-52
Table-272—Alternative 6 Acres of Potential Dispersed Vehicle Camping by Forest ........ Tables-52
Table-273—Angeles National Forest Recreational Target Shooting by Alternative ........ Tables-53
Table-274—Cleveland National Forest Recreational Target Shooting by Alternative. ........ Tables-53
Table-275—Los Padres National Forest Recreational Target Shooting by Alternative. ........ Tables-53
Table-276—San Bernardino National Forest Recreational Target Shooting by Alternative ........ Tables-53
Table-277—Totals — Recreational Target Shooting by Alternative. ........ Tables-53

## List of Tables (continued)

Table-278—Landscape Attractiveness — Acres and Percent of Total Acres, by Class and Forest. .......... Tables-54
Table-279—Key Places Valued for Scenic Quality .......... Tables-54
Table-280—Scenic Integrity Objectives for Alternative 1 — Acres and Percent of Total, by SIO and Forest. .......... Tables-55
Table—281-Law Enforcement Offenses from Fiscal Year 2000 through Fiscal Year 2003 .......... Tables-55
Table-282—Administrative Facilities by Forest .......... Tables-55
Table-283—Miles of Freeways, State Highways, County Roads, and Forest Highways by Forest. .......... Tables-55
Table-284—Miles of PFSR, Arterial, Collector, And Local Roads By Forest .......... Tables-56
Table-285—Miles of NFSR Level 1-5, Temporary, And Unclassified Roads By Forest. .......... Tables-56
Table-286—Acres Occupied By Roads, By Forest, And By Road Category .......... Tables-56
Table-287—Road Density by Forest .......... Tables-56
Table-288—Miles Of National Forest System Roads By Road Maintenance Levels. .......... Tables-57
Table-289—Road Miles By Objective Maintenance Level By Land Use Zone. .......... Tables-57
Table-290—Road Miles in Inventoried Roadless Areas. .......... Tables-57
Table-291—High-Risk Slope Zones 7 and 10, National Forest System Road miles by Forest .......... Tables-57
Table-292—Alternative 1 — Miles Of Roads And Land Use Zone By Objective Maintenance Level .......... Tables-58
Table-293—Alternative 2 — Miles Of Roads And Land Use Zone By Objective Maintenance Level .......... Tables-58
Table-294—Alternative 3 — Miles Of Roads And Land Use Zone By Objective Maintenance Level .......... Tables-58
Table-295—Alternative 4 — Miles Of Roads And Land Use Zone By Objective Maintenance Level .......... Tables-58
Table-296—Alternative 5 — Miles Of Roads And Land Use Zone By Objective Maintenance Level .......... Tables-59
Table-297—Alternative 6 — Miles Of Roads And Land Use Zone By Objective Maintenance Level .......... Tables-59
Table-298—Unclassified Road Miles By Land Use Zone By Alternative. .......... Tables-59
Table—299—Road Density by Acres. .......... Tables-59
Table-300—High Risk Locations by Road Miles, by Forest.. .......... Tables-60
Table-302—Federally Recognized Tribes Within Forest's Sphere Of Influence .......... Tables-61
Table-303—Non-Federally Recognized Tribes Within Forest's Sphere Of Influence .......... Tables-62
Table-304—Wilderness Acres (Existing and Recommended) by Alternative.. .......... Tables-62
Table-305—Back Country Motorized Acres by Alternative .......... Tables-62

## List of Tables (continued)

Table-306—Non-Recreation Special Use Authorizations, Number of Authorizations and Acres by Forest. ....Tables-62

Table-307—Utility and Transportation Corridors and Communication Sites (Currently Designated). ....Tables-63

Table-308—Proposed Urban Rural Interface (URI), Developed Area Intermix (DAI), and Back Country Motorized (BCM) Acreage by Alternative and Forest....Tables-63

Table-309—Suitability of Western Regional Corridor Planning Partnership Corridors....Tables-63

Table-310—Acres Currently Withdrawn From Mineral Entry. ....Tables-63

Table-311—Recommended Acres for Withdrawal from Mineral Entry in Critical Biological Zones by Forest and Alternative. ....Tables-63

Table-312—Percent of Land Area Expected to be Withdrawn from Mineral Entry....Tables-64

Table—313—Ownership Complexity....Tables-64

Table-314—Estimated Percent of Forest Accessible by Road....Tables-64

Table-315—Estimated Percent of Forest Accessible by Road....Tables-64

Table-316—Off-Highway Vehicle Travel (4-Wheelers, Dirt Bikes, Etc.), Use By Forest ....Tables-64

Table-317—20% Increase In OHV Use Projected by the Year 2020....Tables-65

Table-318—Cleveland National Forest Candidate Research Natural Areas Recommended By Alternative....Tables-65

Table-319—Los Padres National Forest Candidate Research Natural Areas Recommended By Alternative....Tables-65

Table-320—San Bernardino National Forest Candidate Research Natural Areas Recommended By Alternative....Tables-65

Table-321—Summary of Candidate Research Natural Areas Recommended By Alternative....Tables-66

Table-322—Established RNAs On The Southern California National Forests. ....Tables-66

Table-323—Candidate RNAs On The Four Southern California National Forests. ....Tables-66

Table-324—Miles of ML 2 Road Opportunity for Non-Highway Licensed Vehicle Use. ....Tables-67

Table-325—Miles of Trail Opportunity for Non-Highway Licensed Vehicles....Tables-67

