# In the United States Court of Federal Claims

No. 06-707L
Filed: November 1, 2007

| | | |
|---|---|---|
| RICHARD CARY, et al., Plaintiffs, v. THE UNITED STATES, Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | Fifth Amendment Takings—The Forest Service's fire suppression policies cannot support a claim for inverse condemnation when the damage complained of was the result of a fire caused by an individual not acting as the government's agent. |

Mark S. Grotefeld, Grotefeld & Hoffmann, L.L.P., Chicago, Illinois, counsel for plaintiffs.

Heide L. Herrmann, with whom was Acting Assistant Attorney General Ronald J. Tenpas, U.S. Department of Justice, Environment and Natural Resources Division, Natural Resources Section, Washington, DC, counsel for defendant.

**ORDER**

WIESE, Judge.

Plaintiffs, fourteen landowners in Southern California, sue here for just compensation under the Fifth Amendment to the United States Constitution for damage to their properties resulting from a forest fire in the Cleveland National Forest that began on October 25, 2003. Plaintiffs maintain that the forest fire, although set by a lost hunter, was the consequence of the United States Forest Service's long-standing land management policies and that the losses they suffered therefore constitute a taking of property by the United States government.

The case is currently before the court on defendant's motion for judgment on the pleadings on the ground that the complaint, on its face, fails to state a basis for relief under the Fifth Amendment. The court heard oral argument on defendant's

motion on October 16, 2007. At the close of the argument, the court entered a bench ruling in defendant's favor. This order explains more fully the basis for that ruling.

I.

The Cleveland National Forest (the "Forest") is the southernmost national forest in the state of California, located just north of Mexico and east of the city of San Diego. The Forest comprises some 460,000 acres of varying terrain. On October 25, 2003, a group of individuals was granted access to a remote area of the Forest to hunt deer. One of these hunters, who had become separated from the group, started a small fire in an attempt to signal for help. The fire, referred to as the Cedar Fire, quickly spread out of control, however, and over the next five days burned more than 273,000 acres of woodland, 2,232 private residences, 22 commercial structures, and 566 outbuildings, making it, at the time, the largest fire in California history. Tragically, the Cedar Fire also claimed the lives of fourteen civilians and one firefighter.

According to plaintiffs' complaint, extreme fire hazard conditions existed within the Forest on or before the time the Cedar Fire began. These conditions, plaintiffs contend, were due in large part to the Forest Service's decades-long policy of suppressing naturally occurring fires in favor of preserving natural resources for the benefit of the public, thus contributing to the growth of unnaturally dense stands of trees and to the creation of highly flammable fuel loads in the Forest. Plaintiffs maintain that the fire risks associated with these land management policies were further heightened by the public's use of the Forest lands for recreational purposes, such as hunting, which the Forest Service not only permitted but in fact encouraged. Plaintiffs thus argue that as a result of these policies, a major conflagration—originating within the Forest but spreading beyond the Forest boundaries to engulf adjacent properties—was a virtual certainty. Plaintiffs additionally note that such a major conflagration was not only predictable but in fact was predicted by the Forest Service significantly in advance of the Cedar Fire. Plaintiffs thus view their losses as the certain result of deliberate policy choices made by the Forest Service acting in full awareness of the risks those policies entailed. Such deliberate action, plaintiffs claim, constitutes a taking of their property by inverse condemnation.

II.

In considering defendant's motion for judgment on the pleadings, we must accept the truth of the facts as set forth in the complaint. Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (holding that the court must "assume

all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant"). The question, then, is whether, as a matter of law, plaintiffs' facts establish a taking of property by inverse condemnation. We conclude that they do not.

"Inverse condemnation is a 'shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.'" Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (quoting United States v. Clarke, 445 U.S. 253, 257 (1980)). Fundamentally, inverse condemnation is a cause of action grounded on invasive government activity, initiated without the benefit of a formal exercise of the power of eminent domain, that results in the prolonged or continuous interference with an owner's use and enjoyment of his property. Id.