Table-326—Summary of Roads and Trails Available for Non-Highway Licensed Vehicle Use....Tables-67

Table-327—Miles of ML2 Road Available as an Off-Highway Vehicle Opportunity for Highway Licensed Vehicles....Tables-68

Table-328—Miles of ML2 Road Managed as a 4WD Opportunity....Tables-68

Table-329-Acres Of Coastal Sage Scrub Expected To Be Grazed By Alternative. ....Tables-68

Table-330-Acres Of Meadow Expected To Be Grazed By Alternative.. ....Tables-68

Table-331-Acres Of Oak Woodland Expected To Be Grazed By Alternative....Tables-69

Table-332-Acres Of Mapped Riparian Vegetation Expected To Be Grazed By Alternative....Tables-69

Table-333-Comparison Of Alternative Acres By Land Use Zone ....Tables-69

Table-334-Percent Of Each Land Use Zone By Alternative. ....Tables-69

## List of Tables (continued)


Table-335-Total Acres Of Recommended Wilderness, By Alternative, By Forest ....Tables-70

Table-336-Recommended Wild And Scenic River Mileage By Classification And Alternative (Los Padres NF) ....Tables-70

Table-337-Summary of Candidate Special Interest Areas Recommended By Alternative. ....Tables-70

Table-338-Established Special Interest Areas ....Tables-71

Table-339-Angeles National Forest Candidate Special Interest Areas.. ....Tables-71

Table-340-Cleveland National Forest Candidate Special Interest Areas. ....Tables-71

Table-341-Los Padres National Forest Candidate Special Interest Areas.. ....Tables-72

Table-342-San Bernardino National Forest Candidate Special Interest Areas ....Tables-72

Table-343-Angeles National Forest - Inventoried Roadless Areas Evaluated ....Tables-73

Table-344-Angeles National Forest - Publicly Proposed Other Undeveloped Areas Evaluated ....Tables-73

Table-345-Cleveland National Forest - Inventoried Roadless Areas Evaluated. ....Tables-74

Table 346 - Cleveland National Forest - Publicly Proposed Other Undeveloped Areas Evaluated ....Tables-74

Table-347-Los Padres National Forest - Inventoried Roadless Areas Evaluated ....Tables-75

Table-348-Los Padres National Forest - Publicly Proposed Other Undeveloped Areas Evaluated ....Tables-76

Table-349-San Bernardino National Forest - Inventoried Roadless Areas Evaluated. ....Tables-76

Table-350-San Bernardino National Forest - Publicly Proposed Undeveloped Areas Evaluated ....Tables-77

Table-351-Angeles National Forest Recommended Wilderness By Alternative.. ....Tables-78

Table-352-Cleveland National Forest Recommended Wilderness by Alternative ....Tables-79

Table-353-Cleveland National Forest Recommended Wilderness by Alternative. ....Tables-80

Table-354-San Bernardino National Forest Recommended Wilderness by Alternative. ....Tables-81

Table-355-Candidate Wild and Scenic Rivers - Angeles National Forest ....Tables-81

Table-356-Candidate Wild and Scenic Rivers - Cleveland National Forest. ....Tables-82

Table-357-Candidate Wild and Scenic Rivers - Los Padres National Forest. ....Tables-82

Table-358-Candidate Wild and Scenic Rivers - San Bernardino National Forest ....Tables-82

Table-359-Acres Managed For Motorized Uses As Defined By Land Use Zone ....Tables-83

Table-360-Plant Species Evaluated for Viability Concerns List (Species of Concern). ....Tables-84

Table-361-Federally Listed Plant Species - Endangered, Threatened, Proposed or Candidate 28 TE species, 2 C species ....Tables-95

Table-362-Federally Listed Animal Species - Endangered, Threatened, Proposed or Candidate ....Tables-97

Table-363-Sensitive Animal Species by Forest (known or potential) Updated as of 8 June 1998, Appended 6 March 2001 and 7 May 2003 ....Tables-99

## List of Tables (continued)

Table-364—USDA Forest Service, Pacific Southwest Region Sensitive Plant Species by Forest ....Tables-101

Table-365—Primary Species within Critical Biological Land Use Zones ....Tables-104

Table-366—Proposed Critical Biological Land Use Zones for Riparian Dependent Species by Forest.. ....Tables-107

Table-367—Plant Species Determined To Be At Substantial Risk From Forest Service Activities With Types Of Threats That Affect Them. All Plants Are In Risk Category 5 ....Tables-109

Table-368—Viability Outcome Statements By Alternative For Plant Species-At-Risk. ....Tables-114

Table-369-Animal Species Evaluated for Viability Concerns List (Species of Concern)....Tables-118

Table-370-Animal Species at Risk List....Tables-126

Table-371-Viability Outcome Statements By Alternative For Vertebrate Animal Species-At-Risk. ....Tables-130

Table-372-Viability Outcome Statements By Alternative For Invertebrate Animal Species-At-Risk ....Tables-132

Table-373-Summary of Animal Threats by Vegetation Group. ....Tables-133

Table-374-Summary of Plant Threats by Vegetation Group. ....Tables-134

Table-375-Conservation Emphasis Areas, Priority Opportunities For The Next 3-5 Years....Tables-136

Table-376-Activities That Can Impact Habitat For 88 Plant Species-At-Risk And The Standards That Address The Threat Producing Activities. ....Tables-139