To succeed on a claim alleging inverse condemnation, a property owner must prove that "the government intend[ed] to invade a protected property interest or [that] the asserted invasion [was] the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" Ridge Line, Inc. v. United States, 346 F.3d 1346, 1356 (Fed. Cir. 2003) (quoting Columbia Basin Orchard v. United States, 132 Ct. Cl. 445, 450 (1955)). To bring themselves within the framework of this requirement, plaintiffs identify as the government action giving rise to their claim the various land management policies—the statutes, directives, and goals—that drive and inform the government's management of the Forest.[1] Plaintiffs argue that these policies "as designed, carried with them the direct, natural, probable, and foreseen result of damage by fire to lands adjacent to the [Forest]," in particular that "disturbance to the fire regime in the [Forest] directly, naturally, and foreseeably led to the increased magnitude and spread of the Cedar Fire and the resulting damage to Plaintiffs' properties."

In making their case, plaintiffs rely on a series of inverse condemnation cases involving damage by flood as analytically similar to their own situation. Plaintiffs point, for example, to Cotton Land Co. v. United States, 109 Ct. Cl. 816 (1948), a case in which the government's impoundment of water behind the Parker Dam led, over a period of years, to the build-up of the river bed above the dam through the disposition of sand and thus eventually to the permanent flooding of the plaintiffs'

---

[1] Included among the statutes that plaintiffs identify as comprising part of the government's land management policies are the Organic Administration Act (16 U.S.C. § 475 et seq.), the National Environmental Policy Act (42 U.S.C. § 4321 et seq.), the Federal Advisory Committee Act (5 U.S.C. App. 2), the Endangered Species Act (16 U.S.C. § 1531 et seq.), the Clean Water and Clean Air Acts (33 U.S.C. § 1251 et seq. and 42 U.S.C. § 7401 et seq.), and the National Forest Management Act (16 U.S.C. § 1600 et seq.).

upstream properties. In concluding that a taking had in fact occurred, the court explained:

> The events which occurred, although they took some time, were only the natural consequences of the collision of sediment-bearing flowing water with still water, and the progress upstream, of the deposit begun by that collision. If engineers had studied the question in advance they would, we suppose, have predicted what occurred.

Id. at 829. The court thus saw the invasion of plaintiffs' land as "the actual and natural consequence of the Government's act." Id.

Just as the government's disruption of the river flow in Cotton Land led to an alteration of the river's ecology and ultimately to the river's invasion of the claimants' lands, plaintiffs argue that here, too, the government's disruption of naturally occurring fires as a seasonal element in the Forest's regime led to an alteration of the Forest's ecology and ultimately to the creation of a condition that invaded plaintiffs' lands. For plaintiffs, then, the loss of their properties by fire was as foreseeable a result of the government's action as was the loss of the plaintiffs' lands by flooding in Cotton Land.

Although plaintiffs argue their position well, we cannot accept it. Our difficulty is not with the foreseeability of the harm plaintiffs suffered but with the cause of the harm. At their core, claims of inverse condemnation involve physical invasions of private property by forces that the government itself has set into motion. That is not the case here. The government did not cause the Cedar Fire. Rather, as the facts demonstrate, a hunter started the fire. And unless one is prepared to say that the hunter was acting as the government's agent, causation cannot be attributed to the government. It must follow, then, that since the government was not an actor, it cannot be a taker.

In reaching this conclusion, we remain mindful of plaintiffs' assertion that the Forest Service's fire suppression policies heightened the risk of a major conflagration. That fact may be relevant to a tort theory (a point on which the court intends to express no opinion), but not to a takings theory. What plaintiffs may challenge here under the Fifth Amendment is what the government actually did; not the effects to which its land management policies may indirectly have contributed.

III.

For the reasons announced at oral argument and as further explained above, defendant's motion for judgment on the pleadings is granted. The Clerk is directed to enter judgment dismissing plaintiffs' complaint. No costs.

s/John P. Wiese
John P. Wiese
Judge