Table-377-Animal Species Determined To Be At Substantial Risk From Forest Service Activities, The Types Of Threats That Affect Them, And The Standards That Address These Threats ....Tables-140

Table-378-System Trail Miles by Erosion Hazard Rating ....Tables-144

Table-379-Developed Recreation Site Occupancy and Estimated Visits – ANF. ....Tables-145

Table-380-Developed Recreation Site Occupancy and Estimated Visits – CNF ....Tables-146

Table-381-Developed Recreation Site Occupancy and Estimated Visits – LPNF ....Tables-146

Table-382- Developed Recreation Site Occupancy and Estimated Visits – SBNF ....Tables-147

Table-420-Special Forest Product Revenue FY2002 ....Tables-147

Table-421-Summary Of Current General Visitor Use By Forest ....Tables-148

Table-422-Predominant Race/Ethnicity, Gender, and Age of Forest Visitors ....Tables-148

Table-423-Five Most Popular Activities by Forest by Percent Participation ....Tables-148

Table-425-Primary Purpose of Visit (% participation). ....Tables-149

Table-426-Visit Characteristics. ....Tables-149

Table-432-Existing Management Indicator Species by National Forest....Tables-149

Table-433-Southern California Forest Plan Revision - Management Indicator Species....Tables-151

Table-434-Existing Management Indicator Species from the San Bernardino National Forest. ...Tables-153

## List of Tables (continued)

Table-436-Arroyo Seco River - Potential Classification by River Segment................................Tables-154
Table-437-Arroyo Seco River - Segment Description..............................................................Tables-154
Table-438-Indian Creek - Potential Classification by River Segment........................................Tables-155
Table-439-Little Sur River - Potential Classification by River Segment.....................................Tables-155
Table-440-Mono Creek - Potential Classification by River Segment..........................................Tables-156
Table-441-Piru Creek - Potential Classification by River Segment.............................................Tables-156
Table-442-Number of Incidents from 2000 through 2003, SBNF...............................................Tables-157
Table-443-San Antonio River - Potential Classification by River Segment.................................Tables-157
Table-444-Upper Sespe Creek - Potential Classification by River Segment...............................Tables-158
Table-445-Indian Creek - Segment Description.........................................................................Tables-158
Table-446-Little Sur River - Segment Description.......................................................................Tables-158
Table-447-Mono Creek - Segment Description...........................................................................Tables-159
Table-448-Piru Creek - Segment Description..............................................................................Tables-159
Table-449-San Antonio River - Segment Description..................................................................Tables-159
Table-450-Upper Sespe Creek - Segment Description.................................................................Tables-159
Table-451-Angeles National Forest Candidate Special Interest Areas by Alternative..................Tables-160
Table-452-Cleveland National Forest Candidate Special Interest Areas by Alternative................Tables-160
Table-453-Los Padres National Forest Candidate Special Interest Areas by Alternative..............Tables-160
Table-454-San Bernardino National Forest Candidate Special Interest Areas by Alternative.......Tables-160
Table-455-OHV Mileage by Forest............................................................................................Tables-161
Table-456-Miles of ML2 Roads Open For OHV Use....................................................................Tables-161
Table-458-Acres Burned by Wildfire Annually............................................................................Tables-161
Table 459 - Predominate Categories of Offense Violations from FY 2001 through FY 2003........ Table-161
Table 460 - Population Growth Trend, 1960 – 2020.................................................................. Table-161
Table 461 – Ethnic Origins, Assessment Area 2000.................................................................... Table-161
Table 462 – FS Generated Impacts............................................................................................. Table-161
Table 346 - Cleveland National Forest - Publicly Proposed Other Undeveloped Areas Evaluated........................................................................ Table-162
Table-463—Invasive Nonnative Plant Species............................................................................. Table-162
Table-464—Invasive Nonnative Animal Species.......................................................................... Table-173

## Table of Contents - Appendices


Appendix A. Common Acronyms....................Appendices 3
Appendix B. Species Viability....................Appendices 7
Species Lists....................Appendices 7
Species within Critical Biological Land Use Zones....................Appendices 7
Viability Analysis....................Appendices 7
Process for Evaluating Viability / Ecosystem Sustainability....................Appendices 7
Process for Landscape Linkage....................Appendices 18
Process for Evaluating Management Indicator Species....................Appendices 19
General Direct and Indirect Effects to Plants and Animals....................Appendices 28
Appendix C. Invasive Species....................Appendices 55
Appendix D. Inventoried Roadless Areas (IRAs)....................Appendices 61
Introduction and Evaluation Process Summary....................Appendices 61
Proposed Wilderness by Alternative....................Appendices 62
Appendix E. Wild and Scenic Rivers....................Appendices 63
Background and Study Process....................Appendices 63
Summary of Wild and Scenic River Eligibility Inventory by Forest....................Appendices 70
Recommended Wild and Scenic Rivers by Alternative....................Appendices 70
Study Reports (Los Padres National Forest)....................Appendices 71
Arroyo Seco River....................Appendices 71
Study Area Summary....................Appendices 71
Eligibility Inventory....................Appendices 71
Suitability Report....................Appendices 75
Indian Creek....................Appendices 80
Study Area Summary....................Appendices 80
Eligibility Inventory....................Appendices 80
Suitability Report....................Appendices 83
Little Sur River....................Appendices 86
Study Area Summary....................Appendices 86
Eligibility Inventory....................Appendices 87
Suitability Report....................Appendices 90
Mono Creek....................Appendices 93
Study Area Summary....................Appendices 93
Eligibility Inventory....................Appendices 93
Suitability Report....................Appendices 97

Piru Creek....Appendices 99
Study Area Summary....Appendices 100
Eligibility Inventory....Appendices 100
Suitability Report....Appendices 107
San Antonio River....Appendices 112
Study Area Summary....Appendices 112
Eligibility Inventory....Appendices 112
Suitability Report....Appendices 114
Upper Sespe Creek....Appendices 117
Study Area Summary....Appendices 117
Eligibility Inventory....Appendices 118
Suitability Report....Appendices 122
Appendix F. Research Natural Areas....Appendices 129
Research Natural Areas Background and Status....Appendices 129
Recommended Research Natural Areas by Alternative....Appendices 129
Appendix G. Special Interest Areas....Appendices 131
Special Interest Areas Background and Status....Appendices 131
Recommended Special Interest Areas by Alternative....Appendices 132
Appendix H. Santa Rosa and San Jacinto Mountains National Monument....Appendices 133
National Monument Background and Status....Appendices 133
Appendix I. Oil and Gas Potential....Appendices 135
Appendix J. Glossary....Appendices 147
Appendix K. Bibliography....Appendices 171
Appendix L - Visitor Use and Participation (NVUM)....Appendices 199
Appendix M - Civil Rights Impact Analysis....Appendices 203
Appendix N - San Dimas Experimental Forest....Appendices 205
Experimental Forest Background and Status....Appendices 205

# Draft Environmental Impact Statement For Southern California National Forests Land Management Plans Revision

**Angeles National Forest**

**Cleveland National Forest**

**Los Padres National Forest**

**San Bernardino National Forest**

**Lead Agency**: USDA Forest Service

**Cooperating Agencies**: U.S. Fish and Wildlife Service

**Responsible Official**: Jack Blackwell, Regional Forester, Pacific Southwest Region, 1323 Club Drive, Vallejo, CA 94592.

**For Information Contact**: Gloria Silva, Planning and Public Collaboration Specialist, Southern California Plan Revision Team, 10845 Rancho Bernardo Dr., Suite 200, San Diego CA 92127

**Abstract**: This Draft Environmental Impact Statement documents the analysis of six alternative sets of management direction for the long-term management of the National Forests of southern California including disclosure of the environmental effects expected from implementing these alternatives. Each Forest has identified a prefered alternative that was used as the basis for development of four draft forest plans. This document is prepared under the 1982 Planning Regulations found in 36 CFR part 219 in partial fulfillment of the requirement to revise forest land and resource management plans at least every 15 years.

Reviewers should provide the Forest Service with their comments during the review period of the draft environmental impact statement. This will enable the Forest Service to analyze and respond to the comments at one time and to use information acquired in the preparation of the final environmental impact statement, thus avoiding undue delay in the decisionmaking process. Reviewers have an obligation to structure their participation in the National Environmental Policy Act process so that it is meaningful and alerts the agency to the reviewers' position and contentions. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553 (1978). Environmental objections that could have been raised at the draft stage may be waived if not raised until after completion of the final environmental impact statement. City of Angoon v. Hodel (9th Circuit, 1986) and Wisconsin Heritages, Inc. v. Harris, 490 F. Supp. 1334, 1338 (E.D. Wis. 1980). Comments on the draft environmental impact statement should be specific and should address the adequacy of the statement and the merits of the alternatives discussed (40 CFR 1503.3).

**Comments** may be submitted electronically at http://www.fs.fed.us/r5/scfpr.

Nonelectronic submissions may be sent to Southern California Forest Plan Revisions, Name of National Forest *(if comments apply to one specific National Forest)*, USDA Forest Service Content Analysis Center, P.O. Box 22777, Salt Lake City UT 84122, or may be faxed to (801) 517-1015.

**Date Comments Must Be Received**: Within 90 days of publication in the Federal Register. Timeliness of receipt will be determined by the timestamp of electronic submissions or the postmark of postal submissions.

# Fire Suppression and Hazardous Fuels Treatment

## Affected Environment

The Federal Wildland Fire Management Policy of 2001 requires that a full range of fire management activities will be used to achieve ecosystem sustainability including its interrelated ecological, economic and social components. Fire as a critical natural process, will be integrated into land and resource management plans and activities on a landscape scale, and across agency boundaries. Response to wildland fires is based on ecological, social and legal consequences of the fire.

Southern California is one of the most dangerous wildland fire environments in the U.S. This region has had by far the most firefighters killed in action and residential structures lost of any region of the country. Some of the structural losses and most of the fatalities have occurred on National Forest System lands. In addition, a significant portion of past flood damages to low-lying communities have occurred as a result of debris flows and debris torrents coming from burn areas on the National Forests; there have also been numerous fatalities associated with these flooding events (Wells 1997). The fires of October 2003 resulted in fatalities of both civilians and firefighters, as well as civilian fatalities from down stream flooding several months after the fires.

Median fire size has varied markedly among the southern California National Forests in the recent past. For example, between 1950 and 1989, the median fire size on the San Bernardino National Forest was 161 acres (mean 1,554), but it was 2,786 acres (mean 3,507) on the much smaller Cleveland National Forest (Weise and others, in press). Chaparral normally does not burn until it reaches about 25 years of age, but in southern California all but the very youngest age classes will burn at times of low fuel moisture and extreme fire weather (Keeley and others 1999).

Since 1910 and the advent of fire suppression, the number of fires per decade has increased in southern California; increases have been most pronounced in counties where human populations have exploded (Keeley and others 1999). Interestingly, although the number of fires in chaparral has increased markedly, mean fire size has remained the same over the roughly 90-year period (Conard and Weise 1998). This is largely due to successful suppression of fires that start in more moderate weather conditions and in more accessible locations, such as along roads, but it also reflects the effectiveness of fixed-wing aircraft and helicopters in extinguishing fires quickly in more remote locations (Moritz 1997). On the other hand, the frequency of large fires (greater than 50,000 acres) in chaparral apparently has not changed for centuries, through several distinct fire regimes: the Native American (before 1792), Spanish-Mexican (1792 to 1848), Anglo (1849 to 1929) and recent (1930 to present) periods (Mensing and others 1999).

Based on analysis of fire records from 1970 to 1999, an average of 564 fires start annually in the four forests, and they burn on average of 57,160 acres per year. Considering all jurisdictions regarding the same fires, slightly more than 87,000 acres per year burn in wildfires on and directly adjacent to these forests. Eighty-four percent of the fires are human-caused; the remainder are caused by lightning. Most are controlled at 100 acres or less.

There is little variation in average patch size of large fires on the landscape in reviewing Forest Service fire history records since 1910. For southern California as a whole, 79% of the acres burned relate to 10% of the fires. However there continues to be a proliferation of small fires, with fire occurrence increasing in southern California counties every decade since 1910 (Keeley, Fotheringham and Morais 1999). Suppression has effectively limited the spread and impacts of these smaller fires. In the high-elevation mixed conifer vegetation where fire suppression has been most successful, the resulting denseness of stands has contributed to the current tree mortality and stand-replacement fire issues. This densification of forested areas due to past fire suppression is well documented (McKelvey and Johnston 1992, Stevenson and Calcarone 1999, Minnich and others 2002).

In southern California, fire suppression plays an extremely important role containing the ever-increasing frequency of human ignitions. Indeed, fire suppression may play a key role in maintaining these ecosystems closer to their natural fire regime than would be the case in its absence (Keeley and others 1999).

See table 458: Acres Burned by Wildfire Annually.

It is the relatively few fires that escape initial attack that account for the majority of the burned area and that account for most of the suppression costs on the National Forests. For the period 1991 to 2000, suppression costs

for these four forests averaged nearly $32 million per year.

For the period 1970 to 1999, fire occurrence has increased only on the Angeles National Forest, and total acres burned have increased during the past three decades, mostly because of large fires on the Los Padres National Forest. Many of the statistical fires originate outside the forests and spread upslope on to National Forest System land from the urban interface. In other cases, fires originating on National Forest System land immediately threaten communities both within and along the edge of the forests. With only 16% of all fires originating from lightning, the human-caused fires from campfires, target shooting, smoking, vehicle fires, equipment use and arson account for most of the damaging wildfires (see table 110: Cause of Fire Occurrence 1970-1999, by Forest).

Wildland-urban Interface

Because of the urbanization in and adjacent to the National Forests in southern California, most of these forests are viewed as part of the wildland-urban interface environment, and fires continue to be aggressively suppressed. Wildland-urban interface is defined as the area where dense development meets the wildlands. In the land use zoning concept related to the alternatives, these areas are identified as urban- rural interface (URI). Developed area intermix (DAI) is a related land use zone, defined as a mixture of developed and undeveloped lands. For general discussion these areas are referred to as the interface/intermix. The interface/intermix areas are a source of substantial human-caused fire occurrence.

Complex land ownership patterns can lead to an increasing miles of future wildland-urban interface as inholdings are developed. There are currently about 1,700 miles of wildland interface with developed areas on the four forests. Table 313: Ownership Complexity displays the number a miles of perimeter per square mile of ownership. This is a measure of complexity of the current land ownership pattern. The table shows that the Los Padres has the least complexity while the Cleveland has the most. Land adjustment is a management tool forests can use to reduce land ownership complexity and therefore the future amount of wildland-urban interface.

Resource managers have shown resistance to managing "fires for resource benefit" as "wildland fire use" wildfires because of concerns related to air quality and government liabilities related to the proximity of interface/intermix lands. Prescribed fires are conducted in place of fire use and most burning is conducted in the months Jof anuary through March to reduce social effects, because smoke dispersal is much more effective in the winter than during the months of July, August (when most lightning ignitions occur) and September (when most of the largest fires occur).

The majority of fires on National Forest System lands pose an imminent threat to communities within and along the periphery of each forest. This threat is magnified during periods of high wind, high temperatures combined with low humidity and drought. For example, the Copper Fire on the Angeles National Forest consumed 24,000 acres in a single afternoon on June 5, 2002. With a burning index of 260, it had the most rapid spread of any fire in the history of the forest, and although it started outside the forest boundary it burned through the forest in a single afternoon. Similar high rates of fire spread were observed on the Curve Fire (August 2002) and on the Williams Fire (September 2002). The severity of these fires was attributed to the effects of drought, resulting in record low percentages of moisture in living chaparral (D. Feser Angeles N.F. pers. Comm. 2002).

Even fires that start in relatively remote areas can threaten communities within the first 24 hours of ignition. For example, within 24 hours of ignition, the Williams Fire spread from the interior of the Angeles National Forest to the communities of Azusa, Glendora, San Dimas, LaVerne and Claremont and caused significant structural losses within the forest by consuming an entire special use cabin tract. Another type of fire that may start in remote areas but can spread quickly across the forest to communities is the Santa Ana wind-driven fire, which typically starts in the fall and early winter months. These examples make it clear that in the four southern California National Forests, all wildfires may pose threats to communities and public safety, even those that originate in remote areas.

In most of central and southern California, fire suppression operations are extremely complex and expensive to initiate and manage. Fire suppression needs in the interface/intermix typically result in a multi-agency fire-fighting response that involves hundred of firefighters participating in well-coordinated air and ground operations. Typically, initial attack forces dispatched to a multi-agency fire include 10 or more engines, several dozers, four handcrews, between two and five helicopters and a minimum of two airtankers.

Structure protection needs, evacuation contingencies, coordination with other government agencies including law

enforcement agencies and management of intense media involvement are indicators of the immediate suppression complexities involving fires, especially those that start in the urban interface. As a result of the evolution of successful firefighting techniques in chaparral vegetation and structure protection, one-third of all Forest Service fire engines (103) in California are located on the southern California National Forests. For the same reasons, there is an equal commitment of firefighting aircraft to support ground operations.

Suppression Effectiveness and Firefighter Access

Even on severe fires such as the Wheeler Fire of 1985 on the Los Padres National Forest, fuelbreaks, past burns and roads have been an effective combination in helping limit wildfire size. Approximately 19 miles of the 96-mile fire perimeter were on fuelbreaks and 15 miles of the final fire perimeter were on roads. In addition, the Wheeler Fire did not burn through the Romero Burn of 1971 and the Howard Creek prescribed burn of 1984. (Salazar and Gonzalez-Caban 1987). The desire to use road and fuelbreaks to contain fires relates to the difficulty of cutting fire line in chaparral. The National Wildfire Coordination Group Fireline Handbook 3 indicates that hand construction of fire line in chaparral requires six times the personnel than required to cut a fire line in grass or timber.

Historically, large fires are common during two times of year. Most fires exceeding 20,000 acres burn between July and September during periods of high temperatures and low humidity. High rates of fuel consumption result in towering plumes of smoke that reach altitudes of 20,000 to 30,000 feet. These updrafts draw in air from the periphery of the fire, generating winds that further accelerate spread rates. In effect, these plume-dominated events create their own fire weather that results in large burn areas. During the past three decades, this type of fire has resulted in most of the acres burned on the National Forests.

On large fires burning under severe conditions, firefighters typically take an indirect approach to fire suppression, often using firing tactics from roads and fuelbreaks. Bulldozers are often used to create wide fire lines on fuelbreaks to serve as containment lines. As many as 20 fixed-wing and rotary-winged aircraft may be assigned to such a fire in support of ground forces involved in fire suppression. Because of the urban nature of the southern California environment, fires that rapidly expand in size result in substantial structure protection needs in multiple jurisdictions. Massive numbers of fire engines and other suppression resources are used to protect structures.

Perimeter control operations are sometimes abandoned because of the numbers of structures in need of protection, resulting in larger fires than would be the case in a remote area. On small fires burning under more moderate conditions, aircraft drop fire retardant on fuelbreaks and ridgetops to halt the spread of the fire while ground forces take the opportunity to build a containment line around the fire. On most fires, containment is achieved using the philosophy of direct attack, and the fires are contained using crews to build hand line along the edge of the fire with support from fire engine crews and helicopter water drops.

The other category of large fires burn from late September through February, when Santa Ana wind patterns follow the passing low-pressure systems and cold fronts. While fires that start in these wind patterns are normally of short duration (two- to three-day fire events) and often produce fires in the 5,000- to 10,000-acre range, there have been historical fires attributed to Santa Ana winds that have burned more than 100,000 acres. There have also been a few cases of these winds lasting for extended periods. Firefighter fatalities and structural losses have been associated with both of these types of fires, with most of the historical structural losses in the region associated with Santa Ana winds.

The Cedar Fire of October 2003 burned 273,000 acres, resulting in the largest wildfire in modern-day California history. Starting on the Cleveland National Forest under a Santa Ana wind pattern, the fire burned for two days, spreading westerly under Santa Ana winds; then it reversed course and spread easterly for four additional days. This fire illustrates that both weather patterns associated with large fires can occur on a single wildfire incident.

Wind-driven fires are suppressed less effectively than other large fires because spot fires can break out several miles in front of the main fire, and because aviation resources have limited value once winds exceed 35 miles per hour. Tactical operations involve the assignment of engines and handcrews to the flanks of the fire to try to keep the head of the fire narrow. Special attention is given to structures out in front of the fire, and evacuations are difficult on fires where winds typically blow at wind speeds of 40 to 60 miles per hour. Winds exceeding 100 miles per hour have been recorded on several of these National Forests. These fires are controlled when they run out of available fuel or the weather changes. Special attention is given to defensible space, and firefighters are often assigned structure protection responsibilities at the head of the fire. Hand crews line the point of origin and

the flanks of the fire so that when the weather changes, the fire is unable to reverse course.

The Angeles National Forest has an extensive system of fuel breaks, designed to assist suppression forces in limiting wildfire size under normal burning conditions. The other three forests have less extensive networks of fuelbreaks. These fuelbreaks have contributed to firefighter safety and have been used to control wildfire perimeters throughout southern California (Green 1977). They have proven most valuable where there is road access to numerous points of the fuelbreak or when a road runs parallel to the fuelbreak and serves as part of the fuelbreak.

Fire roads also are essential to successful suppression operations in southern California (Gucinski and others 2000). These roads have begun to deteriorate because of inadequate road maintenance budgets and the introduction of larger engines to fight fires. As a result, safety concerns for firefighters has increased. The fuelbreak and fire-road system represent a long-term investment related to minimizing wildfire size and downstream flooding that may result from these fires. The evolution of fire suppression in chaparral has produced a firefighting culture that uses large numbers of fire engines to hold fires on roads and fuelbreaks under normal burning conditions and to protect large numbers of structures within and adjacent to Forest Service jurisdiction during extreme burning conditions typical of late summer and fall wildfires. Table 314: Estimated Percent of Forest Accessible by Road illustrates the percentage of each forest that is accessible from the various road systems that are currently inventoried.

In southern California shrublands, fire suppression plays an extremely important role containing the ever-increasing frequency of human ignitions. Indeed, fire suppression may play a key role in maintaining these ecosystems closer to their natural fire regime than would be the case in its absence (Keeley and others 1999).

Transportation Corridors and Recreation Use.

The highest concentration of human-caused fires and a large portion of those chaparral lands degraded by high fire frequencies are directly adjacent to major transportation corridors such as county, state and federal highways passing through or near the National Forests, and privately owned areas in the interface/intermix. Electrical distribution systems and railroads have been linked to substantial fire occurrence in the corridors in addition to the vehicle fires along major transportation routes.

Fire occurrence data in the form of maps suggests that over the region as a whole, the impact of fires that start outside the forest, fires that start on private land inside the forest and along major transportation routes passing through the forest account for a majority of human-caused fire occurrences. Forest Service roads are not a major concern from a fire occurrence perspective, with notable exceptions in the vicinity of Big Bear Lake and Lytle Creek on the San Bernardino National Forest, and roads that provide access to target shooting areas on the Angeles and Cleveland National Forests. The Los Padres National Forest has a very sparse pattern of human-caused fires along Forest Service roads.

Target shooting as a recreational activity is a major fire management concern based on historical fire occurrence and fire suppression costs. Unmanaged shooting areas have resulted in a number of large expensive wildfires on each of the forests during the past decade. Since the Angeles National Forest converted to permitted shooting area operations that are managed, there has been a substantial reduction in suppression costs associated with target shooting.

## Key Indicators

In all alternatives, the key factors affecting wildfire management are suppression effectiveness, firefighter access, vegetation condition, the presence of transportation corridors, recreation use and the wildland-urban interface/intermix, with thousands of structures threatened by wildfire within the forests and tens of thousands of structures along the forest boundaries.

There are three strategies for dealing with the fire-prone West: convert the land to something less combustible, do the burning ourselves or rely on suppression. The United States needs to use all three options, and in innovative mixes (Pyne 2002). Each of the six alternatives provides this mix of all three options.

Key indicators have been identified to address the most important issues for fire management and to measure differences among the alternatives. The present trends in these indicators are discussed in the affected environment section, while various scenarios for future trends are estimated for each alternative in the

environmental consequences section below.

| Title | Goal (Desired Condition) | Indicator(s) |
|---|---|---|
| Wildland-urban Interface (WUI) | Reduce fire hazard in developed interface and intermix areas. Reduce potential for future expansion of the wildland-urban interface/intermix. | Miles of interface/intermix with high-hazard fuel conditions. Acres of WUI vegetation treatment. Complex land ownership patterns indicated by high levels of interface per square mile of land. |
| Suppression Effectiveness and Firefighter Access;Recreation Access | Increase effectiveness of suppression resources. | Access – acres of forest with less than ½-mile of road per square mile of forest. |

## Environmental Consequences

### Direct and Indirect Effects (General)

All alternatives emphasize implementation of the National Fire Plan in wildland-urban interface areas. It is anticipated that community protection effectiveness will increase as a result. The rate of accomplishment of community protection buffers, mortality removal and thinning depends on funding.

The planned mortality removal within community buffers will result in disturbance to the landscape in the interface/intermix area. The mechanical removal of dead trees and other dead vegetation is necessary for community protection. If not addressed now, with each passing year more and more dead trees will fall, creating an increased fire-spread risk on the ground and a major threat to public safety in the form of wildfires and falling trees along transportation and utility corridors. Leaving slash within mortality removal areas would not be permitted. All slash treatments would occur within 1 year of project completion.

At an enhanced budget level, the Forest Service can react quickly to the growing problem of threatened communities in dying forests. Reducing the threat to communities at this more rapid pace is the major difference between fire management at this enhanced budget level compared to current budget levels. Dead tree removal is essential to creating buffers between wildfires and threatened mountain communities. All treatments, including treatment of slash, are to be accomplished with one entry to ensure that projects do not contribute to wildfire concerns in the interface/intermix area.

The three counties that have declared vegetation mortality disasters are also supported by a state declaration. San Bernardino, Riverside and San Diego counties have each formed an interagency safety task force. Each task force reports difficult evacuation issues regarding multiple mountain communities, where the safety of the communities and problems with evacuation routes are considered life-threatening in light of the tree mortality in and around these communities.

Those areas that are treated will result in improvement in community protection, because in many areas the mortality has occurred in thick stands of trees in need of thinning. When mortality removal occurs within community buffers, all other planned treatments to meet buffer standards will also occur to ensure a one-time entry with only light maintenance required in the future.

Substantial progress is made outside the mortality areas on all four National Forests. Progress is made in reducing the fire threat to threatened communities. Fuelbreaks are maintained and constructed to confine fires to single watersheds or to the smallest number possible. In some cases, where community buffers are impractical, fuelbreaks around communities are installed at the forest boundary to provide for a limited degree of community protection. Large prescribed burns are implemented, often to greatly increase the width of fuelbreaks or to form a secondary line of community defense using fuelbreaks, natural features and wildfire areas as part of the chain. Structural loss is decreased because of increased defensible space and decreased hazardous fuels adjacent to communities. Wildfire and prescribed burns do not result in adverse effects on flood-control activities related to

**Table-110-Cause of Fire Occurrence 1970-1999, by Forest**

| Cause | Angeles | Cleveland | Los Padres | San Bernardino |
|---|---|---|---|---|
| **1970s** | | | | |
| Human Caused | 1,073 | 948 | 807 | 1,769 |
| Lightning | 191 | 116 | 171 | 551 |
| Total | 1,264 | 1,064 | 978 | 2,310 |
| **1980s** | | | | |
| Human Caused | 1,213 | 804 | 513 | 1,844 |
| Lightning | 169 | 101 | 185 | 485 |
| Total | 1,382 | 905 | 698 | 2,329 |
| **1990s** | | | | |
| Human Caused | 1,980 | 921 | 497 | 1,807 |
| Lightning | 210 | 75 | 143 | 370 |
| Total | 2,190 | 996 | 640 | 2,177 |

**Table-111-Key Fire Management Issues Ranked by Alternative Under Current (CUR) and Enhanced (ENH) Budget Levels**

| Management Issues | Alt 1 | | Alt 2 | | Alt 3 | | Alt 4 | | Alt 5 | | Alt 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CUR | ENH | CUR | ENH | CUR | ENH | CUR | ENH | CUR | ENH | CUR | ENH |
| Wildland Urban Interface | M | H | M | H | M | H | M | H | M | M | M | H |
| Suppression Effectiveness and Firefighter Access | M | H | M | H | M | H | M | H | M | H | M | L |
| Recreation Use and Transportation Corridors | M | M | M | M | H | H | M | M | M | M | H | VH |

*L=Low*
*M=Medium*
*H=High*
*VH=Very High*

**Table-113-Results Of Threat Assessment For Animal Species Of Conservation Concern In The Plan Area, Number Of Species In Each Threat Category**

| Federal or State Status | Number of Animal Species | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|---|
| Endangered | 25* | 5 | 3 | 0 | 6 | 10 | 1 |
| Threatened | 11 | 0 | 1 | 0 | 4 | 5 | 1 |
| Proposed | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Candidate | 2 | 2 | 0 | 0 | 0 | 0 | 0 |
| Sensitive | 33* * | 0 | 4 | 7 | 14 | 8 | 0 |
| State | 37 | 1 | 3 | 9 | 14 | 9 | 1 |
| Other | 88 | 1 | 6 | 18 | 42 | 19 | 2 |
| Total | 197 | 10 | 17 | 34 | 80 | 51 | 5 |

** Mohave Tui Chub is not present on the national forests. A hybridized form, not recognized as a federally listed species, is located on the San Bernardino N.F.*
** *Yellow-billed cuckoo is included within Candidate status.*

**Table-262—Recreational Target Shooting**

| Component | Los Padres | Angeles | San Bernardino | Cleveland |
|---|---|---|---|---|
| Concession-Operated Sites | None | A Place to Shoot<br>Burro Canyon | Lytle Creek Firing Line | |
| Permitted Gun Clubs: Limited or No Public Access | Winchester Gun Club<br>Ojai Gun Club | Desert Marksmen<br>Burbank | Big Bear Sportman's Club<br>Arrowhead Fish and Game Conservation Club | SERE Camp (DOD) |
| Designated Shooting Sites by Forest Order (Other Shooting Restrictions May Apply) | 3 sites along Camino Cielo | 3 sites temporarily closed since 1993. | Big Pine Flat<br>1N09<br>Lightning Gulch<br>Arrastre #1/#2<br>San Jacinto RD (part open) | |
| Remainder of Forest | Some areas closed by Forest Order, but primarily open. | Closed to shooting. | Closed to shooting. | Closed by District specific order, unless open. Open areas are Orosco Ridge and along Palomar Divide. |

**Table-263—Estimated Hunting and Fishing Activity Participation Range**

| Forest | Forest Visits | Hunting | Fishing |
|---|---|---|---|
| Angeles | 3.5 million | 3% | 12% |
| Cleveland | 0.8 million | 17% | 14% |
| Los Padres | 1.5 million | 1% | 5% |
| San Bernardino | No data | No data--surveying in 2003 | No data--surveying in 2003 |

**Table-264—Angeles National Forest Developed Ski Area Capacity (SAOT–Skiers At One Time)**

| Ski Area | SAOT |
|---|---|
| Mountain High | 6,500 |
| Mount Baldy | 2,000 |
| Ski Sunrise | 1,500 |
| Mount Waterman | 1,200 |
| Kratka Ridge/Snowcrest | 800 |
| **Total** | 12,000 |